SPERTUS, LANDES & UMHOFER, LLP
James W. Spertus (SBN 159825)
Samuel A. Josephs (SBN 284035)
1990 South Bundy Dr., Suite 705
Los Angeles, California 90025
Telephone: (310) 826-4700
Facsimile:  (310) 826-4711

Attorneys for Defendant Karen Sarkissian

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                         Plaintiff,<br><br>         v.<br><br>KAREN SARKISSIAN,<br><br>                         Defendant. | CASE NO.  CR 13-00719(A)-4-PSG<br><br>**DEFENDANT KAREN SARKISSIAN'S SENTENCING POSITION; EXHIBITS 1-58**<br><br>DATE:         September 12, 2016<br>TIME:         10:00 a.m. |

    Defendant Karen Sarkissian, by and through his counsel of record, hereby respectfully submits his Sentencing Brief.

Dated:  August 12, 2016         Respectfully submitted,

                               SPERTUS, LANDES & UMHOFER, LLP

                               By:   /S Samuel A. Josephs_____
                                   James W. Spertus
                                   Samuel A. Josephs
                                   Attorneys for Karen Sarkissian

Spertus, Landes & Umhofer, LLP
1990 S. Bundy Dr., Suite 705
Los Angeles, CA 90025
Tel: 310-826-4700; Fax: 310-826-4711

# **TABLE OF CONTENTS**

**PAGE**

I.    INTRODUCTION ................................................................. 1

II.   THE ADVISORY GUIDELINES RANGE ................................. 3

    A.   The Government's Burden is to Prove Loss by Clear and
        Convincing Evidence ....................................................... 3

    B.   The Government Has Not Proved that All Medicare Billings
        Were Fraudulent ............................................................... 4

    C.   The Government Has Not Proved Intended Loss More than
        $1M ................................................................................ 6

    D.   There is No *Ex Post Facto* Issue Since Loss is Less than $1M....... 8

    E.   The Obstruction of Justice Enhancement Does Not Apply ............. 9

    F.   Objection to Paragraphs 40 and 50: There is Insufficient
        Evidence of Money Laundering to Med Tech ........................... 10

    G.   The Appropriate Guidelines Calculation ........................................ 12

III.  THE STAUTORY SENTENCING FRAMEWORK ................................. 12

    A.   History and Characteristics of the Defendant ............................... 13

        1.   Mr. Sarkissian's upbringing in Armenia and commitment
            to family ........................................................................ 14

        2.   Mr. Sarkissian's altruistic nature ......................................... 15

        3.   Mr. Sarkissian's community depends on him....................... 17

        4.   Mr. Sarkissian lives a modest life ...................................... 19

    B.   Nature and Circumstances of the Offense ................................... 20

    C.   Mr. Sarkissian's Deportation from the United States Should Be
        a Factor When Considering the Need for Deterrence and
        Punishment ....................................................................... 21

IV.   CONCLUSION.................................................................... 23

i.

Spertus, Landes & Umhofer, LLP
1990 S. Bundy Dr., Suite 705
Los Angeles, CA 90025
Tel: 310-826-4700; Fax: 310-826-4711

# TABLE OF AUTHORITIES

**PAGE**

## CASES

*Gall v. United States*,
    552 U.S. 38, 50 (2007) ...................................................................... 13

*Kimbrough v. United States*,
    552 U.S. 85, 109-111 (2007) ............................................................ 12

*Koon v. United States*,
    518 U.S. 81, 113 (1996) .................................................................... 13

*Padilla v. Kentucky*,
    559 U.S. 356, 365-66 (2010). ........................................................... 22

*Pepper v. United States*,
    562 U.S. 476, 488 (2011) (quoting *Williams*, 337 at 246) ............... 13

*Peugh v. United States*,
    133 S.Ct. 2072, 2080 (2013) ....................................................... 12, 13

*Rita v. United States*,
    551 U.S. 338, 351-52 (2007) ....................................................... 12, 13

*United States v. Berger*,
    587 F.3d 1038, 1048 (9th Cir. 2009) ................................................... 4

*United States v. Carty*,
    520 F.3d 987, 991 (9th Cir. 2008) (en banc) ................................ 12, 13

*United States v. Gambaryan*, ---
    F. App'x ----,  2016 WL 3619984, at *1 (9th Cir. July 5, 2016) ............... 5, 6, 8

*United States v. Miller*,
    316 F.3d 495, 504-05 (4th Cir. 2003) .................................................. 7

*United States v. Popov*,
    742 F.3d 911, 913 (9th Cir. 2014) ....................................................... 7

Spertus, Landes & Umhofer, LLP
1990 S. Bundy Dr., Suite 705
Los Angeles, CA 90025
Tel: 310-826-4700; Fax: 310-826-4711

ii.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Spertus, Landes & Umhofer, LLP
1990 S. BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TEL: 310-826-4700; FAX: 310-826-4711

*United States v. Semrau,*
No. 2:07–CR–10074–JPM., 2011 WL 9258, *4 (W.D. Tenn. 2011) ................ 7

*United States v. Singh,*
390 F.3d 168, 193-94 (2d Cir. 2004) ...................................................... 7

*United States v. Staten,*
466 F.3d 708, 720 (9th Cir. 2006) ......................................................... 3

*United States v. Treadwell,*
593 F.3d 990, 1000 (9th Cir. 2010) ....................................................... 4

*Wasman v. United States,*
468 U.S. 559, 564 (1984) ..................................................................... 14

*Williams v. New York,*
337 U.S. 241, 247 (1949) ..................................................................... 13

## **STATUTES**

18 U.S.C. § 3553(a) ...................................................................... 12, 13

## **OTHER AUTHORITIES**

U.S.S.G. § 2B1.1(b)(7) ........................................................................ 8

U.S.S.G. § 3C1.1 .......................................................................... 9, 10

U.S.S.G. § 3C1.1 cmt. nn. 4-5, 7 ....................................................... 10

iii.

KAREN SARKISSIAN'S SENTENCING BRIEF

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Spertus, Landes & Umhofer, LLP
1990 S Bundy Dr., Suite 705
Los Angeles, CA 90025
Tel: 310-826-4700; Fax: 310-826-4711

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## INTRODUCTION

The story that is alleged in the Presentence Report (PSR) is wholly inconsistent with the evidence received over the course of the four-week trial in this case.  The PSR tells the tale of an office manager, Mr. Sarkissian, who intended financial loss of $1.2 million to Medicare; of a clinic, the Sunset Clinic, at which **no** medically necessary services were performed; and of money laundering through not one, but two, government cooperators.  That is not what witnesses testified about at trial, or what the evidence showed.

In fact, the trial conclusively established the following:  *First*, the Sunset Clinic treated real patients, who were administered real treatment, with no patient ever reporting being paid to visit the clinic.  Sunset Clinic patients and employees established those facts beyond dispute, as well as the fact that patients came to the clinic through word-of-mouth and walk-in appointments.  *Second*, L'Tanya Smith treated patients at the clinic and made all medical decisions regarding their care; Mr. Sarkissian played no role whatsoever in patient care.  Sunset Clinic employees also confirmed this to be true.  *Third*, the government never alleged, let alone established, what amount of Medicare billings the government believed to be fraudulent.  Indeed, Special Agent Nancy Kevany testified that not all billings were the result of medically unneccessary tests, that 58% of patients returned for follow-up visits, and that 96% of patients were from the Southern California area.  *Fourth*, payments to the Sunset Clinic were half of what the PSR alleged.  CMS auditor, Angelo Cruz, testified that the clinic billed a total of $660,756, and that Medicare overpaid $313,955.54.  That overpayment was based on issues unrelated to medical necessity, which must be shown to establish criminal liability.  *Finally*, neither Jerayr Rostamian nor Special Agent Darrell

1.

1 Twedt, the two witnesses who testified in connection with alleged money

2 laundering conduct, testified there was anything illegal about the conduct they

3 described.

4     Due process requires that sentencing be based on reliable facts, and the

5 facts received at trial tell a far different story from that which is contained in the

6 PSR. This is a case in which the government proved at trial that L'Tanya Smith

7 administered five allergy tests to five patients that were not medically necessary

8 and that Mr. Sarkissian knew that those five tests should not have been billed to

9 Medicare. (*See* Exhibit 1, Feb. 24, 2016, Trial Tr. at 24:22-25 (government

10 arguing Mr. Sarkissian, not L'Tanya Smith, should not have billed Medicare for

11 those five allergy tests); Exhibit 2, Tr. Exhibit 613, p. 10: Miguel Ponce

12 Superbill.) The total amount billed for those five tests was $2,300. The

13 government also charged that Mr. Sarkissian negotiated six checks made payable

14 to UFA or IFA, and that those six checks represented the proceeds of healthcare

15 fraud. Those checks totaled $49,040.

16     The Guidelines range in this case is properly calculated to be 10-16 months.

17 Given Mr. Sarkissian's lack of any prior criminal conduct, the hardship he and his

18 family have endured in fleeing his native country and coming to live in the United

19 States, where he has almost single-handedly raised his son, and the non-violent

20 nature of his offense, Mr. Sarkissian respectfully requests a sentence at the low-

21 end of that range.

## II.

## FACTUAL OBJECTIONS TO THE PSR

24     Mr. Sarkissian lodges the following factual objections to the PSR.[1]

25 **A.**    **Paragraph 31**

---

[1]     Mr. Sarkissian's remaining objections are set forth, *infra*.

KAREN SARKISSIAN'S SENTENCING BRIEF

Spertus, Landes & Umhofer, LLP
1990 S Bundy Dr., Suite 705
Los Angeles, CA 90025
Tel: 310-826-4700; Fax: 310-826-4711

Mr. Sarkissian objects to paragraph 31 of the PSR and its finding that "Bascoy only went to Sunset Clinic on a few occasions; there is no evidene that he ever saw patients there."  PSR ¶ 31.

At trial, Sunset Clinic employees Silvia Perez and Maria del Carmen Lopez testified that Dr. Bascoy visited the Sunset Clinic as frequently as two to three times per week, or as infrequently as every two weeks.  (Exhibit 3, Feb. 9, 2016, Trial Tr. at 19:21-20:9; 33:10-18.)  According to Ms. Lopez, Dr. Bascoy reviewed charts and brought paychecks.  (Exhibit 3, Feb. 9, 2016, Trial Tr. at 33:10-18.)

### III.

### THE ADVISORY GUIDELINES RANGE

The Probation Office has calculated an advisory Sentencing Guidelines range of 51 to 63 months, based on a total offense level of 24 and Criminal History Categoy I.  Driving the Probation Office's Guidelines calculation is its finding that Mr. Sarkissian's intended loss to Medicare is $1,232,329.  (PSR ¶ 57.)  That calculation, however, is erroneous.

**A.   The Government's Burden is to Prove Loss by Clear and Convincing Evidence**

As an initial matter, it is the government's burden to prove by clear and convincing evidence that the loss in this case justifies a 16-level enhancement, both because that loss would result in a disproportionate impact on the ultimate sentence and  because it is based on uncharged conduct.  The Ninth Circuit has held that "facts found in support of Guidelines enhancements that turn out to have a disproportionate impact on the ultimate sentence imposed [must] be established by clear and convincing evidence."  *United States v. Staten*, 466 F.3d 708, 720 (9th Cir. 2006).  The exception to the rule applying the clear and convincing standard, as opposed to the preponderance standard, is in cases "where sentencing enhancements for financial loss are based on the extent of the fraud ***conspiracy***."

KAREN SARKISSIAN'S SENTENCING BRIEF

Spertus, Landes & Umhofer, LLP
1990 S. Bundy Dr., Suite 705
Los Angeles, CA 90025
Tel: 310-826-4700; Fax: 310-826-4711

Spertus, Landes & Umhofer, LLP
1990 S. Bundy Dr., Suite 705
Los Angeles, CA 90025
Tel: 310-826-4700; Fax: 310-826-4711

1  *United States v. Berger*, 587 F.3d 1038, 1048 (9th Cir. 2009) (emphasis added);

2  *see also United States v. Treadwell*, 593 F.3d 990, 1000 (9th Cir. 2010) (citing

3  *Berger* and holding that "sentencing determinations relating to the extent of a

4  criminal conspiracy need not be established by clear and convincing evidence").

5        Here, Mr. Sarkissian was not charged with conspiracy to commit health care

6  fraud, but rather five substantive counts of healthcare fraud.  Thus the Probation

7  Office's loss enhancement, which attributes to Mr. Sarkissian hundreds of

8  thousands of dollars of fraud, is based on uncharged conduct.  In addition,

9  considering the loss relating only to the instances of fraud for which Mr.

10  Sarkissian was convicted ($2,300) would result in a Guidelines range of  0 to 6

11  months.  The 16-level enhancement called for by the Probation Office increases

12  that range to 41 to 51 months.  The clear and convincing standard of proof

13  therefore applies.

14  **B.**    **The Government Has Not Proved that All Medicare Billings Were**

15         **Fraudulent**

16        Under the clear and convincing standard, the government has not proved

17  that Mr. Sarkissian intended to defraud Medicare out of $1,232,329.[2]  The

18  evidence at trial established that the Sunset Clinic saw real patients, that none of

19  those patients were paid to come to the clinic, and that the vast majority of

20  patients received medically necessary services.  While the evidence at trial

21  focused on five patients who were the subject of five medically unneccesary

22  allergy tests, the Sunset Clinic saw approximately 951 patients.  (Exhibit 4, Feb.

23  11, 2016, Trial Tr. at 60:16-18.)  There was no evidence presented that Medicare

24  was billed for medically unnecessary services for any of these other patients.  In

25  fact, at trial, the government conceded that not all Medicare billings were

26

27  _____

   [2]    Even if the Court were to apply the preponderance of the evidence standard,

28  the government has not carried its burden of proof.

KAREN SARKISSIAN'S SENTENCING BRIEF

fraudulent.  This is not a case where the government proved at trial any condition precedent to using all amounts billed to Medicare as the loss measure, such as cases involving doctors who purchase patient data to fraudulently bill for services never provided.  The Sunset Clinic was a real clinic that saw real patients in need of real medical care.

The Ninth Circuit recently addressed this exact issue in a case involving substantially similar facts.  In *United States v. Gambaryan*, 2:14-cr-00249-ODW, the defendant was convicted of four counts of healthcare fraud for billing Medicare for medically unneccessary power wheelchairs.  At trial, the four beneficiairies at issue testified.  In addition, the evidence showed that the defendant filled prescriptions from 123 different doctors, and that thirty-four of those doctors were listed in a Medicare database as being identified as a fraudulent provider.  *See United States v. Gambaryan*, --- F. App'x ----,  2016 WL 3619984, at *1 (9th Cir. July 5, 2016).  There was no evidence presented that any of the other eighty-nine doctors wrote fraudulent prescriptions, nor was there any evidence as to the number of power wheeelchairs predicated on prescriptions written by the thirty-four fraudulent doctors.  *Id.*

At sentencing, the government argued that intended loss should be calculated according to the total amount billed to Medicare based on a "permeated with fraud argument," that is, "the government spent a great deal of time [at trial] presenting evidence of the overarching fraud scheme in an effort to show, and I think successfully, that Mr. Gambaryan's business was completely permeated with fraud."  (Exhibit 5: Sentencing Transcript from *United States v. Gambaryan*, 2:14-cr-00249-ODW, at 9:13-16.)  The evidence that Gambaryan's business was "permeated with fraud" consisted of: (1) testimony from the top five referring physicians that none signed any of the prescriptions filled by Gambaryan; (2) testimony from a marketer that there was fraud at clinics related to

5.

KAREN SARKISSIAN'S SENTENCING BRIEF

Spertus, Landes & Umhofer, LLP
1990 S Bundy Dr., Suite 705
Los Angeles, CA 90025
Tel: 310-826-4700; Fax: 310-826-4711

Spertus, Landes & Umhofer, LLP
1990 S Bundy Dr., Suite 705
Los Angeles, CA 90025
Tel: 310-826-4700; Fax: 310-826-4711

1   Gambaryan; (3) large cash withdrawals from Gambaryan's bank account; (4) the

2   long distances beneficiaries lived from the clinics; and (5) photocopies of

3   beneficiary signatures.  (Exhibit 5, at 9-11.)  For purposes of calculating intended

4   loss, the defense argued there was insufficient evidence to find that the entire

5   amount Gambaryan billed to Medicare was fraudulent.  (Exhibit 5, at 16:17-21,

6   17:10-13, 18:1-15.)  The district court accepted the government's theory, and

7   found intended loss to be the entire amount Gambaryan billed to Medicare.

8   (Exhibit 5, 24:14-20.)

9       On appeal, the Ninth Circuit reversed.  *Gambaryan*, --- F. App'x ----,  2016

10  WL 3619984.  It held that "the evidence at trial was not sufficiently clear and

11  convincing to justify the assumption that nearly the entire amount billed for power

12  wheelchairs was fraudulent." *Id.*at *2.  While *Gambaryan* is not a published

13  decision, it is clearly persuasive given the nearly identical set of facts to Mr.

14  Sarkissian's case.  As in *Gambaryan*, the government has not carried its burden of

15  proving intended loss of $1,232,329, which the Probation Office believes to be the

16  total amount the Sunset Clinic billed to Medicare.  In the face of evidence that the

17  Sunset Clinic saw real patients, and performed real, medically necessary tests on

18  many of those patients, the government has not established what Medicare billings

19  in particular were fraudulent, nor the amounts associated with those fraudulent

20  billings that would meet the definition of intended loss, as discussed further *infra*.

21  **C.    <u>The Government Has Not Proved Intended Loss More than $1M</u>**

22      In addition to the fact that there is no evidence that all of the Sunset Clinic's

23  medical billings were fraudulent, there are additional errors in the Probation

24  Officer's loss calculations.

25      First, the Probation Office calculates intended loss based on the amount the

26  Sunset Clinic billed Medicare, as opposed to the amount Medicare paid per the

27  Medicare fee schedule.  At trial, however, the evidence clearly established that

28

6.

KAREN SARKISSIAN'S SENTENCING BRIEF

Spertus, Landes & Umhofer, LLP
1990 S Bundy Dr., Suite 705
Los Angeles, CA 90025
Tel: 310-826-4700; Fax: 310-826-4711

1  healthcare providers are required to bill Medicare based on the provider's normal
2  and customary rates, even though the provider knows he or she will only be
3  reimbursed pursuant to the Medicare fee schedule.  (Exhibit 6, Feb. 4, 2016, Trial
4  Tr. at 10:4-13:2.)  Consistent with the Medicare rules, the Sunset Clinic billed
5  Medicare based on its normal and customary rates, knowing that Medicare would
6  not pay those rates, but would pay claims according to the Medicare fee schedule.
7  (*See* Exhibit 7, Declaration of Gary Sarkissian ¶ 2.)  Mr. Sarkissian is aware of the
8  practice of billing Medicare based on a healthcare provider's normal and
9  customary rates, knowing full well that Medicare will not pay the provider what
10  the provider billed, but rather will pay claims based on the Medicare fee schedule.
11  (*See* Exhibit 7, Declaration of Gary Sarkissian ¶ 3.)

12          In *United States v. Popov*, 742 F.3d 911, 913 (9th Cir. 2014), the court
13  recognized that "Medicare assigns an allowed amount to each of its covered
14  services pursuant to a fixed fee schedule and pays the provider approximately
15  eighty percent of the allowed amount."  Accordingly, *Popov* held that the amount
16  billed to Medicare shall constitute prima facie evidence of intended loss for
17  sentencing, but that such evidence may be rebutted by other evidence in the record
18  that the defendant was familiar with Medicare's billing and payment practices
19  such that the billed amount does not accurately reflect the defendant's intent. *Id.*
20  at 916; *see also United States v. Semrau*, No. 2:07–CR–10074–JPM., 2011 WL
21  9258, *4 (W.D. Tenn. 2011) (acknowledging that where a defendant presents
22  evidence that he was "knowledgeable regarding the government's fee schedules
23  and the differences between what is billed to Medicare and what is reimbursed,
24  the loss calculation should be determined based on the paid amount.  This loss
25  amount more accurately reflects the loss a defendant intended to cause through his
26  fraudulent scheme.") (citing *United States v. Singh*, 390 F.3d 168, 193-94 (2d Cir.
27  2004) and *United States v. Miller*, 316 F.3d 495, 504-05 (4th Cir. 2003)).

28

KAREN SARKISSIAN'S SENTENCING BRIEF

1   Such evidence is present here.  (*See* Exhibit 7, Declaration of Gary

2   Sarkissian ¶ 3.)  Therefore, intended loss should be calculated not based on what

3   the Sunset Clinic billed for medically unneccessary claims, but what Medicare

4   paid according to its fee schedule ***for those claims.***

5   Second, at trial, Medicare fraud investigator Angelo Cruz testified that from

6   July 10, 2009, to March 25, 2010 (the same time frame the Probation Officer uses

7   to calculate loss), the Sunset Clinic billed a total of $660,756, of which Medicare

8   allowed $586,346.47, and paid $462,496.50.  (*See* Exhibit 8: Trial Exhibit 7.)  The

9   government has argued that those amounts do not include wholly denied claims,

10  which the government says are included in the figures Special Agent Nancy

11  Kevany testified about at trial.  But nowhere in Angelo Cruz's testimony does he

12  state that Medicare's own audit of the Sunset Clinic did not include anything other

13  than all claims billed to Medicare.

14  In any event, neither $660,756, nor $1,232,329, accurately reflect the

15  amount billed for fraudulent claims.  The government has made no effort to

16  distinguish medically necessary from unneccessary claims, and yet it is required to

17  do so by clear and convincing evidence.  *See Gambaryan*, 2016 WL 3619984, at

18  *2.

19  **D.   There is No *Ex Post Facto* Issue Since Loss is Less than $1M**

20  Next, in the PSR, the Probation Officer applies the November 1, 2009

21  edition of the Guidelines Manual because it believes there is an *ex post facto* issue

22  in this case.  According to the Probation Officer, if the Court were to apply the

23  2015 version of the Guildines there would be a two-level enhancement under

24  U.S.S.G. § 2B1.1(b)(7) because Probation believes this case involved loss to a

25  Government healthcare program more than $1,000,000; that enhancement was not

26  in effect when Mr. Sarkissian committed the offense, thus the apparent *ex post*

27  *facto* issue.

28

8.

Spertus, Landes & Umhofer, LLP
1990 S Bundy Dr., Suite 705
Los Angeles, CA 90025
Tel: 310-826-4700; Fax: 310-826-4711

Any apparent *ex post facto* issue, however, is not inuring to Mr. Sarkissian's benefit.  Under the 2009 version of the Guidelines, Mr. Sarkissian does not receive the benefit of the updated loss table in section 2B1.1.  For example, the 2009 loss table includes a 16-level enhancement where loss is greater than $1 million, but under the 2015 loss table loss must be greater than $1.5 million to warrant the 16-level enhancement.  Therefore, whatever benefit Mr. Sarkissian would receive by using the 2009 version and not applying the two-level enhancement for more than $1 million loss to a Government healthcare program, that benefit is cancelled out by application of the 2009 loss table.

The Court need not resolve this conflict.  There is no *ex post facto* issue in this case because loss is not greater than $1,000,000.  Indeed, the evidence at trial established loss to a Government healthcare program of approximately $2,300, though it is not known what Medicare actually paid under its fee schedule for the five allergy tests the jury found to be medically unneccessary.  Because loss is far less than $1,000,000, and there is no *ex post facto* issue, this Court should apply the November 2015 edition of the Guidelines.

**E.    The Obstruction of Justice Enhancement Does Not Apply**

The Probation Office has also recommended that, pursuant to U.S.S.G. § 3C1.1, a two-level enhancement for obstruction of justice should apply based on the delegation of services agreement (DSA) that Dr. Bascoy produced to Medicare during Medicare's 2009 audit of the Sunset Clinic.  Not only is there insufficient evidence that the DSA was fraudulent, there is no evidence that Mr. Sarkissian obstructed the investigation, prosecution, or sentencing of the instant offense when Dr. Bascoy produced the DSA to Medicare auditor Angelo Cruz.  Mr. Sarkissian objects to application of that enhancement.

Mr. Sarkissian agrees with many of the same arguments the government raised when it objected to the obstruction of justice enhancement as applied to

9.

KAREN SARKISSIAN'S SENTENCING BRIEF

Spertus, Landes & Umhofer, LLP
1990 S Bundy Dr., Suite 705
Los Angeles, CA 90025
Tel: 310-826-4700; Fax: 310-826-4711

1  codefendant L'Tanya Smith.  *See* Gov't Response to Presentence Report for

2  Defendant L'Tanya Smith, Dkt. No. 338.  Most notably, not only is Dr. Bascoy's

3  interview with Medicare auditor Angelo Cruz the only evidence questioning the

4  authenticity of the DSA, but nowhere in Dr. Bascoy's interview does he even

5  claim that the DSA is not a valid representation of his agreement with Physican

6  Assistant L'Tanya Smith.  Rather, while Dr. Bascoy indicated that he did not

7  prepare the DSA, he acknowledged signing it, and gave no indication that the

8  DSA was not otherwise valid. The DSA was, in addition, produced to Medicare

9  by Dr. Bascoy, not Mr. Sarkissian.  In any event, as the government points out,

10 Dr. Bascoy is unavailable as a witness and therefore Mr. Sarkissian is unable to

11 examine him on the issue.

12      As the government notes, even if the Court were to find the DSA to be

13 invalid, preparing a false DSA is entirely encompassed within the offense of

14 conviction.  The enhancement for obstruction of justice applies where there has

15 been some further conduct on behalf of the defendant, ***in addition to his offense***

16 ***conduct***, that has not already adequately been taken into account by the guideline

17 for that conduct.  *See* U.S.S.G. § 3C1.1 cmt. nn. 4-5, 7 (listing examples of

18 covered and uncovered conduct).  That is not the case here.

19 **F.**   **Objection to Paragraphs 40 and 50: There is Insufficient Evidence of**

20       **Money Laundering to Med Tech**

21      Next, Mr. Sarkissian objects to paragraphs 40 and 50 of the PSR.  The

22 Probation Office includes, as relevant conduct, allegations that Mr. Sarkissian

23 laundered $88,574.90 through Jerayr Rostamian and his company Med Tech.  *See*

24 PSR ¶ 40.  The inclusion of an additional $88,574.90 in loss would add two-levels

25 to the Guidelines range, since the loss in connection with the counts of conviction

26 equals $51,340 (resulting in a six-level increase under section 2B1.1), whereas an

27 additional $88,574.90 would total $139,914.90 (resulting in an eight-level increase

28

10.

Spertus, Landes & Umhofer, LLP
1990 S Bundy Dr., Suite 705
Los Angeles, CA 90025
Tel: 310-826-4700; Fax: 310-826-4711

Spertus, Landes & Umhofer, LLP
1990 S BUNDY DR, SUITE 705
LOS ANGELES, CA 90025
TEL: 310-826-4700; FAX: 310-826-4711

under section 2B1.1).  At trial, however, there was no evidence either that: (1) the checks Rostamian cashed for Mr. Sarkissian were the proceeds of illegal activity, or (2) Mr. Sarkissian had any knowledge that the checks involved criminally derived property.[3]

As to the first issue, Rostamian testified at trial that he had ***no idea*** where the checks that he cashed for Mr. Sarkissian came from, or whether they were the proceeds of illegal activity.  (Exhibit 9, Feb. 16, 2016, Trial Tr. at 26:11-27:2.)  Nor did the government present any evidence that those checks, in fact, represented the proceeds of illegal activity.  Rostamian also testified that he did not know what money laundering was, but rather defined it as "cashing checks."[4]  (Exhibit 9, Feb. 16, 2016, Trial Tr. at 25:25-26:10; 27:6-14.)  The jury made no finding with respect to the checks Rostamian cashed because Mr. Sarkissian was not charged with money laundering through Med Tech.

As to the second issue, the evidence at trial established that Mr. Sarkissian knew Rostamian to provide legitimate medical supplies.  (Exhibit 9, Feb. 16, 2016, Trial Tr. at 14:11-15:18.)  Rostamian provided legitimate medical supplies for Mr. Sarkissian at the Sunset Clinic (*see id.*),  as well as for Mr. Sarkissian when Mr. Sarkissian worked for Eagle-1 healthcare, (Exhibit 9, Feb. 16, 2016, Trial Tr. at 18:13-21:9.).  Thus, there was insufficient evidence presented at trial to establish that Mr. Sarkissian would have known that the checks Rostamian

---

[3]    Each element is required for the Med Tech checks to constitute money laundering, and thus relevant conduct.

[4]    For similar reasons,  Mr. Sarkissian objects to the characterization of his meetings with a confidential source in June and July 2009 as "laundering" $25,555.  There was no evidence introduced at trial that the checks involved in those transactions were the proceeds of criminal activity (in fact, it was affirmatively established that the money was government money), or that Mr. Sarkissian had any knowledge or belief that the checks involved criminally derived property.  While the Probation Office did not include any of this as relevant conduct, Mr. Sarkissian objects to any finding in paragraphs 68-69 of the PSR that he laundered money for the confidential source.

11.

KAREN SARKISSIAN'S SENTENCING BRIEF

cashed involved criminally derived property.  The jury was not asked to resolve any of these issues,  and the PSR's findings with respect to money laundering through Med Tech are unsupported by the trial evidence.

## G.   The Appropriate Guidelines Calculation

Based on the above analysis, the total offense level should be 12:

| | | |
|---|---|---|
| Base Offense Level: | +6 | [U.S.S.G § 2B1.1(a)(2)] |
| Loss less than $95k: | +6 | [U.S.S.G. § 2B1.1(b)(1)(D)] |

**Total Offense Level:**      **12**

**Guidelines Range:**      **10-16 months**

### IV.

### THE STATUTORY SENTENCING FRAMEWORK

Under the parsimony principle in 18 U.S.C. § 3553(a), the Court must arrive at a sentence sufficient, but not greater than necessary, to achieve the goals of sentencing.  *See* 18 U.S.C. § 3553(a).  The Supreme Court has stressed that the parsimony principle—not the Guidelines—is the most important overall factor in a court's sentencing decision. *Kimbrough v. United States*, 552 U.S. 85, 109-111 (2007).  While "the Guidelines should be the starting point and the initial benchmark," the district court "must then consider the arguments of the parties and the factors set forth in § 3553(a)." *Peugh v. United States*, 133 S.Ct. 2072, 2080 (2013) (internal quotation marks omitted).  "The district court  may not presume that the guideline range is reasonable." *Peugh*, 133 S. Ct. at 2080 (internal quotation marks omitted); *see also Rita v. United States*, 551 U.S. 338, 351-52 (2007).  The Guidelines are not to be given more weight or consideration than any other factor in the sentencing analysis. *United States v. Carty*, 520 F.3d 987, 991 (9th Cir. 2008) (en banc).

KAREN SARKISSIAN'S SENTENCING BRIEF

Spertus, Landes & Umhofer, LLP
1990 S Bundy Dr., Suite 705
Los Angeles, CA 90025
Tel: 310-826-4700; Fax: 310-826-4711

Spertus, Landes & Umhofer, LLP
1990 S Bundy Dr., Suite 705
Los Angeles, CA 90025
Tel: 310-826-4700; Fax: 310-826-4711

1    It is also critical for the Court to understand that its charge is emphatically

2  not to impose a "reasonable" sentence, but to impose a particularized sentence

3  minimally sufficient to accomplish the statutory purposes of sentencing.  *See*

4  *Carty*, 520 F.3d at 995 ("The district court must make an individualized

5  determination based on the facts." (citing *Gall v. United States*, 552 U.S. 38, 50

6  (2007))) .  The question of reasonableness is for appellate review.  *See Rita*, 551

7  U.S. at 351.

8    The Court is therefore duty-bound to impose the least punitive sentence that

9  accomplishes the statutory purposes of sentencing.  Thus, regardless of how the

10  Court calculates the Guidelines here, the ultimate sentence must be in accord with

11  the parsimony principle.  To arrive at a sentence consistent with the parsimony

12  principle, the Court must consider the factors set forth in 18 U.S.C. § 3553(a).

13  Based on those factors, Mr. Sarkissian respectfully requests a sentence consistent

14  with the low-end of the Guidelines range, or 10 months in custody.

15  **A.    History and Characteristics of the Defendant**

16    "It has been uniform and constant in the federal judicial tradition for the

17  sentencing judge to consider every convicted person as an individual and every

18  case as a unique study in the human failings that sometimes mitigate, sometimes

19  magnify, the crime and the punishment to ensue."  *Peugh*, 133 S. Ct. at 1239-40

20  (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996)).  "Underlying this

21  tradition is the principle that 'the punishment should fit the offender and not

22  merely the crime.'"  *Id.* at 1240 (quoting *Williams v. New York*, 337 U.S. 241, 247

23  (1949)).  In particular, the Supreme Court has "emphasized that '[h]ighly

24  relevant—if not essential—to [the] selection of an appropriate sentence is the

25  possession of the fullest information possible concerning the defendant's life and

26  characteristics.'"  *Pepper v. United States*, 562 U.S. 476, 488 (2011) (quoting

27  *Williams*, 337 at 246)). "Permitting sentencing courts to consider the widest

28

KAREN SARKISSIAN'S SENTENCING BRIEF

Spertus, Landes & Umhofer, LLP
1990 S Bundy Dr., Suite 705
Los Angeles, CA 90025
Tel: 310-826-4700; Fax: 310-826-4711

1  possible breadth of information about a defendant 'ensures that the punishment

2  will suit not merely the offense but the individual defendant.'"  *Id.* (quoting

3  *Wasman v. United States*, 468 U.S. 559, 564 (1984)).

4       Mr. Sarkissian's background and experiences during adolescence are key to

5  understanding the person Mr. Sarkissian is today and how uncharacteristic the

6  instant offense is for him.  Submitted in connection with this Sentencing Position,

7  as Exhibits 12-58, are 47 character letters that describe Mr. Sarkissian's generous

8  and honorable character, as well as his commitment to his family, friends and

9  wider community.

10       **1. Mr. Sarkissian's upbringing in Armenia and commitment to family**

11       Mr. Sarkissian was born and raised in Yerevan, the capital of Armenia.

12  PSR ¶ 84.  He was raised in a loving, supportive home by his parents, along with

13  his younger sister.  *Id.*  Both of his parents have a medical background: his father

14  worked as a medical doctor in Yerevan, and his mother taught at a nursing school.

15  *Id.*  As a teenager during high school, Mr. Sarkissian worked at the same hospital

16  in Yerevan where his father worked, assisting in medical tasks.  PSR ¶ 118.

17       In December 1988, when Mr. Sarkissian was only 17 years old, a

18  devastating earthquake hit north of Yerevan.  PSR ¶ 85.  Mr. Sarkissian and a

19  group of friends voluntarily went north to provide whatever help they could.  (Ex.

20  47, Ltr. from K. Shakarian; Ex. 42, Ltr. from H. Sarkissian.)  For two weeks, Mr.

21  Sarkissian lived in a tent near the damaged area, helping extricate both survivors

22  and the dead.  (*Id.*)  The experience of seeing death and human suffering at a

23  young age had a lasting, profound effect on Mr. Sarkissian that has fostered a

24  sense of genuine compassion for others.  (Ex. 42, Ltr. from H. Sarkissian.)

25       Also in 1988, an ethnic conflict broke out between Armenians and

26  Azerbaijanis in the neighboring country of Azerbaijan, known as the Nagorno-

27  Karabakh War.  PSR ¶ 85.  The war consumed significant government resources

28

KAREN SARKISSIAN'S SENTENCING BRIEF

and created an unstable political and economic environment.  PSR ¶¶ 85, 87.
Although Mr. Sarkissian's parents continued to work during the war, they were
not paid for many months.  PSR ¶ 87.  In order to help make ends meet and put
food on the table, Mr. Sarkissian picked up a job as an electrician's assistant.  (Ex.
47, Ltr. from K. Shakarian; Ex. 42, Ltr. from H. Sarkissian.)  The family
eventually decided to leave Armenia in 1993, and immigrate to the United States.
PSR ¶ 87.

Just prior to leaving Armenia, Mr. Sarkissian and his wife were married at
the young age of twenty-two.  PSR ¶ 89.  Mr. Sarkissian and his family struggled
to adjust to life in America, and Mr. Sarkissian did everything he could to help
support the family and his new wife by picking up multiple jobs.  (Ex. 47, Ltr.
from K. Shakarian; Ex. 42, Ltr. from H. Sarkissian.)  Mr. Sarkissian and his wife
eventually had a son, Daniel Sarkissan, who is currently studying neuroscience
and biology at the University of California, Los Angeles.  Armine Havakimian,
wife and mother of their son describes Mr. Sarkissian as a "calm, caring, loving
person dedicated to his parents, friends, and family and mostly to his son.  He has
been a loving husband and would work hard in order for me to stay home and take
care of our son." (Ex. 25, Ltr. from A. Hovakimian.)  Daniel Sarkissian describes
his father as the person whose "main goal in life was to ensure my education and
… be as successful as possible" by putting him on the journey to medical school
which would not have been possible without the moral and financial support from
his father. (Ex. 41, Ltr. from D. Sarkissian.)

**2.  Mr. Sarkissian's altruistic nature**

Mr. Sarkissian has an immense sense of compassion and cares deeply for
his family, friends and even strangers in need.  Mr. Sarkissian's friends and family
consistently describe him as admirable, loyal, someone you can always depend on.
Valerie Smolyanskaya describes him as "one of the best men I know.  This is not

Spertus, Landes & Umhofer, LLP
1990 S Bundy Dr., Suite 705
Los Angeles, CA 90025
Tel: 310-826-4700; Fax: 310-826-4711

15.

Spertus, Landes & Umhofer, LLP
1990 S Bundy Dr., Suite 705
Los Angeles, CA 90025
Tel: 310-826-4700; Fax: 310-826-4711

1   an exaggeration, but possibly an understatement.  He is kind and compassionate
2   and will drop anything for anyone at any time." (Ex. 49, Ltr. from V.
3   Smolyanskaya.)  Several friends describe Mr. Sarkissian has being naïve, perhaps
4   too trusting in people, who may take advantage of his kindness and loyalty.  (Ex.
5   14, Ltr. from M. Arshakyan.)  In their letters, numerous friends recount how Mr.
6   Sarkissian has gone above and beyond to support them in their time of need, often
7   going out of his way to do things only family members would do for one another.

8        Ekaterina Filimonova, a friend of over 10 years, describes two instances of
9   how Mr. Sarkissian surprised her with his selfless acts.  Once, he drove her to the
10  emergency room in the middle of the night and sat with her daughter in the
11  waiting room for several hours until she was able to go home.  Another time,
12  when Ms. Filimonova was experiencing another health episode and found herself
13  stuck in Hollywood, unable to drive, Mr. Sarkissian came to pick her up, drove
14  her to the hospital, picked up her daughter from school, brought her daughter to
15  the hospital, and then took them both home after she was released. (Ex. 22, Ltr.
16  from E. Filimonova.)

17       Zareh Aramyan, a friend of over 25 years, states that Mr. Sarkissian drove
18  over 70 miles to help him when his car broke down.  (Ex. 13, Ltr. from Z.
19  Aramyan.)  Vicktoria Sarkissian, a friend of over 15 years, describes a time when
20  a mutual friend was traveling abroad, Mr. Sarkissian went to visit the friend's
21  parents every day to help with anything they needed.  (Ex. 45, Ltr. from V.
22  Sarkissian.)  Yana Seviyeva, a friend of 10 years, wrote about the time when she
23  had surgery on a brain tumor, Mr. Sarkissian helped take care of her son.  After
24  she was discharged from the hospital, Mr. Sarkissian helped the family with
25  groceries and taking care of other needs even though he had his own family to
26  take care of.  (Ex. 46, Ltr. from Y. Seviyeva.)  Armine Karapetyan, the wife of a
27  childhood friend, states that Mr. Sarkissian flew to San Francisco for just one day
28

16.

KAREN SARKISSIAN'S SENTENCING BRIEF

Spertus, Landes & Umhofer, LLP
1990 S Bundy Dr., Suite 705
Los Angeles, CA 90025
Tel: 310-826-4700; Fax: 310-826-4711

1  to help her with her Dental Hygiene Board examination. (Ex. 27, Ltr. from A.

2  Karapetyan.)

3      Dulce Barajas was struggling to make ends meet and was desperately

4  looking for a second job to provide the basic needs for herself and her two

5  children when Mr. Sarkissian learned of her struggles, he notified her of a job

6  opening at his work place and she continues to work at both jobs due to his "great

7  act of kindness." (Ex. 18, Ltr. from D. Barajas.)  Edouard Grigorian, an attorney

8  and longtime friend of 20 years describes the one example which he feels shows

9  "how much kindness and compassion there is in [Mr. Sarkissian's] heart.  In 2005,

10  I was hospitalized at a hospital about 25 miles away.  Gary used to come visit me

11  at the hospital literally every day." (Ex. 24, Ltr. from E. Grigorian.)

12      These are just a few examples of the way Mr. Sarkissian sacrifices his own

13  time and money for those around him.  And not just for people that he knows, but

14  complete strangers as well.  Sgt. Albert Rutledge writes about a time when his car

15  broke down, and Mr. Sarkissian offered help even though they were strangers.

16  This one selfless deed twelve years ago turned into a lasting friendship. (Ex. 38,

17  Ltr. from A. Rutledge.)  Ray Karapetyan describes how Mr. Sarkissian pulled an

18  unconscious woman from a car crash at high danger to himself, "without

19  hestitation, jumped out of our car ran to the scene."  (Ex. 28, Ltr. from R.

20  Karapetyan.)

21      **3.  Mr. Sarkissian's community depends on him**

22      Not only are these examples of Mr. Sarkissian's generosity and goodwill

23  towards others, but it also demonstrates how much Mr. Sarkissian's community

24  depends on him.  According to his sister and brother-in-law, Mr. Sarkissian visits

25  their parents daily, helps them with chores, takes them to doctor's appointments,

26  and makes repairs around the house.  (Ex. 44, Ex. 16, Ltrs. From S. Sarkissian and

27  H. Vetisyan.)  Suzanne Sarkissian also writes how much her daughter and son

28

17.

1   look up to him as a role model and mentor.  Mr. Sarkissian helps them both with

2   their homework and pays for his niece's acting classes. (Ex. 44, Ltr. from S.

3   Sarkissian.)

4        Sahak Keshishyan, a childhood friend of Mr. Sarkissian's son, describes

5   Mr. Sarkissian as an "uncle figure" who taught him "the importance of giving to

6   those who have less."  Mr. Sarkissian has "made [him] a better person" and

7   "motivated [him] to improve the lives of others."  (Ex. 31, Ltr. from S.

8   Keshishyan.)  Hasmik Sahakyan, a friend of 5 years, writes about a time when her

9   son started using drugs, going in and out of juvenile detention, and Mr. Sarkissian

10  was the only one who could get through to him.  While her son would not talk to

11  anyone else, Mr. Sarkissian slowly and patiently built a relationship with him,

12  eventually becoming a mentor and role model.  Mr. Sarkissian taught her son "to

13  obey the law, respect others, [and] to be an honest person."  (Ex. 40, Ltr. from H.

14  Sahakyan.)

15       When childhood friend Andrey Karapetyan was diagnosed with non-

16  Hodgkin lymphoma, Mr. Sarkissian was always by his side, helping him through

17  chemotherapy and radiation treatments.  Andrey states that Mr. Sarkissian's

18  "kindness, understanding and love gave [him] strength" and that he considers Mr.

19  Sarkissian to be a brother.  (Ex. 26, Ltr. from A. Karapetyan.)  Ruzan Sarkissian,

20  friend of 10 years, credits Mr. Sarkissian with giving her the emotional

21  encouragement and support to open her own dental clinic, as well as helping her to

22  clean and remodel the old dental clinic that she purchased.  (Ex. 43, Ltr. from R.

23  Sarkissian.)

24       Mr. Sarkissian also works as a caregiver for his friend, Val Stamboltsian,

25  who is legally blind.  PSR ¶ 107.  Mr. Sarkissian helps Val daily in the morning,

26  helping him with such tasks as taking him to medical appointments, taking him

27  grocery shopping, doing laundry, and preparing food.  According to Val, Mr.

28

Spertus, Landes & Umhofer, LLP
1990 S Bundy Dr., Suite 705
Los Angeles, CA 90025
Tel: 310-826-4700; Fax: 310-826-4711

18.

Spertus, Landes & Umhofer, LLP
1990 S Bundy Dr., Suite 705
Los Angeles, CA 90025
Tel: 310-826-4700; Fax: 310-826-4711

1  Sarkissian came to his rescue when he offered to be Val's caregiver, and he "can't

2  imagine [his] life without [Mr. Sarkissian]."  (Ex. 50, Ltr. from V. Stamboltsian.)

3  Gayane Musayelyan notes Mr Sarkissian "has dedicated many hours of his

4  weekend to the old, my grandmother and her elderly friends by taking them out,

5  since they don't go out a lot from their homes.  He organized activities for the

6  aged and kids and spends time with them making everyone happy."  (Ex. 35, Ltr.

7  from G. Musayelyan.)

8        Mr. Sarkissian is also an active member of his church, St. Kevork Armenian

9  Apostolic Church, where Father Mampre Kesabyan notes that he always

10  volunteers his services for the Church, makes charitable contributions and is a

11  valuable member of the Church.  (Ex. 29, Ltr. from Father M. Kesabyan.)  Irina

12  Shinyaeva recalls Mr. Sarkissian's help in a fundraiser to restore the church dome

13  and volunteering to be Santa Claus at a church Christmas party.  (Ex. 48, Ltr. from

14  I. Shinyaeva.)

15        Additionally, Mr. Sarkissian has helped numerous families with the

16  adjustment process after immigrating to the United States.  Paruyr Zoryan, Khoren

17  Keshishyan, Matvey Baranov, and Marina Arshakyan all write about how Mr.

18  Sarkissian helped them when they first came to America.  Whether it was help

19  finding a job, teaching how to pay bills, or providing a place to stay, knowing how

20  difficult transitioning to a new country was, Mr. Sarkissian regularly reached out

21  to the members of his community to help them adjust to American life.  (Exs. 14,

22  19, 30, 51, Ltrs. From M. Arshakyan, M. Baranov, K. Keshishyan, and P. Zoryan.)

23  **4.  Mr. Sarkissian lives a modest life**

24        Mr. Sarkissian's lifestyle is further evidence that the acts he has been found

25  guilty of are uncharacteristic of his true nature.  For the past ten years, Mr.

26  Sarkissian has been living in a townhouse in Glendale that was purchased by his

27  father.  PSR ¶¶ 88, 92.  There is nothing extravagant about the townhouse, which

28

19.

1  contains nothing of exceptional value.  PSR ¶ 92.  Mr. Sarkissian does not even

2  own a car, PSR ¶ 127; he gave his only car to his son who was in a serious

3  accident.  And while he is constantly caring for the health of others, he currently

4  does not even have his own health insurance.  PSR ¶ 98.

5  More than anything, Mr. Sarkissian wants to know that his family is well

6  cared-for.  Mr. Sarkissian is completely devoted to his family and more concerned

7  about their needs than his own.  He worries more about how the outcome of this

8  case will affect his son and his parents than how it will affect himself.  PSR ¶ 99.

9  **B.**   **Nature and Circumstances of the Offense**

10  This Court sat through a four-week trial in this case, and got a first-hand

11  look at the stark contrast between the Sunset Clinic and the numerous other clinics

12  about which the government presented evidence at trial to prove the money

13  laundering counts against co-defendant Edgar Pogosian.  The Sunset Clinic was

14  not permeated with fraud like the clinic run by Dr. Claude Cahen, who was in

15  Vietnam during the time his clinic was operating, or the sleep study clinic run by

16  Karapet Sarafian, who billed for dead patients.  Sunset Clinic employees Sylvia

17  Perez and Maria Del Carmen Lopez testified about the real patients who came to

18  the clinic, many of whom were walk-ins or were referred by family or friends.

19  (Exhibit 3, Feb. 9, 2016, Trial Tr. at 52:8-25.)  Perez and Lopez testified about the

20  kinds of real medical attention patients received at the clinic.  (Exhibit 3, Feb. 9,

21  2016, Trial Tr. at 54:21-58:14.)  SA Kevany testified about the statistics—that

22  58% of patients returned for a follow-up visit, (Exhibit 4, Feb. 11, 2016, Trial Tr.

23  at 60:19-23; 187:7-13), and that 96% of patients were from the Southern

24  California area (Exhibit 4, Feb. 11, 2016, Trial Tr. at 174:9-15).  Even the Sunset

25  Clinic patients themselves who testified, and who said that they did not recall

26  having an allergy test performed on them, told of being refered to the clinic by

27  friends and otherwise receiving real medical care at the clinic.  (Exhibit 10, Feb.

28

Spertus, Landes & Umhofer, LLP
1990 S Bundy Dr., Suite 705
Los Angeles, CA 90025
Tel: 310-826-4700; Fax: 310-826-4711

Spertus, Landes & Umhofer, LLP
1990 S Bundy Dr., Suite 705
Los Angeles, CA 90025
Tel: 310-826-4700; Fax: 310-826-4711

10. 2016, Trial Tr. at 22:7-24.)  And while the government did its best to infer otherwise to the jury, there was not a shred of evidence that any patient was ever paid to visit the clinic.  Indeed, during the testimony of Miguel Ponce, the government repeatedly asked Mr. Ponce if he received some compensation or illegal benefit from the Sunset Clinic in exchange for his visit, which he denied. (Exhibit 11, Feb. 5, 2016, Trial Tr. at 101:13-25.)

There is no doubt that the jury found that Mr. Sarkissian knew that the five allergy tests PA L'Tanya Smith claimed to have performed were either never performed or were medically unneccessary, and that Mr. Sarkissian negotiated six checks from the Sunset Clinic's bank account to IFA and UFA that were the proceeds of unlawful activity.  Both healthcare fraud and money laundering are serious offenses, and Mr. Sarkissian now faces prison time followed by almost certain deportation from the United States due to his convictions.  But Mr. Sarkissian was not engaged in a massive fraud scheme that resulted in the loss of millions of dollars, or that victimized hundreds of individual patients.  The nature and circumstances of Mr. Sarkissian's conduct, while certainly unlawful, are not so repugnant as to warrant a harsh sentence in this case.

**C.**  **Mr. Sarkissian's Deportation from the United States Should Be a Factor When Considering the Need for Deterrence and Punishment**

This Court can sufficiently achieve the goals of deterrence and punishment by sentencing Mr. Sarkissian to a ten-month prison term, in large part because of the consequences Mr. Sarkissian will suffer as a result of his conviction in this case.  Simply put, this is not a case in which the consequences of a conviction— namely, Mr. Sarkissian's impending deportation from the United States—can be easily divorced from the need for a lengthy prison sentence.  Mr. Sarkissian will most certainly be deported from the United States after serving his prison term, and that will have a devastating impact on his life.  Indeed, the Supreme Court has

21.

KAREN SARKISSIAN'S SENTENCING BRIEF

recognized the severe penalty of deportation, and the role it plays in the criminal process. *See Padilla v. Kentucky*, 559 U.S. 356, 365-66 (2010). For Mr. Sarkissian, deportation is the most severe penalty he will face as a result of his conviction after trial, and the Court should consider it as part of fashioning a sentence that is sufficient, but not greater than necessary, to achieve the goals of sentencing.

Mr. Sarkissian has lived in the United States since his father brought him and his family here in 1993. Since then, he has made a life for himself in this country, living in close proximity to his parents, both of whom are doctors and to whom he is very close. He has also raised a son who is about to enter his sophomore year at the University of California, Los Angeles (UCLA). Mr. Sarkissian's son, Daniel, spent his first two years of college at the University of California, Santa Cruz. However, given how close Daniel is to his father, and having gone through the stress of being many hours away during his father's trial, Daniel has since transferred to UCLA to be closer to Mr. Sarkissian. Mr. Sarkissian's absence from his son's life will sufficiently deter and punish him.

Deportation will not only deter Mr. Sarkissian from committing future crime because of its impact on his family. More practically, deportation will also deter Mr. Sarkissian from future crime due to the simple fact that he will no longer reside in this country. That kind of deterrence extends to those similarly situated to Mr. Sarkissian, and will thus also achieve the goals of general deterrence.

With respect to punishment, a ten-month sentence will sufficiently punish Mr. Sarkissian because it will mean having to spend his final year in the United States in custody, prior to deportation. No measurable increase in punishment will be served by extending that time by sentencing Mr. Sarkissian to a lengthy prison term—certainly none that would comply with the parsimony principle's directive that a sentence should be no greater than is necessary.

22.

KAREN SARKISSIAN'S SENTENCING BRIEF

# V.

## <u>CONCLUSION</u>

For the foregoing reasons, Mr. Sarkissian respectfully requests that the Court sentence him to ten months in prison, which corresponds to the low-end of the Guidelines range.

Dated:  August 12, 2016          Respectfully submitted,

SPERTUS, LANDES & UMHOFER, LLP


By:    /S Samuel A. Josephs
       James W. Spertus
       Samuel A. Josephs
       Attorneys for Karen Sarkissian

# EXHIBIT 1

**EXHIBIT 1**

1    UNITED STATES DISTRICT COURT

2    CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3    HONORABLE PHILIP S. GUTIERREZ, U.S. DISTRICT JUDGE

4

5    UNITED STATES OF AMERICA,              )
                                            )
6                   Plaintiff,              ) CASE NO.
                                            ) CR 13-00719(A)
7          VS.                              )
                                            )
8    EDGAR POGOSIAN,                        )
        aka "Edgar Hakobyan,"               )
9    KAREN SARKISSIAN,                      )
        aka "Gary Sarkissian,"              )
10                                          )
                    Defendants.             )
11   _____)

12

13

14

15                 REPORTER'S TRANSCRIPT OF
16                  JURY TRIAL - DAY 13
                 WEDNESDAY, FEBRUARY 24, 2016
17                        8:03 A.M.
                   LOS ANGELES, CALIFORNIA
18

19

20

21

22   _____

23

            MAREA WOOLRICH, CSR 12698, CCRR
24        FEDERAL OFFICIAL COURT REPORTER
        255 EAST TEMPLE STREET, ROOM 181-K
25        LOS ANGELES, CALIFORNIA 90012
              mareawoolrich@aol.com


                 UNITED STATES DISTRICT COURT

1                    **APPEARANCES OF COUNSEL:**

2

3     **FOR THE PLAINTIFF:**

4          EILEEN M. DECKER
           UNITED STATES ATTORNEY
5          BY:  CATHY OSTILLER
           KRISTIN WILLIAMS
6          CASSIE PALMER
           ASSISTANT UNITED STATES ATTORNEYS
7          UNITED STATES COURTHOUSE
           312 NORTH SPRING STREET
8          LOS ANGELES, CA 90012

9

10    **FOR DEFENDANT EDGAR POGOSIAN:**

11         LAW OFFICES OF PAT HARRIS
           BY:  PAT HARRIS
12         225 SOUTH LAKE AVENUE, SUITE 300
           PASADENA, CA 91101
13

14    **FOR DEFENDANT KAREN SARKISSIAN:**

15         SPERTUS, LANDES & UMHOFER
           BY:  JAMES SPERTUS
16         SAMUEL JOSEPHS
           1990 S. BUNDY DRIVE, SUITE 705
17         LOS ANGELES, CA 90025

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

```
 1   because it didn't happen.
 2        Now, it's true that full-time clinic employee Maria Lopez
 3   said there might have been three allergy tests a month.  Still
 4   far too few to account for the more than 500 tests they billed.
 5   But when I asked her -- if you'll remember, I asked her why she
 6   previously told the government that those tests didn't happen
 7   at all, she said it was because those tests were something that
 8   they, quote, "really didn't do."
 9        And ladies and gentlemen, you knew that
10   Defendant Sarkissian knew those tests weren't being done.  One,
11   he was there every day to see that they weren't being done.
12   Two, you have the Sunset Clinic checks.  The checks, all the
13   checks that went into the Sunset Clinic account, those are in
14   Exhibit 22.  And you have the GN Group bank records, what
15   Defendant Sarkissian's counsel told you was the company he's
16   using to manage this.  You have those bank records in
17   Exhibit 21.
18        And I'll invite you to look at those too.  And if you look
19   at those, I submit that you are not going to find that
20   Defendant Sarkissian, who paid everyone, ever paid a tech or a
21   company to do allergy tests, much less 544 of them.
22        And three, Defendant Sarkissian can't rely on L'Tanya
23   Smith, the PA at the Sunset Clinic, because when you look at
24   the superbills -- do you remember the superbills we looked at?
25   This is Exhibit 613, page 10, this kind of check box form.
```

UNITED STATES DISTRICT COURT

```
 1                  CERTIFICATE OF OFFICIAL REPORTER

 2

 3

 4

 5              I, MAREA WOOLRICH, FEDERAL OFFICIAL REALTIME COURT

 6    REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE

 7    CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT

 8    TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING

 9    IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY

10    REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT

11    THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE

12    REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

13

14

15                        DATED THIS  14TH  DAY OF JUNE, 2016.

16

17

18                        /S/ MAREA WOOLRICH
                          _____
19                        MAREA WOOLRICH, CSR NO. 12698, CRR
                          FEDERAL OFFICIAL COURT REPORTER
20

21

22

23

24

25
```

**UNITED STATES DISTRICT COURT**

# EXHIBIT 2

**EXHIBIT 2**

| Physician's Name | LOUIS T. BASCOY M.D. | PIN# | FEDERAL ID# |
|---|---|---|---|

**Patient Name** Ponce, Miguel   **DOB** ___/___/___   **Date os Service** 2,26,10

**Type of Insurance:** ☒ Medicare  ☐ Medical  ☐ Insurance # ____ Name ____ # ____

**Patient Address:** ____ City ____ State ____ Zip code ____

| CODE | DESCRIPTION | UNITS | CODE | DESCRIPTION | UNITS | CODE | DESCRIPTION | UNITS |
|---|---|---|---|---|---|---|---|---|
| 99201 | LEVEL 1, BRIEF; 10 min | | 428.0 | CHF | | 786.52 | PAINFULL RESPIRATION | |
| 99202 | LEVEL 2, 20 min | | 595.9 | CYSTITIS | | 785.1 | PALPITATION | |
| 99203 | LEVEL 3, EXPANDED; 30 min | | 715.90 | DJD | | 427.0 | PSVT | |
| 99204 | LEVEL 4, COMPREHENSIVE; 45 min | | 692.9 | DERMATITIS | | 427.1 | VENTRICULAR TACHYCARDIA | |
| 99205 | LEVEL 5, COMPREHENSIVE; 60 min | | 250.02 | DIABETIS TYPE II NIDDM | | 785.0 | RESPIRATORY DIAGNOSIS | |
| 99025 | NEW PT. INITIAL VISIT W/PROC. | | 250.03 | DIABETIS TYPE I IDDM | | 357.0 | ACUTE INFECTIVE POLYNEURIT | |
| 99211 | LEVEL 1, BRIEF; 5 min | | 780.4 X | DIZZINESS GIDDINESS | | 786.03 | APNEA | |
| 99212 | LEVEL 2, LIMITED; 10 min | | 780.6 | FEVER | | 491.0 | BRONCHITIS CHRONIC SIMPLE | |
| 99213 | LEVEL 3, EXPANDED; 15 min | | 575.9 | GALL BLADDER DISEASE | | 493.20 | CHRONIC ASTHMA OBSTRU | |
| 99214 | LEVEL 4, COMPREHENSIVE; 25 min | | 535.50 | GASTRITIS | | 786.2 X | CHRONIC COUGH | |
| 99215 | LEVEL 5, COMPREHENSIVE; 40min | | 784.0 | HEADACHE | | 518.83 | CHRONIC RESPIRATORY FAILURE | |
| | | | 389.9 | HEARING LOSS | | 492.8 | EMPHYSEMA | |
| | PROCEDURE | | 787.1 | HEARTBURN | | 514 | PULMONARY CONGESTION | |
| 93010 | EKG INTERPRETATION ONLY | | 719.45 | HIP PAIN | | 786.00 | RESPIRATORY ABNORMALITY | |
| 93000 | EKG, COMPLETE | | 402.90 | HYPERTENSIVE HEART DISEASE | | 491.0 | SMOKER'S COUGH | |
| 95921 X | RNR | | 272.40 | HYPERLIPIDEMIA | | 786.09 | SNORING, YAWNING | |
| 69210 | REMOVAL IMPACTED CERUMEN | | 715.98 | KNEE ARTHITIS | | 786.06 | TACHYPNEA | |
| 92552 | AUDIOGRAM | | 719.48 | KNEE PAIN | | 786.07 X | WHEEZING | |
| 94010 X | SPIROMETRY | | 721.48 | LUMBAR SPONDYLOSIS | | | NEUROLOGICAL DIAGNOSIS | |
| 94060 | BRONCHOSPASM EV | | 780.79 | MALAISE and FATIGUE | | 354.0 ,09 | MONONEUR, UP | |
| 36415 X | VENIPUNCTURE, TECH | | 346.90 | MIGRAINE HEADACHE | | 355.0 ,09 | MONONEUR, LOW | |
| 36410 | VENIPUNCTURE, MD | | 782.0 X | NUMBNESS/PARESTHISIA | | 356.0 ,09 | HEREDITARY IDIOPATHIC PHERY NE | |
| 82948 | GLUCOSE FINGER STICK | | 723.1 | NECK PAIN | | 723.4 | CERVICAL RADICULITIS | |
| 82270 | OCCULT BLOOD 1-3 SPECIMENS | | 728.00 | OBESITY | | 724.4 | RADICULAR SYNDROME, LOWER | |
| 86580 | PPD | | 715.90 | OSTEOARTHRITIS | | 728.2 | HEMIATHOPHY OF LEG | |
| 81000 | URINALYSIS, DIPSTICK | | 677.0 | PANCREATITIS ACUTE | | 729.5 X | PAIN IN LIMB | |
| 81025 | URINE PREGNANCY TEST | | 443.9 X | PERIPHERAL VASCULAR DISEASE | | 729.82 | CRAMP | |
| 87880 | STREP TEST | | 462 | PHARYNGITIS, ACUTE | | 729.2 | NEURALGA | |
| 94757 | OXIMETRY, PULSE | | 486 | PNEUMONIA | | | OTHER DIAGNOSIS | |
| | | | 601.9 | PROSTATITIS | | 477.0 | ALLERGIC RHINITIS NOS | |
| | ALLERGIES | | 724.4 | RADICULOPATHY L/S | | 285.9 | ANEMIA NOS | |
| 97000 | EVALUATION | | 788.0 | RENAL COLIC | | 300.0 | ANXIETY | |
| 97001 | RE-EVALUATION | | 786.05 X | SHORTNESS OF BREATH | | 600.90 | BPH NOS W/O UR OBS/LUTS | |
| 97032 | ELECTRIC STIMULATION | | 246.9 | THYROID DYSFUNCTION | | 600.91 | BPH NOS W UR OBS/LUTS | |
| 97035 | ULTRASOUND | | 465.9 | UPPER RESP. TRAC. INFECTION | | 434.91 | CEREBRAL ARTERIES OCCLUSION | |
| 97110 | THERAPEUTIC PROCEDURE | | 625.6 | URINARY STRESS INCONTINENCE F | | 437.9 | CEREBROVASCULAR DISEASE NOS | |
| 97140 | MASSAGE | | 788.32 | URINARY STRESS INCONTINENCE M | | 574.20 | CHOLELITHIASIS NOS | |
| | PULMONARY DIAGNOSIS | | 599.0 | URINARY TRACT INFECTION | | 311 | DEPRESSIVE DISORDER NEC | |
| 94060 | Bronchospasm evaluation | | 454.1 | VERICOSE VEINE WITH INFLAM | | 757.0 X | EDEMA OF LEG | |
| 94200 | MVV | | 719.43 | WRIST PAIN | | 607.84 | ERECTILE DYSFUNCTION | |
| 94240 | FRC | | | GASTRO DIAGNOSIS | | 530.81 | GASTROESOPHAGEAL REFLUX | |
| 94350 | HET | | 422.90 | ACUTE MYOCARDITIS | | 365.9 | GLAUCOMA | |
| 94370 | SBN2 | | 402.10 | BENIGN HYP HT DIS W/O HF | | 242.90 | HYPERTHYROIDISM NOS | |
| 94664 | Administration of bronchodilator | | 402.11 | BENIGN HYP HT DIS W HF | | 780.52 | INSOMNIA NOS | |
| 94720 | Total body plethysmography | | 427.5 | CARDIAC ARREST | | 440.21 X | INTERMITTENT CLAUDICATION | |
| 94725 | Membrane DLCO | | 429.3 | CARDIOMEGALY | | 518.89 | LUNG DISEASE NEC | |
| 94750 | Pulmonary compliance | | 425.4 | CARDIOMYOPATHY | | 592.0 | NEPHROLITHIASIS NOS | |
| | | | 428.0 | HEART FAILURE | | 733.00 | OSTEOPOROSIS GENERALIZED | |
| | | | 414.01 | CORONARY ASHD | | 533.9 | PEPTIC ULCER DISEASE NOS | |
| 95004 | SKIN SCRATCH, POLLEN | | 785.2 | HEART MURMUR | | 586 | RENAL FAILURE NOS | |
| 95004 | SKIN SCRATCH, INHALANT | | 401.9 X | HYPERTENSION | | 719.00 | SWELLING/EFFUSION OF JOINT UNSP | |
| | | | 414.9 | ISCHEMIC HEART DISEASS | | 438.85 X | VERTIGO | |
| 789.00 | ABDOMINAL PAIN | | | | | | | |
| 427.9 | ARRHYTHMIA | | | | | | | |
| 429.2 | ASCVD | | | | | | | |
| 440.9 | ATHEROSCLEROSIS NOS | | X Abn EKG | | | | | |
| 716.9 | ARTHRITIS | | | | | | | |
| 493.9 | ASTHMA | | | | | | | |
| 724.2 X | BACK PAIN, LOW | | X Urinary frequency | | | | | |
| 491.1 | BRONCHITIS MUCOP | | | | | | | |
| 466.0 | BRONCHITIS ACUTE | | | | | | | |
| 786.5 | CHEST PAIN | | | | | | | |

Date 2,26,10

SUNSET027716
Exhibit 613
Page 10 of 47

# EXHIBIT 3

**EXHIBIT 3**

```
 1                  UNITED STATES DISTRICT COURT

 2          CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

 3           HONORABLE PHILIP S. GUTIERREZ, U.S. DISTRICT JUDGE

 4

 5     UNITED STATES OF AMERICA,              )
                                              )
 6                        PLAINTIFF,          ) CASE NO.
                                              ) CR 13-719(A)
 7               VS.                          )
                                              )
 8     EDGAR POGOSIAN,                        )
          AKA "EDGAR HAKOBYAN"                )
 9     KAREN SARKISSIAN,                      )
          AKA "GARY SARKISSIAN,"              )
10                                            )
                          DEFENDANTS.         )
11     _____)

12

13

14

15                      REPORTER'S TRANSCRIPT OF
16                      JURY TRIAL - DAY 4
                      TUESDAY, FEBRUARY 9, 2016
17                         FIRST SESSION
                      LOS ANGELES, CALIFORNIA
18

19

20

21

22     _____

23
                   MAREA WOOLRICH, CSR 12698, CCRR
24              FEDERAL OFFICIAL COURT REPORTER
               255 EAST TEMPLE STREET, ROOM 181-K
25               LOS ANGELES, CALIFORNIA 90012
                      mareawoolrich@aol.com
```

```
 1                    APPEARANCES OF COUNSEL:

 2

 3   FOR THE PLAINTIFF:

 4       EILEEN M. DECKER
         UNITED STATES ATTORNEY
 5       BY:  CATHY OSTILLER
         KRISTIN WILLIAMS
 6       CASSIE PALMER
         ASSISTANT UNITED STATES ATTORNEYS
 7       UNITED STATES COURTHOUSE
         312 NORTH SPRING STREET
 8       LOS ANGELES, CA 90012

 9

10   FOR DEFENDANT EDGAR POGOSIAN:

11       LAW OFFICES OF PAT HARRIS
         BY:  PAT HARRIS
12       225 SOUTH LAKE AVENUE, SUITE 300
         PASADENA, CA 91101
13

14   FOR DEFENDANT KAREN SARKISSIAN:

15       SPERTUS, LANDES & UMHOFER
         BY:  JAMES SPERTUS
16       SAMUEL JOSEPHS
         1990 S. BUNDY DRIVE, SUITE 705
17       LOS ANGELES, CA 90025

18

19

20

21

22

23

24

25
```

```
 1   Q     There were blood tests that were being done there?
 2   A     Yes.
 3   Q     EKGs?
 4   A     Yes.
 5   Q     And you also talked about allergy tests.  Do you remember
 6   that?
 7   A     Yes.
 8   Q     I believe you stated with the prosecutor that you -- that
 9   there were about five or six allergy tests that were performed
10   a week you thought?
11   A     Yes.
12   Q     And you said that those tests were -- you saw more of
13   those towards the end, I think you said, versus during the
14   beginning of your employment there; right?
15   A     Yes.
16   Q     Ms. Perez, you were part time in the beginning, right, at
17   the clinic?
18   A     Yes.
19   Q     And then you became full time later on?
20   A     Yes.
21   Q     Ms. Perez, I want to talk to you about how often
22   Dr. Bascoy was at the clinic and how -- what his role was
23   there.  Okay?
24   A     Okay.
25   Q     You stated on your direct testimony that Dr. Bascoy was at
```

```
1    the clinic about once a week.  Do you remember that?
2    A    Yes.
3    Q    Could it have been more like two or three times a week?
4    Does that sound right?
5    A    I was told that he had gotten there late when I was
6    working part time because I would go home at 2:00.
7    Q    But you would see him there around two to three times a
8    week; is that fair to say?
9    A    No.  One time, one time or two, once or twice.
10   Q    Okay.  Ms. Perez, do you recall -- you've been interviewed
11   before about this case; right?
12   A    Yes.
13   Q    And you've actually been interviewed several times by the
14   prosecutors and by agents in the case; right?
15   A    Yes.
16   Q    And some of those interviews took place years ago when it
17   was closer in time to when you worked at the clinic; right?
18   A    Yes.
19   Q    Do you recall being interviewed back in 2013 by agents
20   about this clinic?
21   A    What I remember is that it's been about five years or more
22   than five years, these interviews.
23   Q    Okay.  So much closer in time to when you worked at the
24   clinic?
25   A    Yes, because -- I think about a year after I stopped
```

```
1   Q    And what, if anything, did the two talk about?
2   A    Sometimes about the time, the things that they had to do.
    But sometimes they also locked themselves in the office.  So
3
4   no.
5   Q    When you say they would lock themselves in the office, who
6   is the "they" there?
7   A    Arturo and Gary Sarkissian.
8   Q    Who paid Arturo?
9   A    Gary.
10  Q    You said that L'Tanya Smith was the one seeing patients at
11  the Sunset Clinic.  Did Dr. Bascoy ever come to the Sunset
12  Clinic?
13  A    Yes.
14  Q    And how often would he come?
15  A    Every two weeks.
16  Q    What did he do when he was there?
17  A    He would ask to review charts, and sometimes he would
18  bring our checks.
19  Q    Did you speak to Dr. Bascoy when he was at the clinic?
20  A    Yes, but little.
21  Q    At any point were you ever told not to speak with
22  Dr. Bascoy?
23  A    Yes.
24  Q    And what were the circumstances of that?
25  A    One day he came to the clinic, and he greeted me.  And he
```

```
 1   Q     Okay.  But you do recall telling the agents in 2013 that
 2   he may have seen some patients?
 3   A     Maybe, but I don't remember.
 4   Q     Okay.  Thank you, Ms. Lopez.
 5   A     Because I had a blow to the head, and sometimes there's
 6   things that I have forgotten.
 7   Q     Thank you.
 8         Ms. Lopez, when patients would come into the clinic, they
 9   would come in with family members; right?
10   A     Yes.
11   Q     And the family members would be bringing the patients into
12   the clinic with them?
13   A     Yes.
14   Q     And patients would also be referred to the clinic by
15   friends of theirs; right?
16   A     Yes.
17   Q     And there were fliers that were sent out by the clinic
18   that people responded to?
19   A     In the beginning they had them.
20   Q     And that's another that --
21   A     Fliers.
22   Q     I'm sorry.
23   A     Fliers.
24   Q     And that's another way the patients came to the clinic?
25   A     Yes.
```

 1          MR. JOSEPHS:  I apologize.  It was not meant to be

 2   stapled.  Just from pages 62205 until 62259.

 3          THE COURT:  6 -- can you say that again, 62 --

 4          MR. JOSEPHS:  62205 through 62259.  And we'll have

 5   that separated, Your Honor.

 6          MS. WILLIAMS:  No objection to that portion.

 7   Thank you, Your Honor.

 8          THE COURT:  Admitted.

 9          (Exhibit No. 1518 received into evidence.)

10          MR. JOSEPHS:  If the interpreter could turn

11   Ms. Lopez's attention to 62210.

12          THE INTERPRETER:  Done.

13          MR. JOSEPHS:  Your Honor, permission to publish?

14          THE COURT:  You may.

15          MR. SPERTUS:  Your Honor, may I approach and turn on

16   the projector?

17          THE COURT:  You may.

18          MR. JOSEPHS:  I apologize, Your Honor.  It wasn't

19   on.

20   BY MR. JOSEPHS:

21   Q    Ms. Lopez, do you recognize what's on the screen in front

22   of you?

23   A    Yes.

24   Q    And what is that?

25   A    The vital signs for a patient.

1    Q     And you filled that out?

2    A     Yes.

3    Q     I'm going to put on the screen page 62214 of that same

4    file.  Do you recognize that, Ms. Lopez?

5    A     Yes.

6    Q     That's an ultrasound study; is that right?

7    A     Yes.

8    Q     And there were ultrasound machines at the clinic; right?

9    A     Yes.

10   Q     I'm placing on the screen 62215.  Ms. Lopez, that's a

11   certificate of medical necessity for cardiac studies; is that

12   right?

13   A     I can't see the top.

14   Q     I'm sorry.

15   A     Yes.

16   Q     And the same equipment that was used for the ultrasound

17   was used for the cardiac studies; is that right?

18   A     Yes.

19   Q     I'm placing on the screen page 62216.  Do you recognize

20   that, Ms. Lopez?

21   A     Yes.

22   Q     And that's a physician order form for transcranial

23   Doppler?

24   A     Yes.

25   Q     Is that the TCD machine or the TCD test that we were

1    talking about earlier?

2    A    Yes.

3    Q    So this test would have been performed with a TCD machine;

4    is that right?

5    A    Yes.

6    Q    And the Sunset Clinic had a TCD machine; right?

7    A    Yes.

8    Q    I'm placing 62219.  Ms. Lopez, that's a physician order

9    form for bilateral and vein study, bilateral arterial study,

10   and bilateral arterial stress study; is that right?

11   A    Yes.

12   Q    And that's -- that would have been performed with a PVL

13   machine; is that right?

14   A    Yes.

15   Q    And the clinic had a PVL machine; right?

16   A    Yes.

17   Q    I'm placing page 622 -- 62220.  And, Ms. Lopez, that's a

18   printout from the spirometry test; right?

19   A    Yes.

20   Q    And that's the test that you described earlier that you

21   performed?

22   A    Yes.

23   Q    And the very next page in the file is a page from

24   Seacliff Diagnostics Medical Lab -- is that right? -- Medical

25   Group?

57

1    A    Yes.

2    Q    And that's a -- that's a blood lab; right?

3    A    Yes.

4    Q    And you would draw blood from the patients that would get

5    sent to Seacliff?

6    A    Yes.

7    Q    I'm not going to put every page up on the screen, but if

8    you just flip through -- I apologize to the interpreter --

9    6222 (sic) at the bottom, the next several pages are also from

10   that same Seacliff results; right?

11   A    These are patient results from the blood.

12   Q    From Seacliff?

13   A    Yes.

14   Q    I'm placing 62228.  That's a report related to the aortic

15   ultrasound from Radiographics Medica Group.  Do you see that?

16   A    Yes.

17   Q    So this is a report provided by the person who performed

18   the ultrasound and the echocardiograms?

19              MS. WILLIAMS:  Objection, Your Honor.  Calls for

20   speculation.

21              THE COURT:  Overruled.

22              THE WITNESS:  Yes.

23   BY MR. JOSEPHS:

24   Q    And it's a little difficult to see the page number at the

25   bottom here, but it's 62233.  This is the tape used in the

```
 1    echocardiogram; right?
 2    A     Yes.
 3    Q     So that would come from the EKG machine?
 4    A     Yes.
 5    Q     And I'm placing what's marked 62247.  This is -- it's
 6    called the "Main Problems" sheet that's listed at the top
 7    there.  You can also see it on your screen, Ms. Lopez.
 8    A     Yes.
 9    Q     And this documents the patient's complaints; right?
10    A     Yes.
11    Q     Why they came to the clinic?
12    A     Yes.  Well, the problems that they had there, the problems
13    that they had for which they needed to come and be seen, these
14    are it.
15    Q     Thank you.
16          Now, Ms. Lopez, you worked at the clinic every day?
17    A     Yes.
18    Q     And your hours were 9:00 to 5:00; is that right?
19    A     Yes.
20    Q     You never saw Mr. Sarkissian treat a patient; right?
21    A     No.
22    Q     Never saw Mr. Sarkissian fill out a patient's chart?
23    A     No.
24    Q     Never saw him perform a test on a patient?
25    A     No.
```

1          CERTIFICATE OF OFFICIAL REPORTER

2

3

4

5          I, MAREA WOOLRICH, FEDERAL OFFICIAL REALTIME COURT

6    REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE

7    CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT

8    TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING

9    IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY

10   REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT

11   THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE

12   REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

13

14

15          DATED THIS  27TH  DAY OF APRIL, 2016.

16

17

18          /S/ MAREA WOOLRICH

19          MAREA WOOLRICH, CSR NO. 12698, CRR
            FEDERAL OFFICIAL COURT REPORTER
20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

# EXHIBIT 4

**EXHIBIT 4**

<pre>
 1                UNITED STATES DISTRICT COURT

 2          CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

 3            HONORABLE PHILIP S. GUTIERREZ, U.S. DISTRICT JUDGE

 4

 5   UNITED STATES OF AMERICA,            )
                                          )
 6                     PLAINTIFF,         ) CASE NO.
                                          ) CR 13-719(A)
 7           VS.                          )
                                          )
 8   EDGAR POGOSIAN,                      )
       AKA "EDGAR HAKOBYAN"               )
 9   KAREN SARKISSIAN,                    )
       AKA "GARY SARKISSIAN,"             )
10                                        )
                       DEFENDANTS.        )
11   _____)

12

13

14

15                     REPORTER'S TRANSCRIPT OF
16                     JURY TRIAL - DAY 6
                     THURSDAY, FEBRUARY 11, 2016
17                          8:01 A.M.
                     LOS ANGELES, CALIFORNIA
18

19

20

21

22   _____
23
               MAREA WOOLRICH, CSR 12698, CCRR
24            FEDERAL OFFICIAL COURT REPORTER
             255 EAST TEMPLE STREET, ROOM 181-K
25             LOS ANGELES, CALIFORNIA 90012
                    mareawoolrich@aol.com
</pre>

UNITED STATES DISTRICT COURT

| | |
|---|---|
| 1 | **APPEARANCES OF COUNSEL:** |
| 2 | |
| 3 | **FOR THE PLAINTIFF:** |
| 4 |     EILEEN M. DECKER<br>    UNITED STATES ATTORNEY |
| 5 |     BY:  CATHY OSTILLER<br>    KRISTIN WILLIAMS |
| 6 |     CASSIE PALMER<br>    ASSISTANT UNITED STATES ATTORNEYS |
| 7 |     UNITED STATES COURTHOUSE<br>    312 NORTH SPRING STREET |
| 8 |     LOS ANGELES, CA 90012 |
| 9 | |
| 10 | **FOR DEFENDANT EDGAR POGOSIAN:** |
| 11 |     LAW OFFICES OF PAT HARRIS<br>    BY:  PAT HARRIS |
| 12 |     225 SOUTH LAKE AVENUE, SUITE 300<br>    PASADENA, CA 91101 |
| 13 | |
| 14 | **FOR DEFENDANT KAREN SARKISSIAN:** |
| 15 |     SPERTUS, LANDES & UMHOFER<br>    BY:  JAMES SPERTUS |
| 16 |     SAMUEL JOSEPHS<br>    1990 S. BUNDY DRIVE, SUITE 705 |
| 17 |     LOS ANGELES, CA 90025 |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

1   Q    That includes other types of services that were billed;

2   right?

3   A    Yes.

4   Q    But in terms of the three that we see up there, allergy

5   tests, physical medicine and rehabilitation, and office visits,

6   are these the three largest categories of services reflected in

7   the claims data?

8   A    Yes.

9   Q    Let's take a look at Exhibit 940, please.  And what does

10  this chart show?

11  A    This is -- according to the total number of patients in

12  the Medicare claims data, this is the total number of patients

13  with only one visit and also shown by percentage and then the

14  total number of patients billed for allergy tests also with a

15  percentage.

16  Q    Okay.  So how many patients were identified in the

17  Medicare claims data for the Sunset Clinic?

18  A    951.

19  Q    And how many of those patients, according to the claims

20  data, had only one visit to the Sunset Clinic?

21  A    The number is 402.

22  Q    And what percentage is that?

23  A    42 percent.

24  Q    And, again, out of the 951 patients in the claims data,

25  how many were billed for allergy tests?

174

```
 1    patients came from the immediate vicinity of his clinic.
 2    A     According to the Medicare claims data, the address listed
 3    in the claims data --
 4              MS. OSTILLER:  Objection.  Vague as to "immediate
 5    vicinity."
 6              THE COURT:  Sustained.
 7         Rephrase.
 8    BY MR. SPERTUS:
 9    Q     Okay.  When you were -- if you were to add up the
10    circles -- I'm going to highlight them, and if you can see
11    where my highlighter is, what is the total number of patients
12    who live in the highlighted area?
13    A     Percentage?
14    Q     Percentage.
15    A     79, 89, 96 percent.
16    Q     Okay.  Now I'm going to place back on the projector
17    Exhibit 957.  What is -- this is, again, for Dr. Craig Smith.
18    What is the total percentage of patients in the same
19    highlighted area in Dr. Craig Smith's distance chart?
20    A     Approximately 21 percent.
21    Q     And is a low number of local patients indicative of fraud
22    to you?
23              MS. OSTILLER:  Objection.  Vague.
24              THE COURT:  Rephrase.  Sustained.
25    BY MR. SPERTUS:
```

```
 1              THE COURT:  Overruled.
 2              THE WITNESS:  As I look at this chart, I'm not
 3   thrilled with it.  The numbers at the top and the total number
 4   of calls is what I found out.  I mean, there are periods of
 5   time between the 12 and the 6 and the 6 and the 6 and the 7
 6   where there were no calls.
 7   BY MR. SPERTUS:
 8   Q    And is the color designed to imply that there were calls
 9   when there, in fact, were not calls?
10   A    I didn't mean to imply that.
11   Q    So when you say you were not thrilled with the chart, is
12   it because you recognize that this chart creates a
13   misimpression?
14   A    It is -- it is not a great chart.  There is the total
15   number of calls up in the right-hand corner.  So I'm not trying
16   to say that there are more than the number of calls that are up
17   in the right-hand corner.
18   Q    Right.  But you could create a little table like you did
19   for the government on other topics if you just wanted to total
20   the calls; right?
21   A    I could have.
22   Q    But you didn't for calls, did you?
23   A    No, I didn't create a table like that.
24   Q    So, for example, when you turn to the right of the chart,
25   on the slide the exhibit over, you confirm now, despite the
```

1          CERTIFICATE OF OFFICIAL REPORTER

2

3

4

5               I, MAREA WOOLRICH, FEDERAL OFFICIAL REALTIME COURT

6    REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE

7    CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT

8    TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING

9    IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY

10   REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT

11   THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE

12   REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

13

14

15               DATED THIS  6TH  DAY OF MAY, 2016.

16

17

18          /S/ MAREA WOOLRICH
            _____
19          MAREA WOOLRICH, CSR NO. 12698, CRR
            FEDERAL OFFICIAL COURT REPORTER
20

21

22

23

24

25

# EXHIBIT 5

**EXHIBIT 5**

```
 1              UNITED STATES DISTRICT COURT

 2        CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

 3        HONORABLE OTIS D. WRIGHT, II, U.S. DISTRICT JUDGE

 4   UNITED STATES OF AMERICA,         )
                                       )
 5                  Plaintiff,         )   CASE NO.
                                       )
 6          vs.                        )   CR 14-00249-ODW
                                       )
 7   HAKOP GAMBARYAN,                  )
                                       )
 8                  Defendant.         )
     _____)

 9

10

11

12                     REPORTER'S TRANSCRIPT OF
                              SENTENCING
13                     TUESDAY, MAY 26, 2015
                            10:21 A.M.
14                     LOS ANGELES, CALIFORNIA

15

16

17

18

19

20

21   _____

22              DEBI READ, CSR 3949 CRR RMR
                FEDERAL OFFICIAL COURT REPORTER
23              312 NORTH SPRING STREET 432A
                LOS ANGELES, CALIFORNIA 90012
24                 READIT3949@GMAIL.COM

25
```

1                    **A P P E A R A N C E S**

2


3    **ON BEHALF OF THE PLAINTIFF, UNITED STATES OF AMERICA:**

4         UNITED STATES DEPARTMENT OF JUSTICE
          BY:  FRED MEDICK
5              RITESH K. SRIVASTAVA
          TRIAL ATTORNEYS, CRIMINAL DIVISION FRAUD SECTION
6         4811 Airport Plaza Drive, 5TH Floor
          Long Beach, CA 90815
7         202-674-5653
          562-982-1746
8         fred.medick@usdoj.gov
          ritesh.srivastava@usdoj.gov
9
     **ON BEHALF OF THE DEFENDANT, HAKOP GAMBARYAN:**
10
          LAW OFFICES MARKS & BROOKLIER, LLP
11        BY:  ANTHONY P. BROOKLIER, ESQ.
          10100 Santa Monica Boulevard, Suite 300
12        Los Angeles, CA 90067
          310-772-2287
13        marksbrooklier@yahoo.com

14
     **ALSO PRESENT**
15
          NOUNE OGANESSIAN, ARMENIAN INTERPRETER
16        SPECIAL AGENT KURT SOO HOO

17

18

19

20

21

22

23

24

25

```
 1              LOS ANGELES, CALIFORNIA; TUESDAY, MAY 26, 2015

 2                            10:21 A.M.

 3                             -OOO-

 4          (Call to Order of the Court.)

 5              THE COURTROOM DEPUTY:  Calling Item 1, CR 14-249,

 6    United States of America versus Hakop Gambaryan.

 7          Counsel, may have your appearances, please.

 8              MR. MEDICK:  Good morning, your Honor.

 9          It's Fred Medick and Ritesh Srivastava for the United

10    States.  Also in court today is Health and Human Services

11    Special Agent Kurt Soo Hoo.

12              THE COURT:  Good morning to you all.

13              MR. BROOKLIER:  Good morning, your Honor.

14          Anthony Brooklier for Hakop Gambaryan.  He's present being

15    assisted by an Armenian interpreter.

16              THE COURT:  Mr. Brooklier, good morning.

17          And Mr. Gambaryan, good morning.

18          All right.  We are here for sentencing.  And my first

19    question is, Mr. Gambaryan, whether or not you have -- I just

20    noticed something.  Mr. Gambaryan, have you seen the

21    Presentence Investigation Report prepared by U.S. Probation and

22    disclosed to the parties on April 22nd of 2015?  Looks like

23    this.

24              THE DEFENDANT:  Yes.

25              THE COURT:  Okay.  As has the Court.  And the Court
```

1    has also reviewed, carefully considered that presentence

2    investigation report together with the sentencing position

3    papers filed by the government on the 19th of this month, as

4    well as the rather voluminous filing on behalf of the defendant

5    to which were attached a number of letters of support, some of

6    which I have some questions about.

7         In any event, on March 20th of 2015, Mr. Gambaryan was

8    found guilty following a jury trial of Counts 1 through 4 of a

9    five-count indictment.

10        Counts 1 through 4 charged a violation of Title 18 United

11   States Code Section 1347, that is, causing health care fraud.

12   This carries with it a base offense level of 6.

13        Now, as we get to the various specific offense

14   characteristics which lead to additional enhancements, there's

15   quite a divergence of opinion with respect to which

16   enhancements are appropriate.  But let me begin with

17   Probation's analysis.

18        To the base offense level of 6, Probation has recommended

19   a 16-level upward adjustment for the intended loss, and this is

20   pursuant to Guidelines Section 2B1.1(b)(1).

21        To that, a further four-level enhancement has been

22   suggested by Probation because more than 15 victims but less

23   than 250 victims were involved, this pursuant to

24   2B1.1(b)(2)(B), and an additional two-level enhancement because

25   the loss was more than $1 million to a government health care

1   program, and this pursuant to 2B1.1(b)(7).

2        This then yields a final adjusted offense level of 28.

3   Based upon zero criminal history points, this then suggests a

4   Guidelines range of 78 to 97 months and Probation made a

5   recommendation for 78 months.

6        The defendant has -- defendant has a much different take

7   on this, and some of which the Court agrees with, some of which

8   the Court rejects.  Actually, the defendant takes exception to

9   the intended loss and the number of victims.  The Court is

10  inclined to agree with the defense's objection with respect to

11  the number of victims involved.  There were a number of people

12  whose Medicare cards were fraudulently used and prescriptions

13  were written in their names, but I'm afraid there was no

14  evidence adduced at trial supporting the theory that they were

15  victimized or damaged in any way.

16       There is one victim in this case -- or multiple victims if

17  you want to consider all of the taxpayers of this country --

18  but the United States government, in the Court's view, is a

19  single victim in this case; therefore, there should be no

20  upward adjustment for that.  The Court, therefore, will strike

21  the four-level enhancement.  That's my tentative view, in any

22  event.

23       It's also the Court's tentative view that there should

24  have been a 16-level -- correction -- an 18-level enhancement

25  with respect to intended loss because the intended loss was

1    actually over $3 million, certainly greater than $2.5 million.

2    So under 2B1.1(b)(7), the Court would apply an 18-level upward

3    enhancement.

4        Now, that being said, let me hear from the government.

5    Those were -- those are simply my tentative findings.  I will

6    withhold making a final determination until after I hear from

7    counsel.  All right.

8          MR. MEDICK:  Thanks, your Honor.  Maybe starting

9    with the four-level enhancement, frankly, it's not something I

10    have ever seen before, and I was surprised.  It was something

11    that was new to me.  I'm not sure that I come out exactly the

12    same as Probation in terms of the reasoning behind it --

13          THE COURT:  This is for the number of victims?

14          MR. MEDICK:  Yeah.

15          THE COURT:  Okay.

16          MR. MEDICK:  -- but looking at the Sentencing

17    Guidelines, frankly, it makes a great deal of sense to me, and

18    this is why.  I'm looking at the bottom of page 92 of the 2014

19    Guidelines and it's talking about -- so these are the

20    application notes.  Application note 4 to Section 2B1.1

21    subsection (e) at the bottom of the page speaks directly to

22    cases involving means of identification, and it's referencing

23    subsection (b)(2) which is what's at issue here.  And it says,

24    (Reading:)

25        "In a case involving means of identification,

1      victim means either" -- I'm saying either --

2      "victim means, 1, any victim as defined in

3      application note 1," I think which is what the

4      Court's referencing, "or, 2, any individual

5      whose means of identification was used

6      unlawfully or without authority."

7      And I would say that, obviously, Medicare identification

8  numbers are means of identification.

9      THE COURT:  Uh-huh.

10      MR. MEDICK:  And certainly they're being used here

11  unlawfully and without authority.  This isn't even a case

12  where, you know, sometimes in, like, access device fraud or

13  identity theft, you got to argue that it was without legal

14  authority even if the individual, him or herself, said it was

15  okay.

16      Here, there's no evidence that any of these -- well,

17  there's -- I should strike that.

18      I think there is plenty of evidence that the submissions

19  were being made without the beneficiaries' knowledge.  At any

20  rate, I think that that's a separate issue.

21      Here, the question is whether it was lawful or not, and I

22  think it's -- the evidence showed that these were unlawful

23  submissions.

24      THE COURT:  Is it -- but I think -- well, I don't

25  have -- I don't have my Guidelines with me; they're still on my

1    desk.  But I think it assumes when someone's identification has

2    been used illegally, that that person is going to be damaged

3    somehow, that they're going to be defrauded of money or

4    property, that somehow they will be victimized.

5        In this particular case my understanding is that they

6    simply paid these people some nominal sum to be able to copy

7    their identification, and then they put that information to use

8    without the knowledge of these Medicare beneficiaries who

9    weren't damaged in any way.

10        MR. MEDICK:  That is right, your Honor.  There is no

11    evidence of damage to the beneficiaries.  So there's -- this

12    isn't a case where, for example, their credit, you know,

13    history was damaged or money was taken out of their bank

14    accounts.  That is true, your Honor.

15        THE COURT:  Okay.  Tell me this.  When over

16    $3 million in claims are submitted to Medi-Cal for payment --

17    Medi-Cal -- Medicare for payment, is it just a desire to take a

18    more conservative approach by saying that the intended loss was

19    between 1 million but not more than 2.5 million?

20        MR. MEDICK:  Right.  So I guess moving on then to

21    that, the second topic, your Honor, I, obviously, disagree with

22    the Probation on that.  You know, these cases -- I was actually

23    just talking to counsel outside very briefly and reflecting on

24    the fact that these health care cases are different than other

25    fraud cases in the sense that if you've got a mortgage fraud or

1   usually an investment fraud or a bank fraud, the loss is much

2   more straightforward, because if you've got a $10 million loan,

3   you just show fraud, you know, in the loan application.  You

4   got a mortgage, investment, you know, fraud in the inducement.

5         Here we have, as counsel has pointed out, literally

6   thousands of claims.  And also as counsel has pointed out, the

7   government provided direct evidence in the sense that

8   beneficiaries actually showed up in court --

9               THE COURT:  Right.

10              MR. MEDICK:  -- as to only a very small subset.

11              THE COURT:  Right.

12              MR. MEDICK:  Now that said, I think what defense's

13  filing overlooks is that the evidence -- the government spent a

14  great deal of time presenting evidence of the overarching fraud

15  scheme in an effort to show, and I think successfully, that

16  Mr. Gambaryan's business was completely permeated with fraud.

17  And I just sort of noted a few of the things -- a few of the

18  topics.  And probably the most obvious and striking one was the

19  referring physicians, in the first place.

20        So the government presented evidence that five of the top

21  referring physicians for Mr. Gambaryan's business, it was all

22  fraud, right?

23        So Dr. Johnson who testified via video conference said he

24  didn't see these beneficiaries, so he just signed these things

25  without knowing who these people were, what their conditions

1    were.

2         Ms. O'Brien, a marketer, testified about fraud at the

3    Glazer and Altamirano clinics.

4         And then we had Drs. Fennell, Fang, and Zeng.  All three

5    of them testified that they didn't sign a single one of these

6    power wheelchairs.  It was all fraud.

7         And, you know, there were a couple other sort of indirect

8    ways that we tried to show this sort of permeated-with-fraud

9    theory.  One is the distance to beneficiaries, and the evidence

10   showed that the beneficiaries lived, you know, I think a range

11   of literally 450 to 500 miles --

12             THE COURT:  Right.

13             MR. MEDICK:  -- with L. A. at the epicenter.

14             THE COURT:  Right.

15             MR. MEDICK:  And one of the agents testified that

16   every single one -- almost every single one of the

17   beneficiaries that he saw in Northern California definitely

18   walked.  And one he just wasn't sure because the guy sat on the

19   couch the whole time.  And, obviously, none of those were the

20   four people who came into court.

21        The evidence showed more than 60-, $65,000 in cash

22   withdrawals, and the government sort of gave its overarching

23   scheme which was that the defendant was paying these cash

24   kickbacks to these fraudulent clinics.  So clearly, 60-,

25   $65,000, that's a lot of wheelchairs.

 1     And then finally, as -- as I think Probation had talked

 2   about in a different context, there's all these photocopied

 3   beneficiaries' signatures.  Yeah.  So the government can't

 4   really bring in 300 beneficiaries to show that every single one

 5   of them -- and that would be a very long trial and the Court

 6   would probably not be very happy with us by the end of it.

 7             THE COURT:  Huh-uh.

 8             MR. MEDICK:  But certainly what we tried to do is

 9   bring in representative beneficiaries and then show the overall

10   scheme and, again, show this permeated-with-fraud concept.

11     And I guess on the other side of the coin, there -- as I'm

12   recalling, there was no evidence of legitimate activity with

13   regards to the Medicare billing.

14     Now, counsel mentions in his filing there is this

15   legitimate business activity that the defendant is engaged in.

16   In fact, his business is still open.  But that, I think, is

17   very, very different from what we saw.  We saw almost

18   completely 75 percent power wheelchairs in the Medicare

19   billings, and the evidence showed numerous times and numerous

20   ways that power wheelchairs are very rarely appropriate.

21     You can contrast that to Mr. Gambaryan's legitimate

22   business which, as I understand it -- I don't know what

23   evidence of it there was at trial -- but as I understand it, it

24   is this much smaller DME.  Like, we're talking what is like

25   surgical tape, gloves, that sort of stuff that's going to adult

1    daycare centers.  So I'm not aware of any indication that there

2    was -- there were any legitimate power wheelchair

3    prescriptions.  And certainly I'm not aware that the business

4    that he does outside of the Medicare context has anything to do

5    with power wheelchairs.

6         So again, I mean, I think -- I can understand where

7    Probation's coming from with this sort of buffer which maybe

8    makes some visceral sense, but I don't think that there's any

9    indication that that's appropriate given the evidence.

10             THE COURT:  It seemed arbitrary to me, so -- and not

11   supported by the evidence.

12        In a moment I'm going to -- I want to give Mr. Brooklier

13   an opportunity to speak, but in a moment I want to get back to

14   the position of -- abuse of a position of trust position that

15   the government takes.

16             MR. MEDICK:  Thank you.

17             THE COURT:  All right.  Mr. Brooklier, you've been

18   very patient, sir.

19             MR. BROOKLIER:  Your Honor, good morning.

20             THE COURT:  Good morning, sir.

21             MR. BROOKLIER:  I'm just going to emphasize a couple

22   of things.  I'd like to talk about the loss.  I really tried to

23   set forth all our arguments.  I really don't have anything

24   new --

25             THE COURT:  Okay.

13

1          MR. BROOKLIER:  -- to add, but I would just like to

2     emphasize this.  At paragraph 29, the PSR states, (Reading:)

3          "The United States Attorney's Office did not,

4          however, provide the probation officer with

5          information regarding which, if any, of these

6          claims were legitimate.  As such, the probation

7          officer is not aware of the actual amount of

8          losses suffered by Medicare as a result of the

9          instant offense."

10         Now, given that which is something I think you rarely

11    see -- at least I rarely see in a probation report -- and given

12    the fact that the Ninth Circuit is very clear about what level

13    of proof is necessary to include uncharged conduct for purposes

14    of sentencing, and the case is, of course, *Staten* -- I think

15    I'm pronouncing it right -- and we, in fact, cited it in our

16    brief to the Court -- it has to be clear and convincing

17    evidence.

18    Now, I -- I was -- when thinking back about the trial, there

19    were two agents that I think testified in a sense about the

20    overall -- what counsel calls the overall scheme, and it was

21    Agent Soo Hoo and the second gentleman who testified was Agent

22    Salvador Rojas.  They spoke generally about seeing -- Agent Soo

23    Hoo spoke generally about seeing a few people up north, I think

24    he said a few people, most of whom could walk, and Agent -- and

25    then we got the statistical information from the other agent.

 1   But, your Honor, there's a lot of elements that would go into I

 2   think the standard of clear and convincing evidence.  It

 3   would -- you would have to prove that Mr. Gambaryan knew that

 4   these people didn't need this.

 5              THE COURT:  Okay.  What issue are we talking about?

 6              MR. BROOKLIER:  I'm talking about --

 7              THE COURT:  Counts 1 through 4?

 8              MR. BROOKLIER:  No.  I'm talking -- no.  Counts 1

 9   through 4, you got to accept that.  They were convicted on

10   that.

11              THE COURT:  All right.

12              MR. BROOKLIER:  I'm talking about counsel wants a

13   16-level enhancement or 18-level enhancement based on --

14              THE COURT:  Intended loss.

15              MR. BROOKLIER:  -- uncharged conduct.

16              THE COURT:  Intended loss.

17              MR. BROOKLIER:  Right.

18              THE COURT:  The claims.

19              MR. BROOKLIER:  The claims.

20              THE COURT:  Over $3 million of claims that were

21   submitted.

22              MR. BROOKLIER:  Exactly.  So what they're saying to

23   your Honor is pretend he was convicted of those.  Now, the

24   probation officer says they don't know which ones were

25   legitimate and which ones weren't.

1          THE COURT:  But that was with respect to actual

2    loss.  Probation is in a quandary with respect to actual loss.

3          MR. BROOKLIER:  No, intended -- actual and intended

4    loss.

5          THE COURT:  Here it is.  Let me just read it.

6          MR. BROOKLIER:  Sure.

7          THE COURT:  The last sentence of paragraph 29 says,

8    (Reading:)

9        "As such, the probation officer is not aware of

10        the actual amount of losses suffered by Medicare

11        as a result of the instant offense."

12          MR. BROOKLIER:  Well --

13          THE COURT:  And I'm not talking about actual.  I'm

14    addressing and I believe Mr. Medick was also addressing

15    intended loss of $3.3-plus million in billings.

16          MR. BROOKLIER:  Well, they go on to say in that same

17    paragraph, your Honor, I think they're talking -- at page -- at

18    paragraph 36 the probation officer says, (Reading:)

19        "Here the Probation Office has been presented

20        with reliable information which establishes the

21        amounts billed and the amounts paid."

22        That would be intended loss and actual loss.  Amounts

23    billed, of course, would be the actual loss.  The amounts

24    paid -- I mean, the amounts billed would be intended loss; the

25    amounts paid would be actual loss.

1    But then the probation officer goes on to say that she has

2    no way to establish which, if any, of the submissions were

3    legitimate and not part of the overall scheme.

4              THE COURT:  And I understand that because the

5    probation officer did not attend the trial.

6              MR. BROOKLIER:  Well --

7              THE COURT:  I'm not suffering from that same

8    disability.

9              MR. BROOKLIER:  I understand.  So it goes to you.

10   It goes to your Honor and it -- and what I'm saying, what I'm

11   arguing to the Court is that the Ninth Circuit says there has

12   to be clear and convincing evidence.

13             THE COURT:  I'm fairly convinced.

14             MR. BROOKLIER:  Well, okay.  I mean, that's --

15   that's -- that's your call, your Honor.

16             THE COURT:  Okay.

17             MR. BROOKLIER:  Except that I don't think there's a

18   basis, with great respect to the Court, to just assume that all

19   of these were illegitimate.  Some of these -- most of these

20   doctors you never heard from.  You only heard from a small

21   percentage of them, actually.

22             THE COURT:  Well, I am so mindful of the fact that

23   during the trial Mr. Gambaryan wasn't required to lift a

24   finger, didn't have to utter a word.  I understand that and he

25   is certainly not going to be penalized for that.

1    That being said, the only information that I have is that

2    it appeared that the vast bulk of his business was in writing

3    prescriptions for power wheelchairs.  Now, maybe there's some

4    surgical tape and a bedpan here or there, but I would imagine

5    if it had been over a million dollars or more in legitimate

6    business, we probably would have heard about that, all right?

7    We didn't hear about that.  So I am fairly well convinced that

8    certainly over $2.5 million of the $3.3 million that was billed

9    was fraudulent.

10              MR. BROOKLIER:  But, so I would counter with,

11   respectfully of the Court, based on what evidence?  I'd argue

12   rhetorically.  You're just -- from -- five claims were

13   presented --

14              THE COURT:  Oh, no, no, no, no.  No, no, no, no.  If

15   I was just relying on these poor people who came in and

16   testified -- and God bless them.  I mean, you certainly

17   couldn't bring in every single person, and none of us wanted to

18   see that; that simply wasn't necessary.  But the vast amount of

19   the billings that -- wait a minute.  I believe in your papers

20   you had indicated there was unrefuted that some of these

21   billings were legitimate?  I'm going, "Really?"  I -- that's

22   not true.

23              MR. BROOKLIER:  Your Honor, there's just --

24   there's -- I don't think it's fair just to assume that the --

25   all of the wheelchairs that Mr. Gambaryan -- that were given by

```
1    Mr. Gambaryan and were billed for were illegitimate.  You

2    didn't hear from all the doctors.  You heard -- only heard from

3    a small percentage of the doctors.  Does that mean that all

4    these other doctors that prescribed these wheelchairs are also

5    engaging in a fraud?

6         You just -- with great respect, I don't think you can jump

7    the way the government wants you to jump to that conclusion

8    based on what the Ninth Circuit requires to do that, and that's

9    clear and convincing evidence.

10        So I --

11             THE COURT:  Okay.

12             MR. BROOKLIER:  -- I say I was at the trial, too.  I

13   understand what you're saying, your Honor.  I understand that

14   there's an argument to be made, but I just disagree that it has

15   reached the level of clear and convincing in this case.

16             THE COURT:  Okay.

17             MR. BROOKLIER:  Otherwise, I think we've said

18   everything that I can possibly say at this point.  We've spent

19   a lot of time preparing this.

20             THE COURT:  You did indeed.  I appreciate that.  And

21   you got to help the Court out next time.  When you get well

22   over ten pages -- and this was three times that -- would you

23   give me a table of contents and authorities?

24             MR. BROOKLIER:  Yes, your Honor, of course.

25             THE COURT:  I appreciate that.
```

```
 1              MR. BROOKLIER:  Thank you.

 2              THE COURT:  All right.  I -- maybe you want to

 3     address the position of trust.

 4              MR. BROOKLIER:  I don't think it applies in the

 5     situation.  He's not a professional.  If it applies in this

 6     situation, it applies in every situation where there's an

 7     alleged fraud.  So I don't think the Guidelines really call for

 8     it.

 9         In other words, if it was a position -- I think it would

10     apply to the doctors, but I don't think it would apply to

11     Ralph's market over here.

12              THE COURT:  No, but if these people have -- these

13     people -- those who are dealing in the durable medical

14     equipment, if they were on this approved list with the

15     government and are basically allowed to have their bills paid

16     almost at face value -- I mean, just submit a bill and the

17     government will pay it -- I don't know that that's the case.

18         I was a little troubled when I saw this position of trust

19     thing, too, because -- but if that is indeed the case, if these

20     are all, you know, approved providers, etc., and are able to

21     have their claims paid without having to go through an awful

22     lot of justification and verification, etc., then maybe an

23     argument could be made.

24         But maybe I -- I've got things ass backwards, don't I?  I

25     do.
```

1            MR. BROOKLIER:  I would never say that.

2            THE COURT:  I do.

3            MR. BROOKLIER:  I would never argue.

4            THE COURT:  Let me hear from the government first.

5    Let me find out what their basis is for holding that somehow

6    there's a violation of a position -- or an abuse --

7            MR. BROOKLIER:  Then perhaps we can talk about the

8    3553 factors.

9            THE COURT:  Absolutely.

10           MR. BROOKLIER:  Thank you, your Honor.

11           THE COURT:  Absolutely.

12           MR. MEDICK:  So, your Honor, I guess probably not

13   surprisingly, I think that the enhancement does apply.  Just to

14   look at the application note here, we have someone who's

15   subject to significantly less supervision, so it seems that the

16   test is whether the individual's responsibilities are primarily

17   discretionary or nondiscretionary, and that means that -- well,

18   I guess in addition, this person's position contributed in a

19   significant way to facilitating the commission or concealment

20   of the offense.

21      So maybe stepping back from that, I think -- so we had

22   this other guy who worked at -- at Colonial, Amlesh

23   Bajracharya.  There wasn't really any evidence -- very little

24   evidence at trial of Mr. Bajracharya's involvement.  But I

25   think someone in that role, to the extent he was referenced, he

1  was an employee -- I guess sort of opened the place up, I guess

2  made some deliveries with the defendant -- now that's somebody

3  who I think we would say, if that guy was in front of us, yeah,

4  clearly the enhancement does not apply.  He's an employee,

5  right?  He's basically doing what he's told.

6      Mr. Gambaryan, on the other hand, is the business owner,

7  right?  He has -- his responsibilities are completely

8  discretionary, right?  He does essentially what he wants when

9  he wants.  Nobody is supervising him.  And in the context of

10  the Medicare fraud, you know, we could debate whether it's wise

11  for Medicare, what we call this honesty based program that it

12  has.  Functionally, I think that to some extent it's just,

13  frankly, necessary because of the volume of claims and that

14  came -- that evidence came in at trial.

15      Regardless, that is the way it works, right?  Medicare

16  trusts these providers to submit truthful claims, and the

17  evidence showed that Mr. Gambaryan abused that trust, right?

18  So I think sort of by definition, you know, Mr. Gambaryan, yes,

19  this is abuse of a position of trust.  Medicare is trusting him

20  to submit truthful claims and he's abusing that trust.  So I do

21  think he is very much in the heartland of what this enhancement

22  anticipates or envisions which is somebody who's acting with a

23  great deal of personal authority, not at the direction of

24  someone else.  In other words, nobody's telling Mr. Gambaryan,

25  "Go submit this claim, " right?  That's Mr. Gambaryan's

1    decision.

2              THE COURT:  Tell me this.  I just simply don't

3    remember whether or not Mr. Gambaryan has been, like, placed on

4    a list of preferred or previously-vetted venders so that his

5    submissions aren't given a great deal of scrutiny, that they're

6    basically accepted at face value.  Is that what we're dealing

7    with?

8              MR. MEDICK:  Your Honor, that would actually be a

9    good idea.  Sort of like the TSA prescreening the airports do?

10             THE COURT:  Right.

11             MR. MEDICK:  Medicare does not do that.

12             THE COURT:  Okay.

13             MR. MEDICK:  There is a laborious and sort of

14   painful application process that a provider like a DME supply

15   company like Colonial has to go through, however, that is much

16   less -- it's not a vetting.  It's just, frankly, a ton of red

17   tape.

18             THE COURT:  Okay.

19             MR. MEDICK:  So the default is very much that these

20   providers are trusted up until the point that it's determined

21   that they're not trustworthy, and then they get put on this

22   sort of pre -- I can't remember what it's called -- preapproval

23   of some sort.

24             THE COURT:  So it's kind of a stretch then to make

25   the argument that he was in some sort of a position of trust.

```
 1   He really wasn't any more than anybody else doing business with
 2   the government.  The government hopes that you're not out to
 3   cheat them, and by virtue of the sheer volume of invoices that
 4   they receive, they have to pretty much take these invoices at
 5   face value.
 6             MR. MEDICK:  I understand -- certainly I understand
 7   what you're saying, your Honor.  I think it is different
 8   because here, yeah, it's true he's not in, like I say, the TSA
 9   prescreening; that doesn't exist.  But every one of these
10   providers does have to go through this -- again, this very
11   laborious application process where they certify to Medicare
12   that they're going to be submitting truthful claims.  So I do
13   think that anybody who becomes a Medicare provider is very much
14   in a position of trust.
15             THE COURT:  Okay.
16             MR. MEDICK:  I would contrast that to somebody
17   who's, like, maybe, you know, just a government contractor
18   who's submitting invoices.  You know, of course, the Department
19   of Justice uses these contractors and we vet those invoices,
20   but in the specific instance of provider submissions to
21   Medicare, that is very much a position of trust, specifically
22   because the claims are not being vetted by Medicare.
23             THE COURT:  Okay.  All right.  Mr. Brooklier, I
24   don't think I need to hear from you, sir.  I'm not going to
25   apply the two-level enhancement that the government was seeking
```

24

```
1    for abusive position of trust.
2         Let me explain something -- explain my approach in terms
3    of what we're doing here.  Aside from the fact that we must go
4    through this exercise of doing the Guidelines computation, my
5    overriding consideration is the reasonableness of my sentence.
6    So after we have done this, then I'm going to put that aside
7    and we're going to talk about 3553(a), and we're going to --
8    I'm going to try to arrive at a reasonable sentence,
9    irrespective of the Guidelines.
10        And with respect to the Guidelines and the computation of
11   them, of course, we're going to try to be accurate.  But if I
12   have to err, I'm going to err on the side of the defense, all
13   right?
14        All right.  I just wanted you to know what my philosophy
15   is going in, okay?  That doesn't mean that I buy all of the
16   defense arguments.  I still think that based upon what I have
17   seen that the intended loss was greater than $2.5 million and,
18   therefore, warranted an 18-level enhancement.  Everything I saw
19   during the course of the trial has thoroughly convinced me that
20   that is what is appropriate.
21        I do agree with the defense that the four-level
22   enhancement for 50 victims or between 50 and 250 victims is
23   completely inappropriate.  I don't believe any enhancement is
24   warranted for that.  There is but a single victim in my view.
25        Of course, the other enhancement, the two-level
```

1   enhancement because the -- there was a loss of more than a

2   million dollars to a government health care program -- I

3   certainly think that that's -- that's appropriate, which then

4   in my view leads us to a final adjusted offense level of 26,

5   which then suggests a Guidelines sentence of 63 to 78 months.

6   I know, half of what the government was looking for, but, all

7   right.

8        Let's talk about -- let's talk about the 3553(a) factors.

9   Now, there's an awful lot of letters -- and I've lost them.

10  There were an awful lot of letters and I found a curiosity with

11  respect to some of those letters.  One thing I found curious

12  was that many of them looked like they were spit out of the

13  same computer or word processer and they had identical

14  formatting, sort of a curious formatting.  That's the sort of

15  thing that makes the submission suspect.  It makes me question

16  the authenticity of all of these wonderful letters.

17       Now, I did find one that I'll tell you, quite frankly,

18  swayed me quite a bit.  Elderly gentleman discussing how

19  Mr. Gambaryan looks in on him on a daily basis in the morning

20  and checks on him again in the evening.  I think that said more

21  to me than all of the other letters put together.

22       But in any event, let me begin with you, Mr. Brooklier.

23            MR. BROOKLIER:  Yes, your Honor.  Your Honor, in

24  terms of the format, what we did was some of these people --

25  the people really don't write English.  So what we did was we

```
 1   sat down with them and with help that I had from John Brown's
 2   office in preparing this entire submission --
 3              THE COURT:  Okay.
 4              MR. BROOKLIER:  -- spit those letters out so you can
 5   read them.
 6              THE COURT:  Got you.  Thank you.
 7              MR. BROOKLIER:  I don't know -- I don't know what
 8   the Court's level of Armenian language ability is at this
 9   point.  We thought we'd put them in English.
10              THE COURT:  You can imagine.
11              MR. BROOKLIER:  Probably about as good as mine.
12         Your Honor, again, I don't have much to add.  We tried to
13   be complete.  We tried to give you a good picture of
14   Mr. Gambaryan's life.  Notwithstanding the fact that he was
15   convicted of these four counts, he seems to me -- you've seen
16   him in court, his countenance.  He seems to be a very humble
17   man.  He's certainly not -- by no means rich.  They've lived in
18   the same small apartment since he arrived in the United States.
19         He's the kind of man who cares for people.  You know that
20   he took care of his mother, who had her leg amputated, on a
21   daily basis, changed her diapers, showered her, etc., etc.  He
22   has a wonderful family that's very, very supportive of him, and
23   he's a kind -- he's a kind man, your Honor.
24         So I think -- I know the Court read this and I know you
25   read the letters, and I think you've got a good picture of him
```

 1  and particularly after seeing him here in Court.  You're an

 2  experienced judge, your Honor.  You've seen how people act and

 3  I think you probably read people pretty well.

 4       I think that he should be at this point -- in a sense,

 5  this is the payoff for leading a good life, absent what has

 6  happened, absent what has happened here.  He's in his late 50s

 7  I believe at this point, never been arrested for anything.

 8  He's a kind, caring person.  He's a family man.

 9       Any questions that I might be able to answer, your Honor,

10  other than just repeating myself?

11            THE COURT:  Yes, yes.

12            MR. BROOKLIER:  Are there any other questions?

13            THE COURT:  Yes.

14            MR. BROOKLIER:  What is that?

15            THE COURT:  I have -- I have no doubt just looking

16  at what you've submitted that he is -- to other human beings he

17  is what we need more of on this planet.  He appears to be a

18  good man and he appears to look after those within his sphere.

19       I'm having a difficult time, I guess, reconciling that

20  against the conduct which has brought him here.  This wasn't --

21  we're not talking about a one-time lapse in judgment, one time

22  where he gives in to greed or financial necessity and he takes

23  an easy route.

24       This was a system in place, and it went on and on and on.

25  This was a business way of life.  And I know you made comment

```
 1   about his character, etc., and as I'm reading that, I'm
 2   thinking, really?  That's a tough sell.  It is.  In certain
 3   respects, just like in his personal life, he is, well, what I
 4   would call a good man.  But in his professional life, he is a
 5   crook.  I'm having trouble making those things mesh because
 6   it's almost as though we're talking about two different people.
 7              MR. BROOKLIER:  You know what I think happens, your
 8   Honor, just being very candid with the Court, I think people --
 9   a lot of people start off with the best of intentions.  I've
10   represented people on Ponzi schemes before.  I was -- we were
11   almost counsel for Mr. Shervin Neman, if you recall.  I sat --
12              THE COURT:  I do recall that.
13              MR. BROOKLIER:  I sat through that trial, your
14   Honor, and as my partner did.  And I think what happens is I
15   think people start -- sometimes start off with the best of
16   intentions and they get lulled into a system.  I think a lot of
17   these, for example -- I'm only using this as an example --
18   Ponzi people, they start off with the best of intentions and
19   then they're behind, so this one time they're going to --
20   they're going to borrow money that really isn't theirs.
21   They're going to borrow it from B to pay A.
22              THE COURT:  Uh-huh.
23              MR. BROOKLIER:  And you start doing that and you
24   start doing that, and you get into a Bernie Madoff situation.
25      I -- look, I -- I'm with you.  I am.  I totally understand
```

```
 1    the dilemma that you have because, I mean, I find him to be a
 2    kind man.  He's always -- when he makes his appointment, he's
 3    always early.  He's always on time.  He's concerned.  He's not
 4    concerned about himself so much.  He's concerned about his
 5    family.  Many people are here.
 6          So I don't know if that's an -- I don't mean it as an
 7    excuse.  I don't even know if it goes to mitigation, but I
 8    think that that's kind of what happens in some of these
 9    situations.  You get involved in it and then you get blinded by
10    what you're doing.  It becomes almost routine.  And I guess
11    that a lot of people would say to themselves, "Well, my
12    goodness, the doctors are giving me these things," and maybe
13    they kid themselves.  You know what I mean?  That they're
14    not -- they're not -- it's not as abrupt or overt as walking
15    into a bank with a gun.  I've got a doctor.  Well, it's his
16    problem if he gives me a false prescription.
17          Should he have really known about it?  I don't know.  So I
18    think that you can perhaps better -- we could perhaps better
19    understand it if you say you're having trouble reconciling it?
20    Me too.  He's a kind man that maybe had a weakness and the
21    weakness allowed him to continue this for some time.  But I
22    think -- I think you've got an accurate picture, I really do.
23          THE COURT:  I think you did a good job on that.
24    Thank you.
25          MR. BROOKLIER:  Thank you, your Honor.
```

1        MR. MEDICK:  Uhm, I agree that Mr. Brooklier did a

2   very good job on that.  I'm going to try to splash some cold

3   water on it now.  I heard -- real quick, I heard this spot on

4   MPR recently about these guys who are sort of the new

5   generation of drug dealers -- I'm not saying Mr. Gambaryan --

6   this is just by way of example -- guys who were working as day

7   laborers at, like, Home Depot or whatever.  They realized if

8   they started selling drugs, they could make a lot more money.

9   These were guys who generally, you know, still send a ton of

10  money -- they're from Central America -- send a ton of money

11  home.  And often what they -- they don't -- you know,

12  generally, according to the spot, aren't using the drugs.

13      And in fact, often what they do is they buy a ton of Levis

14  and bring the Levis back to their villages to give out to

15  everybody at the village, and everybody at the village loves

16  them and they are, by all accounts, you know, nice guys, good

17  guys who really do want to help out their community.  But they

18  are still drug dealers, right?  So a guy like that, beloved in

19  the community, but committing tons of crime that makes that all

20  possible.

21      I'm not saying, again, that Mr. Gambaryan is a drug

22  dealer.  I'm not saying that he's that same sort of Santa Claus

23  type of benefactor who's giving sort of these gifts out.  And

24  in fact, I read through his letters as well, and I've done a

25  lot of these cases, and I'm sure as the Court and counsel, I

1    also felt, you know, these powerful letters, not just because

2    of the number of letters -- and frankly the number of people in

3    court also is unusual and impressive -- but also they were -- I

4    hate to compare them to, like, recommendation letters for

5    clerkships or for, you know, college, but they were very

6    specific and detailed and individuated in terms of what exactly

7    they were saying, and they were very powerful.  And that is --

8    that is moving and wonderful.

9         On the other hand, as the Court has pointed out,

10   Mr. Gambaryan was committing -- this wasn't just a guy -- like,

11   frankly, if he had just walked into a bank with a gun once --

12   there's this movie *Out of Sight* where George Clooney is really

13   frustrated and he gets out of the car and he throws his tie on

14   the ground, and he just says, "Oh, there's a" -- on impulse

15   just walks into the bank and tries to rob it.  Like, okay,

16   that's a crime, but that was an impulsive one-time thing.

17        Mr. Gambaryan over the course of -- what? -- six years,

18   more than $3 million in claims, and God only knows how many

19   thousands of individual decisions to commit fraud, and what

20   comes to my mind is the deliveries themselves.  Mr. Gambaryan

21   is delivering these power wheelchairs to people, by his own

22   admission, and these people often can't even speak English,

23   right?  And he's just having them sign stuff.  They don't know

24   what they're signing.  He's at least in one instance carrying a

25   power wheelchair up the stairs.

```
 1          As much as Mr. Gambaryan is a great benefactor in his own
 2    community, so was he truly calloused and horrible and
 3    detrimental to -- I guess more than detrimental -- just
 4    completely indifferent to all of these hundreds of people that
 5    he was supplying wheelchairs to.  And the fact that he was a
 6    great man to the people close to him, well, that's really nice,
 7    but frankly, I think that our character is judged more by how
 8    we act towards people who are not close to us and who we're not
 9    going to see again.  And in that environment, Mr. Gambaryan
10    was, again, completely callous, completely indifferent.  All he
11    saw these people as was money, was more claims, more money
12    coming back to him.  Didn't care about them.  You know, no
13    evidence of follow-up, no evidence of any interaction with
14    these beneficiaries ever after just dumping the power
15    wheelchairs on them.  We had evidence that he put them in the
16    garage if the person can't take them in the house, right?
17    Could not care less about these people.
18          So, your Honor, I think for all the wonderful letters that
19    Mr. Gambaryan did get, all the people here in court, there are
20    hundreds of people out there who, if they had a chance to come
21    in, would say a very, very different story.  That's it.
22              THE COURT:  A lot of cold water.
23          Got at least a dozen people here.  How many of you sitting
24    back there are relatives of Mr. Gambaryan?  Oh, my goodness.
25              Wait a minute.  All right.  Let me do it this way:  How
```

```
 1    many of are you are not relatives of Mr. Gambaryan?  Are not?
 2    There seems to be -- you don't really know.  You're not sure.
 3    There's two of you --
 4              MR. BROOKLIER:  I think some of the people don't
 5    speak English, your Honor.
 6              THE COURT:  Oh, oh, got you.
 7              THE INTERPRETER:  May the interpreter interpret,
 8    your Honor?
 9              THE COURT:  Please.  Thank you.
10              Are not?
11              THE INTERPRETER:  These are the individuals that are
12    not relatives.
13              THE COURT:  1, 2, 3, 4, 5, 6, 7.  All right.  Thank
14    you very much.  Okay.  8 -- 8 of 13.  That's impressive.
15         All right.  Mr. Gambaryan, this is also an opportunity for
16    you, sir, if you wish to exercise it, to address the Court on
17    the issue of your sentence.  Just -- just as an aside -- this
18    is coming to me too late -- but he's got all of this support
19    here, and if they don't understand English, then all of this
20    openness is lost on them.
21              MR. BROOKLIER:  I think that -- your Honor, I think
22    that many of them do understand English.  Most of them do.
23              THE COURT:  Okay.
24              MR. BROOKLIER:  Yeah.  I'm sorry.
25              THE COURT:  All right.  Okay.
```

1      MR. BROOKLIER:  We'll have the interpreter

2  interpret, your Honor, the short statement Mr. Gambaryan made

3  to her.

4      THE DEFENDANT:  I would like to apologize for my

5  wrongdoing and request to be able to be with my family.

6      THE COURT:  Having considered the sentencing factors

7  enumerated at Title 18 United States Code Section 3553(a),

8  including the advisory Guidelines range of 63 to 78 months

9  based upon an offense level of 26 and a Criminal History

10  Category of I, it is ordered that the defendant shall pay to

11  the United States a special assessment of $400 which is due

12  immediately.  Any unpaid balance shall be due during the period

13  of imprisonment at the rate of not less than $25 per quarter.

14     Defendant shall comply with General Order No. 01-05.

15     All fines are waived as it is found that the defendant

16  does not have the ability to pay a fine in addition to

17  restitution.

18     Pursuant to Sentencing Reform Act of 1984, it is the

19  judgment of the Court that defendant Hakop Gambaryan is hereby

20  committed on Counts 1, 2, 3, and 4 of the indictment to the

21  custody of the Bureau of Prisons to be imprisoned for a term of

22  84 months on each of Counts 1, 2, 3, and 4 of the indictment to

23  be served concurrently.

24     Defendant -- correction -- Court recommends that the

25  Bureau of Prisons evaluate defendant for the 500-hour RDAP

program and conduct a mental health evaluation of the defendant

and provide all necessary treatment.

Upon release from imprisonment, defendant shall be placed

on supervised release for a term of three years. This term

consists of three years on each of Counts 1, 2, 3, and 4 of the

indictment, all such terms to run concurrently under the

following terms and conditions:

1. Defendant shall comply with the rules and regulations

of the U.S. Probation Office and General Order 05-02.

2. Defendant shall refrain from any unlawful use of a

controlled substance. Defendant shall submit to one drug test

within 15 days of release from imprisonment and at least two

periodic drug tests thereafter, not to exceed eight tests per

month, as directed by the probation officer.

3. Defendant shall participate in an outpatient substance

abuse treatment and counseling program that includes

urinalysis, breath and/or sweat patch testing as directed by

the Probation Officer. Defendant shall abstain from using

illicit drugs and from abusing prescription medications and

alcohol during the period of supervision.

4. During the course of supervision, the probation

officer, with the agreement of the defendant and defense

counsel, may place the defendant in a residential drug

treatment program approved by the U.S. Probation Office for

treatment of narcotic addiction or drug dependency which may

1    include counseling and testing to determine if the defendant

2    has reverted to the use of drugs.

3         The defendant shall reside in the treatment program until

4    discharged by the program director and the probation officer.

5         5.  Defendant shall participate in mental health treatment

6    which may include evaluation and counseling until discharged

7    from the treatment by the treatment provider with the approval

8    of the probation officer.

9         6.  As directed by the probation officer, the defendant

10   shall pay all or part of the cost of treating his drug and/or

11   alcohol dependency and mental health treatment to the aftercare

12   contract or during the period of community supervision pursuant

13   to 18 U.S.C. Section 3672.

14        Defendant shall provide payment and proof of payment as

15   directed by the probation officer.

16        During the period of community supervision, the defendant

17   shall pay the special assessment in accordance with this

18   judgment's orders pertaining to such payment.

19        8.  Defendant shall not obtain or possess any driver's

20   license, social security number, birth certificate, passport,

21   or any other form of identification in any name other than

22   defendant's true legal name without the prior written approval

23   of the probation officer.

24        Defendant shall cooperate in -- 8 -- correction.

25        9.  Defendant shall cooperate in the collection of a DNA

1    sample from himself.

2         10.  Defendant shall apply all moneys received from income

3    tax refunds to the outstanding court-ordered financial

4    obligation.  In addition, the defendant shall apply all moneys

5    received from lottery winnings, inheritance, judgments, and any

6    anticipated or unexpected financial gains to the outstanding

7    court-ordered financial obligation.

8         The Court authorizes the Probation Office to disclose the

9    presentence report to the substance abuse treatment provider in

10   order to facilitate the defendant's treatment for narcotic

11   addiction or drug dependency.  Further redisclosure of the

12   presentence report by the treatment provider is prohibited

13   without the consent of this Court.

14        The Court finds that the defendant does not pose a risk to

15   the community or a risk of flight.  Therefore, the Court will

16   permit the defendant to self-surrender.

17        Uhm, 30 -- Mr. Brooklier, confer with your client.

18   30 days?  60 days?  90 days to surrender?

19             MR. BROOKLIER:  I think 90 days, your Honor, if --

20             THE COURT:  Done.

21        All right.  The defendant is ordered to surrender himself

22   to the institution designated by the Bureau of Prisons on or

23   before 12 noon, August 28th of 2015.  In the absence of such

24   designation, defendant shall report on or before the same date

25   and time to the United States Marshal located at the Roybal

1   Federal Building, 255 East Temple Street, Los Angeles,

2   California.

3       Now, pursuant to Title 18 United States Code

4   Section 3553(a), the Court is obligated to impose a sentence

5   which is sufficient but not greater than necessary to comply

6   with the purposes of 3553(a)(2).  In determining a sentence,

7   the Court must consider the nature and circumstances of the

8   offense, the history and characteristics of the defendant, and

9   the Court must recognize the need for the sentence imposed to

10  reflect the seriousness of the offense, that it should promote

11  respect for the law, that it should provide just punishment for

12  the offense and afford adequate deterrence to future criminal

13  conduct.

14      The sentence should protect the public from further crimes

15  of the defendant and provide the defendant with needed

16  correctional treatment in the most effective manner.

17      Here, the Court has evaluated the various kinds of

18  sentences available as well as the Guidelines sentencing range.

19  The Court has also recognized the need to avoid unwarranted

20  sentence disparities among defendants with similar records who

21  have been found guilty of similar conduct.

22      This sentence of 84 months of incarceration is indeed a

23  meaningful sentence.  Defendant has never been previously

24  incarcerated and it is believed that the sentence will have a

25  significant impact on him specifically and others similarly

1    inclined generally.  As such, it is believed that this sentence

2    is sufficient to reflect the seriousness of the offense,

3    promote respect for the law, and to provide just punishment for

4    the offense.

5         The instant offense involved numerous and repeated

6    criminal acts over a period of years and resulted in

7    significant losses to Medicare, a public agency designed to

8    assist the elderly and the disabled.

9         Conversely, the instant offense resulted in significant

10   financial gains to the defendant.  For this reason, the

11   three-year term of supervised release is necessary to allow

12   time for the defendant's conduct to be monitored and to allow

13   time for the defendant to make restitution which is ordered to

14   be paid to the United States Treasury in the amount of

15   $1,740,000 -- well, -40,009 dollars.

16        You have the right to appeal your conviction and your

17   sentence.  With few exceptions, a notice of appeal must be

18   filed within 14 days of judgment being entered.

19        Do you understand that, sir?

20             THE DEFENDANT:  Yes.

21             THE COURT:  If you are unable to afford a transcript

22   of the record in this case, one will be provided at government

23   expense.

24        If you are unable to pay the cost of an appeal or the

25   filing fee, you may apply within 14 days for a waiver.

40

1    If you do not have an attorney to act on your behalf, and

2    if you request it, the Clerk of the Court will prepare and file

3    a notice of appeal on your behalf.  Again, you must make the

4    request within 14 days.  The notice of appeal must designate

5    the judgment or order appealed from and the fact that you are

6    appealing to the Court of Appeals.  It should also designate

7    that portion of the proceedings not already on file that you

8    deem necessary for the reporter to include.

9    Also in its consideration, the Court has evaluated the

10   Sentencing Guidelines as required by Title 18 United States

11   Code Section 3553(a)(4) and finds the calculations of suggested

12   sentence therein for this defendant under the present

13   circumstances to be unreasonable.  The Court, therefore,

14   sentences the defendant as previously stated.

15   All right, sir.  Once again, you are permitted to remain

16   free on bond on the same terms and conditions originally

17   imposed, and you will be permitted to self-surrender either to

18   the institution designated by the Bureau of Prisons, or, in the

19   absence of such designation, to the U.S. Marshal at the Roybal

20   Building two blocks down the street on Temple Street on or

21   before noon of August 28th of 2015.

22   Anything further from the government?

23        MR. MEDICK:  No, your Honor.

24        THE COURT:  Mr. Brooklier?

25        MR. BROOKLIER:  Yes, your Honor.  Given the -- our

```
 1   position, which is far different from the government's in the
 2   sentence, would the Court consider bail on appeal for
 3   Mr. Gambaryan?
 4              THE COURT:  No.
 5              MR. BROOKLIER:  Thank you, your Honor.
 6              THE COURT:  But I appreciate you asking.
 7              MR. BROOKLIER:  Thank you.
 8              THE COURT:  All right.
 9              THE COURTROOM DEPUTY:  This Court is in recess.
10         (Proceedings concluded at 11:28 a.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
1                    CERTIFICATE OF OFFICIAL REPORTER

2

3

4

5    I, DEBRA READ, FEDERAL OFFICIAL REALTIME COURT REPORTER, IN AND

6    FOR THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT

7    OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753,

8    TITLE 28, UNITED STATES CODE, THAT THE FOREGOING IS A TRUE AND

9    CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED PROCEEDINGS

10   HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE

11   FORMAT IS IN CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL

12   CONFERENCE OF THE UNITED STATES.

13

14          DATED THIS 2ND DAY OF JUNE, 2015._____

15

16

17          /S/ DEBRA READ
     _____  _____
18   DEBRA READ, CSR NO. 3949 CRR RMR
     FEDERAL OFFICIAL COURT REPORTER
19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT

# EXHIBIT 6

**EXHIBIT 6**

```
 1                    UNITED STATES DISTRICT COURT

 2           CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

 3            HONORABLE PHILIP S. GUTIERREZ, U.S. DISTRICT JUDGE

 4

 5    UNITED STATES OF AMERICA,              )
                                             )
 6                      PLAINTIFF,           ) CASE NO.
                                             ) CR 13-719(A)
 7           VS.                             )
                                             )
 8    EDGAR POGOSIAN,                        )
         AKA "EDGAR HAKOBYAN,"               )
 9    KAREN SARKISSIAN,                      )
         AKA "GARY SARKISSIAN,"              )
10                                           )
                        DEFENDANTS.          )
11    _____)

12

13

14

15                      REPORTER'S TRANSCRIPT OF
16                       JURY TRIAL - DAY 2
                      THURSDAY, FEBRUARY 4, 2016
17                          FIRST SESSION
                      LOS ANGELES, CALIFORNIA
18

19

20

21

22       _____
23
                   MAREA WOOLRICH, CSR 12698, CCRR
24               FEDERAL OFFICIAL COURT REPORTER
                255 EAST TEMPLE STREET, ROOM 181-K
25                 LOS ANGELES, CALIFORNIA 90012
                       mareawoolrich@aol.com
```

```
 1                    APPEARANCES OF COUNSEL:

 2

 3   FOR THE PLAINTIFF:

 4       EILEEN M. DECKER
         UNITED STATES ATTORNEY
 5       BY:  CATHY OSTILLER
         KRISTIN WILLIAMS
 6       CASSIE PALMER
         ASSISTANT UNITED STATES ATTORNEYS
 7       UNITED STATES COURTHOUSE
         312 NORTH SPRING STREET
 8       LOS ANGELES, CA 90012

 9

10   FOR DEFENDANT EDGAR POGOSIAN:

11       LAW OFFICES OF PAT HARRIS
         BY:  PAT HARRIS
12       225 SOUTH LAKE AVENUE, SUITE 300
         PASADENA, CA 91101
13

14   FOR DEFENDANT KAREN SARKISSIAN:

15       SPERTUS, LANDES & UMHOFER
         BY:  JAMES SPERTUS
16       SAMUEL JOSEPHS
         1990 S. BUNDY DRIVE, SUITE 705
17       LOS ANGELES, CA 90025

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT

1                     **I N D E X**

2                 FEBRUARY 4, 2016

3 **FIRST SESSION**

4 ----------------------------------------------------------

5           **CHRONOLOGICAL INDEX OF WITNESSES**

6

7  WITNESSES                                   PAGE

8  JODY WHITTEN
        DIRECT EXAMINATION BY MS. PALMER       41
9         CROSS-EXAMINATION BY MR. SPERTUS       63

10

11 ----------------------------------------------------------

12              **INDEX OF EXHIBITS**

13

14           RECEIVED INTO EVIDENCE

15  EXHIBIT NOS. 1, 2, 4, AND 6             40
 EXHIBIT NO. 1600                       68
16  EXHIBIT NOS. 1603, 1604, AND 1605       79
 EXHIBIT NO. 1611                       76

17

18

19

20

21

22

23

24

25

1   Defendant Sarkissian was involved in setting up that clinic,

2   recruiting a doctor for that clinic, getting the Sunset Clinic

3   enrolled as a Medicare provider, and handling the day-to-day

4   operations of the clinic.

5       You will hear that he controlled the checkbook for the

6   Sunset Clinic and that for a certain period of time after the

7   clinic started billing Medicare, he was listed on the account

8   with the doctor for the bank account where all the Medicare

9   money went.

10      Once the Sunset Clinic was enrolled as a Medicare

11  provider, it could provide services to Medicare patients, and

12  it could bill Medicare for those services.  And you'll hear us

13  refer to Medicare patients during this trial as beneficiaries.

14  We'll call them either patients or beneficiaries.

15      So once it was enrolled, it could bill Medicare.  And bill

16  it did.  In just six months, the Sunset Clinic billed Medicare

17  over $1.2 million for services that it claimed it had provided

18  to Medicare beneficiaries.  And when Medicare paid money for

19  those services, that money went into the bank account that had

20  the checkbook that was controlled by Defendant Sarkissian.

21      Can you all see the screen to your -- there's one to your

22  right.  There's one to your left.  Sorry.  Left/right.

23      The Sunset Clinic was enrolled with Medicare under the

24  name of a doctor, Dr. Louis Bascoy.  However, you will hear

25  that Dr. Bascoy was rarely at the Sunset Clinic and hardly saw

```
1    any patients there.
2         Instead, you will hear that L'Tanya Smith, whose picture
3    appears on the top right, worked at the Sunset Clinic as a
4    physician's assistant or PA -- you'll hear us call it a PA --
5    and saw almost all of the patients.  You'll hear from some of
6    these patients --
7              (Cell phone interruption.)
8              THE COURT:  All cell phones should be off.  If I
9    hear any other cell phone, the phone will be confiscated.  All
10   cell phones are off now.  Thank you.
11             MS. OSTILLER:  As I said, you will hear from some of
12   the patients that L'Tanya Smith saw at the Sunset Clinic.
13   These were elderly Medicare beneficiaries.  And they'll tell
14   you how they were recruited to come to the Sunset Clinic to see
15   someone who was not their regular doctor.  And they went to a
16   clinic that in some cases didn't really look like a real clinic
17   to them.
18        You'll see a picture of the Sunset Clinic in the middle of
19   the screen there.  Again, we have Defendant Sarkissian on the
20   top left, L'Tanya Smith on the top right, and Dr. Bascoy just
21   below them.
22        You will hear that L'Tanya Smith supposedly saw as many as
23   60 to 70 patients on some days according to the Medicare
24   billings.  And L'Tanya Smith regularly ordered lots of
25   diagnostic tests for these patients, often on their first visit
```

```
 1   to the clinic, allergy tests, nerve tests, lung tests.  Some of
 2   these tests were to be done at the Sunset Clinic, and some were
 3   to be referred to other medical clinics who could then, in
 4   turn, bill Medicare for those services.  And you see we have a
 5   line going from the Sunset Clinic to other clinics with the
 6   word "referrals" there on the screen.
 7        I'm going to talk about allergy tests in particular.  The
 8   evidence will show that the Sunset Clinic billed Medicare for
 9   allergy tests ordered by L'Tanya Smith for over half of the
10   clinic's patients.  Now, Medicare will only pay for diagnostic
11   tests like allergy tests if the tests are actually done and if
12   the patient actually needs the test.
13        You will hear that the Sunset Clinic told Medicare that
14   these allergy tests were being performed at the Sunset Clinic.
15   Yet you won't see any allergy test results in the patient
16   files.  And you'll hear that during most of the time that the
17   Sunset Clinic was billing Medicare for allergy tests, it wasn't
18   actually doing any allergy tests.
19        You'll see L'Tanya Smith's order forms for the allergy
20   tests which say that the patients are to receive as many as 60
21   or 70 skin pricks on their arms for different allergens.  But
22   they don't say which allergens.  And there's no proof in the
23   files that those skin pricks actually occurred.
24        During the course of the trial, we will focus on allergy
25   tests for five patients in particular.  You'll hear that those
```

1   patients did not have allergies and did not need the allergy

2   tests.  Some of those patients will tell you that they did not

3   actually get the allergy tests.  Those five patients make up

4   the five counts of health care fraud against

5   Defendant Sarkissian because this fraud occurred at the clinic

6   that he managed and operated.

7       Now, although those allergy tests make up the five counts

8   of health care fraud against Defendant Sarkissian, you'll hear

9   that there was other fraudulent activity happening at the

10  Sunset Clinic that he managed and operated.

11      You'll hear that L'Tanya Smith's physician's assistant

12  license was expired during a portion of the time that she

13  worked at the Sunset Clinic.  Medicare will not pay for

14  services provided by an unlicensed PA.  But you will hear that

15  the Sunset Clinic never told Medicare that her license was

16  expired.

17      You'll hear that L'Tanya Smith said she saw no more than

18  ten patients a day at the Sunset Clinic.  But you'll see that

19  the Sunset Clinic often billed for more than 20 patients per

20  day and sometimes as many as 60 or 70.

21      In addition to allergy tests, L'Tanya Smith ordered a

22  bunch of other diagnostic tests for patients, the same tests

23  for almost every patient.  And she tried to justify ordering

24  these tests by writing in the patient files that the patients

25  had conditions they didn't have.

82

1                     CERTIFICATE OF OFFICIAL REPORTER

2

3

4

5                 I, MAREA WOOLRICH, FEDERAL OFFICIAL REALTIME COURT

6   REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE

7   CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT

8   TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING

9   IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY

10  REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT

11  THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE

12  REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

13

14

15                            DATED THIS  23RD  DAY OF APRIL, 2016.

16

17

18                    /S/ MAREA WOOLRICH

19                    MAREA WOOLRICH, CSR NO. 12698, CRR
                      FEDERAL OFFICIAL COURT REPORTER
20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

# EXHIBIT 7

**EXHIBIT 7**

SPERTUS, LANDES & UMHOFER, LLP
1990 SOUTH BUNDY DRIVE, SUITE 705
LOS ANGELES, CALIFORNIA 90025
TEL (310) 826-4700 • FAX (310) 826-4711

## DECLARATION OF KAREN SARKISSIAN

I, Karen Sarkissian, hereby state and declare as follows:

1.      I am the defendant in the matter of *United States v. Karen Sarkissian*, Case No. CR 13-00718(A)-4-PSG.  I have personal knowledge of the facts set forth herein and, if called as a witness, I could and would competently testify thereto.

2.      I never believed or intended that Medicare would pay the amounts that the Sunset Clinic billed for services.  I understand that bills must be submitted using a provider's normal and customary billing rates, but that lesser amounts will be paid by Medicare.  For the bills submitted by the Sunset Clinic, I intended to receive whatever Medicare would ultimately pay, and I never once believed that Medicare would pay the amounts billed.  I always knew that the amounts paid by Medicare would be less than the amounts billed to Medicare under the Medicare billing number, both because Medicare reimbursed according to the Medicare fee schedule and because Medicare would deny some claims and not pay all claims.

3.      Government witnesses testified to these facts at my trial, but I knew these facts independently and am describing my intent and knowledge at the time the bills for services were submitted in connection with the Sunset Clinic.  My knowledge at the time was based on my experience in the healthcare industry, which includes being employed at other clinics that billed to Medicare.  Although I was not responsible for billing and other employees and professional billing companies actually submitted the bills to Medicare, I was aware that the amount billed to Medicare would not be the same amount Medicare reimbursed the Sunset Clinic.  I never in my lifetime expected that the Sunset Clinic would be paid the billed amount for Medicare services.  I expected the Sunset Clinic would receive only what Medicare actually paid according to its fee schedule and its practice of regularly denying claims.  I was specifically aware throughout the period of time charged in the Indictment filed against me that Medicare often partially or wholly denied

DECLARATION OF KAREN SARKISSIAN

1   denied claims, and I never expected we would be paid on all claims submitted.  I

2   only expected to receive what Medicare would pay.

3        I declare under penalty of perjury under the laws of the State of California

4   and the United States that the foregoing is true and correct.  Signed this  9th  day of

5   August, 2016 at Los Angeles, California.

Karen Sarkissian

SPERTUS, LANDES & UMHOFER, LLP
1990 01TH BUNDY DRIVE, SUITE 705
LOS ANGELES, CALIFORNIA 90025
TEL (310) 826-4700 • FAX (310) 826-4711

DECLARATION OF KAREN SARKISSIAN

# EXHIBIT 8

**EXHIBIT 8**



CENTERS for MEDICARE & MEDICAID SERVICES

**SafeGuard
Services**
LLC

September 23, 2010

Louis T. Bascoy, MD
4560 E. Cesar E. Chavez Ave.
Los Angeles, CA 90022-1117

**RE:** FINAL RESULTS OF POST PAYMENT REVIEW
**PTAN:** CA284A
**NPI:** 1942375100
**WMM Number:** 4711062009019

Dear Dr. Bascoy:

This letter is to inform you of the finalized results of our post payment review.

### Background

Our review focused on claims submitted with dates of services between July 10, 2009 and March 25, 2010. Data revealed that 2,949 claims for 588 beneficiaries were paid under your Medicare Provider Transaction Access Number (PTAN) CA284A for these services dates. The practice address for this PTAN is listed as 1377 West Sunset Blvd., Los Angeles, CA 90026-4449. The PTAN was active from May 27, 2009 through March 26, 2010. A total of $660,756.00 was billed, of which Medicare allowed $586,346.47 and paid $462,496.50.

The following is a detailed review of the findings.

### Review Findings

On January 26, 2010, CAL-BISC Fraud Investigators George Salazar and I conducted an in-person interview with Physician Assistant (PA) L'Tanya Denise Smith and Mr. Gary Sarkisian, Office Manager, at your practice location at 1377 West Sunset Blvd., Los Angeles, CA 90026. When we arrived at the clinic, at approximately 10:45 am, neither PA Smith nor Mr. Sarkisian was in the office. However, there were patients in the waiting room as well as in the examination/treatment rooms. PA Smith and Mr. Sarkisian came 20 minutes later after one of the office staff called them. During the interview, PA Smith stated that she started working there in July 2009 and her office days/hours were Monday through Friday from 9 am to 5 pm. She indicated that she sees approximately 8-10 patients per day for both initial and follow-up examinations. She was

KH_AA057582

Exhibit 7
Page 1 of 7

Dr. Louis T. Bascoy
Page 2 of 7

asked if she has a signed Delegation of Services Agreement (DSA) with you. PA Smith responded
that she does, but she has to look for it. Mr. Sarkisian was asked if there was a DSA on file at the
clinic to which he replied, "No, but we could get it for you." Mr. Sarkisian added that he could send
a copy of the DSA via facsimile to me.

Later that same day, we went to your other clinic at 4560 E. Cesar Chavez Ave., Los Angeles, CA
90022 in an attempt to conduct an in-person interview with you. We arrived at the location at
approximately 2:10 pm. We were met by Margie Dosal, Office Manager, who advised us that ▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ We asked Ms. Dosal if there was a
file on-site for your W. Sunset clinic. She pulled a folder with some documents pertaining to the
West Sunset clinic. She was asked if there was a DSA document between you and PA Smith in the
folder. Ms. Dosal responded that there was no DSA in the folder ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮

KH_AA057583

Exhibit 7
Page 2 of 7

Dr. Louis T. Bascoy
Page 3 of 7

Medicare also obtained information from the Physician Assistant Committee (PAC) that PA Smith's license had expired on September 30, 2009. However, our records show that services were billed during the time in which she was unlicensed.

A thorough review of all of the information gathered was conducted. The review revealed that services were billed with dates of service during a time period when there was no signed and dated Delegation of Services Agreement between you and PA Smith, who you were allegedly supervising. Additionally, there were services billed with dates during the time when the PA's license was expired. Lastly, the services billed that were allegedly rendered were PA services that were not incident to your services, and therefore, payment should have been reduced to 85 percent of the fee schedule amount.

### No Delegation of Services Agreement

Internet Only Manual (IOM) Publication 100-02, Chapter 15, Section 190, issued by the Centers for Medicare & Medicaid Services (CMS), discusses <u>Physician Assistant Services</u>. It states in pertinent part:

"A. Qualifications for PAs

To furnish covered PA services, the PA must meet the conditions as follows:
> 1. Have graduated from a physician assistant educational program that is accredited by the Accreditation Review Commission on Education for the Physician Assistant (its predecessor agencies, the Commission on Accreditation of Allied Health Education Programs (CAAHEP) and the Committee on Allied Health Education and Accreditation (CAHEA); or 2. Have passed the national certification examination that is administered by the National Commission on Certification of Physician Assistants (NCCPA); and 3. Be licensed by the State to practice as a physician assistant.

B. Covered Services

Coverage is limited to the services a PA is legally authorized to perform in accordance with State law (or State regulatory mechanism provided by State law).
1. General
The services of a PA may be covered under Part B, if all of the following requirements are met:
> .....
> • They are performed by a person who meets all the PA qualifications,.....
> • The PA is legally authorized to perform the services in the state in which they are performed; ....."

In January 2009, the Physician Assistant Committee Medical Board of California issued laws and regulations pertaining to the practice of physician assistants. These laws and regulations were

KH_AA057584

Exhibit 7
Page 3 of 7

Dr. Louis T. Bascoy
Page 4 of 7

published in the Physician Assistant Committee website.  Physician Assistant Regulations as contained in Title 16, Division 13.8 of the California Code of Regulations state in pertinent part:

"1399.540.  Limitation on Medical Services.

 (a) A physician assistant may only provide those medical services which he or she is competent to perform and which are consistent with the physician assistant's education, training, and experience, and which are delegated in writing by a supervising physician who is responsible for the patients cared for by that physician assistant.

(b) The writing which delegates the medical services shall be known as a delegation of services agreement. A delegation of services agreement shall be signed and dated by the physician assistant and each supervising physician….."

It is also indicated in the Physician Assistant Committee website that the physician assistant (PA) is required by law to execute a Delegation of Services Agreement with the supervising physician. The DSA must be signed and dated by the PA and the supervising physician. The original or a copy of this document should be maintained at all practice sites where the PA practices, and should be readily accessible.

it was determined that you did not have a signed and dated DSA with PA Smith when she allegedly started rendering services in July 2009 at the W. Sunset location.  There was no DSA on file at the W. Sunset location, as required by regulations, when CAL-BISC Investigators asked for it during their visit on January 26, 2010.

Thus, services that were allegedly rendered with dates of service July 10, 2009 through January 27, 2010 are not covered for non-compliance with the requirements pertaining to the DSA.  Payments made for these services under your PTAN were inappropriate and are considered overpayments.

**Expired PA License**

As provided in Internet Only Manual (IOM) Publication 100-02, Chapter 15, Section 190 (A) (B), the PA must meet all the qualifications to furnish covered PA services.  One of the qualifications that must be met is that the PA is licensed by the State to practice as a PA.

Physician Assistant Practice Act as contained in Division 2, Chapter 7.7 of Business and Professions Code states in pertinent part:

"3524.  Renewal of Expired License or Approval

A license or approval that has expired may be renewed at any time within five years after its expiration by filing an application for renewal on a form prescribed by the committee or board, as the case may be, and payment of all accrued and unpaid renewal fees. If the license or approval is not renewed within 30 days after its expiration, the licensed physician assistant and approved supervising

KH_AA057585

Exhibit 7
Page 4 of 7

Dr. Louis T. Bascoy
Page 5 of 7

physician, as a condition precedent to renewal, shall also pay the prescribed delinquency fee, if any. Renewal under this section shall be effective on the date on which the application is filed, on the date on which all renewal fees are paid, or on the date on which the delinquency fee, if any, is paid, whichever occurs last.....”

Information obtained from the PAC indicates that PA Smith's PA license expired on September 30, 2009 and was not processed for renewal until December 16, 2009.  With an expired license, PA Smith was not qualified and permitted to practice from October 1, 2009 through December 15, 2009 according to the above mentioned regulations.  Therefore, services billed with dates within this time period are not covered.  Payments made for these services under your PTAN were inappropriate and are considered overpayments.

**Physician Assistant Services Paid Inappropriately**

Internet Only Manual (IOM) Publication 100-04, Chapter 12, Section 110 issued by the Centers for Medicare & Medicaid Services (CMS), discusses Physician Assistant Services Payment Methodology. It states in pertinent part, “.....Physician Assistant services are paid at the lesser of the actual charge or 85 percent of the physician fee schedule.....”

The information we obtained from the interviews conducted with ▒▒▒▒ PA Smith indicate that the services PA Smith allegedly rendered at the W.  Sunset location were not incident to your services. We determined that you did not perform an initial evaluation on any of the patients as PA Smith stated that she provided both initial and follow-up examinations. ▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒

Since it has been established that the services billed were not rendered incident to your services, payment is limited to 85 percent of the fee schedule amount (IOM Publication 100-04, Chapter 12, and Section 110).  Services billed with dates January 28, 2010 through March 25, 2010 were allowed inappropriately at 100 percent of the fee schedule amount; therefore, these services were overpaid by 15 percent.

Based on all the information gathered, it was determined that services billed with dates of service July 10, 2009 through January 27, 2010 were rendered by a PA without a signed and dated Delegation of Services Agreement and/or while the PA's license was expired, and therefore, not covered.  Payments made for these services under your PTAN CA284A were inappropriate and are considered overpayments.  Additionally, services billed with service dates January 28, 2010 through March 25, 2010 were paid inappropriately at 100 percent of the fee schedule amount.  Payments made for these services under your PTAN CA284A were overpaid by 15 percent.

<u>Issue of Notice</u>

The criteria for determining that a provider knew that the services were excluded from coverage are determined under 42 C.F.R §411.406(e). The section states “It is clear that the provider, practitioner,

KH_AA057586

Exhibit 7
Page 5 of 7

Dr. Louis T. Bascoy
Page 6 of 7

or supplier could have been expected to have known that the services were excluded from coverage on the basis of ...its receipt of CMS notices, including manual issuances, bulletins, or other written guides or directives from intermediaries, carriers, or Quality Improvement Organizations (QIOs), including notification of QIO screening criteria specific to the condition of the beneficiary for whom the furnished services are at issue and of medical procedures subject to pre-admission review by a QIO."

It has been determined that Medicare's policy regarding the issues discussed were made available to you through Current Procedural Terminology (CPT), Medicare Newsletters, Medicare Bulletins, and special policy issues These manuals, bulletins, and written guides serve as notice to providers. The following is a partial listing of policy issues and billing manuals related to the issues mentioned above that were made available to all providers between the time you joined the Program and when the services were rendered:

- CMS Internet Only Manual Publication 100-02, Chapter 15, Section 190A and B.
- CMS Internet Only Manual Publication 100-04, Chapter 12, Section 110
- Title 16, Division 13.8 of the California Code of Regulations, Section 1399.540 (a) and (b)

The Medicare B Resource Preview summary was mailed to all active providers on a quarterly basis, upon the publication and web posting of each newsletter. Prior to September 1, 2008 NHIC, Corp. was responsible for these distributions. Effective September 1, 2008 the Medicare Administrative Contractor (MAC) for California, Palmetto GBA, assumed this responsibility. In addition to a listing of available topics, the summary contained a reminder that "Medicare B Resource Preview and Medicare B Resource, together with occasional special releases, serve as legal notice to physicians and suppliers concerning responsibilities and requirements imposed upon them by Medicare law, regulations, and guidelines."

As of September 1, 2008 notifications have been sent electronically through the MAC's website, which automatically sends e-mails to Medicare providers.

All Medicare providers have been directed to the following websites for current coverage and other information:
- www.cms.hhs.gov (Centers for Medicare & Medicaid Services Website)
- www.palmettogba.com

**Limitation of Waiver of Liability/Without Fault**

Section 1879 of the Social Security Act permits Medicare payments to be made to providers on assigned claims for certain services otherwise not covered, if neither the beneficiary nor the provider knew, or could reasonably be expected to know, that the services were not covered. Services affected are those disallowed as not medically reasonable or necessary for the diagnosis or treatment of illness or injury, or to improve the functioning of a malformed body member.

Beneficiaries may not be billed for any overpayment amount that is refunded by offsetting against future Medicare payments payable to you by reason of assignment. Under provisions of Section 1879 of the Social Security Act, beneficiaries are waived of any liability for services, which they did not

KH_AA057587

Exhibit 7
Page 6 of 7

Dr. Louis T. Bascoy
Page 7 of 7

know (or could not have reasonably been expected to know) would not be allowed and paid by Medicare.

Section 1870 of the Social Security Act permits Medicare to not recover inappropriate payments with respect to an individual deemed without fault in having caused the overpayment. For the "without fault" provision to apply, the individual must have complied with all pertinent regulations and instruction materials. These include CPT procedure code definitions and Medicare Bulletins. The individual is expected to have had a reasonable basis for assuming the payments received were correct or, if there was reason to question payment, to promptly bring such question to the contractor's attention. In addition, the individual is expected to have made full and accurate disclosure of material facts.

It is important that the management of any medical practice treating a significant number of Medicare beneficiaries understand the conditions governing which services will be reimbursed under the Medicare Program. Pertinent information was available from the law and regulations, from Medicare Bulletins and from your peers in the medical community. Lacking any information that the provider is "without fault" we have found that Section 1870 of the Social Security Act does not apply and that you are liable for the overpayment.

**Overpayment**

We have estimated that you have been overpaid **$313,955.54** by Medicare Part B.  The overpayment worksheet with a detailed summary of the overpayment would be provided to you upon request.

**Conclusion**

This letter is educational in regards to the appropriate submission of Medicare claims. You will be contacted in writing by the MAC regarding any overpayment assessed as a result of this review. Any concerns related to an overpayment assessed by the MAC must be addressed to them.

Sincerely,

Angelo A. Cruz
Fraud Investigator
California Benefit Integrity Support Center
SGS - A CMS Program Safeguard Contractor
(213) 553-5207

cc: Atty. R. J. Strotz
    816 S. Windsor Blvd.
    Los Angeles, CA 90005-3760

KH_AA057588

Exhibit 7
Page 7 of 7

# EXHIBIT 9

**EXHIBIT 9**

1        UNITED STATES DISTRICT COURT

2      CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3       HONORABLE PHILIP S. GUTIERREZ, U.S. DISTRICT JUDGE

4

5   UNITED STATES OF AMERICA,              )
                                           )
6                    PLAINTIFF,            ) CASE NO.
                                           ) CR 13-719(A)
7        VS.                               )
                                           )
8   EDGAR POGOSIAN,                        )
       AKA "EDGAR HAKOBYAN"                )
9   KAREN SARKISSIAN,                      )
       AKA "GARY SARKISSIAN,"              )
10                                         )
                     DEFENDANTS.           )
11  _____)

12

13

14

15                REPORTER'S TRANSCRIPT OF
16                 JURY TRIAL - DAY 8
                TUESDAY, FEBRUARY 16, 2016
17                      8:09 A.M.
                  LOS ANGELES, CALIFORNIA
18

19

20

21

22      _____
23

          MAREA WOOLRICH, CSR 12698, CCRR
24         FEDERAL OFFICIAL COURT REPORTER
          255 EAST TEMPLE STREET, ROOM 181-K
25          LOS ANGELES, CALIFORNIA 90012
                mareawoolrich@aol.com


                UNITED STATES DISTRICT COURT

```
1                    APPEARANCES OF COUNSEL:

2

3   FOR THE PLAINTIFF:

4        EILEEN M. DECKER
         UNITED STATES ATTORNEY
5        BY:  CATHY OSTILLER
         KRISTIN WILLIAMS
6        CASSIE PALMER
         ASSISTANT UNITED STATES ATTORNEYS
7        UNITED STATES COURTHOUSE
         312 NORTH SPRING STREET
8        LOS ANGELES, CA 90012

9

10  FOR DEFENDANT EDGAR POGOSIAN:

11       LAW OFFICES OF PAT HARRIS
         BY:  PAT HARRIS
12       225 SOUTH LAKE AVENUE, SUITE 300
         PASADENA, CA 91101
13

14  FOR DEFENDANT KAREN SARKISSIAN:

15       SPERTUS, LANDES & UMHOFER
         BY:  JAMES SPERTUS
16       SAMUEL JOSEPHS
         1990 S. BUNDY DRIVE, SUITE 705
17       LOS ANGELES, CA 90025

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT

3

```
1                        I N D E X

2                    FEBRUARY 16, 2016

3    FIRST SESSION

4
        --------------------------------------------------------
5
              CHRONOLOGICAL INDEX OF WITNESSES
6

7
     WITNESSES                                          PAGE
8
      JERAYR ROSTAMIAN
9          CROSS-EXAMINATION BY MR. JOSEPHS              12
           REDIRECT EXAMINATION BY MS. OSTILLER          42
10         RECROSS-EXAMINATION BY MR. JOSEPHS            49

11    ANDRES JIMINEZ
           DIRECT EXAMINATION BY MS. OSTILLER           51
12         CROSS-EXAMINATION BY MR. SPERTUS              67
           REDIRECT EXAMINATION BY MS. OSTILLER          77
13         RECROSS-EXAMINATION BY MR. SPERTUS            79

14    NARINE ARUTYUNYAN
           DIRECT EXAMINATION BY MS. WILLIAMS            81
15         CROSS-EXAMINATION BY MR. HARRIS              113
           REDIRECT EXAMINATION BY MS. WILLIAMS         138
16         RECROSS-EXAMINATION BY MR. HARRIS            143

17    TODD HARDY
           DIRECT EXAMINATION BY MS. PALMER             147
18

19

20

21

22

23

24

25
```

**UNITED STATES DISTRICT COURT**

1                  **I N D E X**

2

3       ---------------------------------------------------------

4                 **INDEX OF EXHIBITS**

5

6              RECEIVED INTO EVIDENCE

7   EXHIBIT NOS. 10, 21, 210, 214, 216, 218, 219,    146
      220, 223 THROUGH 233, 239, 241 THROUGH 245, 247,
8   248, 251 THROUGH 255, 259, 260, AND 305
      EXHIBIT NO. 212                     105
9   EXHIBIT NO. 265                      98
      EXHIBIT NO. 402                     146
10  EXHIBIT NOS. 900 THROUGH 916            155
      EXHIBIT NO. 934                     155
11  EXHIBIT NO. 1515                    18

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

14

```
1   A      No, I don't think so.  No.

2   Q      You never knew Mr. Sarkissian before that?

3   A      No, I don't think so.

4   Q      You never cashed any checks for him before that time?

5   A      No, I don't think so.  I mean, it starts with when he come

6   to my office.  I didn't know him before he come to my office.

7   Q      It starts when he comes to your office?

8   A      Exactly.

9   Q      And informs you that he represents a Dr. Bascoy?

10  A      Yes.

11  Q      Okay.  Now, when Mr. Sarkissian first met you, he asked

12  you for medical equipment; correct?

13  A      Yes.

14  Q      And your company, Med-Tech, it supplied medical equipment;

15  correct?

16  A      And disposables, yes.

17  Q      And disposables.  You spoke about disposables on Friday.

18  What are disposables exactly?

19  A      Like gloves, table paper, EKG pads.

20  Q      Medical recording charts?

21  A      Recording charts.

22  Q      Spirometry tubes?

23  A      Right.

24  Q      And you said exam table paper?

25  A      Yes.
```

1   Q    The paper that's spread out over the exam tables?

2   A    Right.

3   Q    And after you met Mr. Sarkissian, you delivered medical

4   equipment to the Sunset Clinic; correct?

5   A    Not myself personally but probably, yes, my people did,

6   yes.

7   Q    Your company, Med-Tech?

8   A    Yes, correct.

9   Q    Supplied real medical equipment to the clinic, correct, to

10  the Sunset Clinic?

11  A    I don't think we supplied any equipment, but we supplied

12  disposables, yes.

13  Q    Sir, Mr. Sarkissian came to you and asked for supplies

14  from Med-Tech; correct?

15  A    Right.

16  Q    And Med-Tech supplied those disposables, equipment,

17  whatever you are describing to his clinic; right?

18  A    Yes, some of it.  Yes, uh-huh.

19  Q    Now, Med-Tech, your company, had customers; correct?

20  A    Yes.

21  Q    It had legitimate customers?

22  A    Exactly, yes.

23  Q    I'm sorry?

24  A    Yes, correct.

25  Q    That you supplied real equipment to?

```
1   Q    That was the clinic that Mr. Sarkissian worked at on

2   Virgil Avenue?

3   A    Should be, yes, uh-huh.

4         MR. JOSEPHS:  Your Honor, at this time I'd move

5   Exhibit 1515 into evidence.

6         MS. OSTILLER:  No objection.

7         THE COURT:  Give me a moment.  Admitted.

8         (Exhibit No. 1515 received into evidence.)

9         MR. JOSEPHS:  Your Honor, permission to publish?

10        THE COURT:  You may.

11        MR. JOSEPHS:  Thank you.

12  BY MR. JOSEPHS:

13  Q    I'm placing on the screen the third page of Exhibit 1515.

14  It's marked 86031 at the bottom right-hand corner.

15        Sir, do you see that?

16  A    Yes.

17  Q    Now, that's an invoice for Eagle-1 Health Care; correct?

18  A    Correct.

19  Q    An invoice from Med-Tech --

20  A    Uh-huh.

21  Q    -- for supplies to Eagle-1?

22  A    Correct.

23  Q    And if we look at the description, that's ten medical

24  recording charts; correct?

25  A    Correct.
```

```
 1   Q     At 4.99 each?

 2   A     Correct.

 3   Q     For 49.90?

 4   A     Uh-huh.

 5   Q     One electrode ECG resting.  That says "Fast Race 4," for

 6   $89 each; correct?

 7   A     Correct.

 8   Q     So a total of $89; correct?

 9   A     Correct.

10   Q     And the total amount due at the bottom, $152.44; correct?

11   A     Correct.

12   Q     Now I'm placing on the screen the following page marked

13   86032 on the bottom.  Do you see that, sir?

14   A     Yes.

15   Q     Again, the description is for ten medical recording charts

16   at 4.99 each; correct?

17   A     Correct.

18   Q     Ten thermometer probes -- thermometer probe covers.  Do

19   you see that?

20   A     Correct.

21   Q     Also for 4.99 each; correct?

22   A     Correct.

23   Q     And two ear loop face masks for 9.99 each; correct?

24   A     Correct.

25   Q     And the total due, $131.46; correct?
```

```
 1    A      Correct.

 2    Q      I just want to go through a few other pages from this

 3    exhibit.

 4           The following invoice of Exhibit 1515 is 86033 on the

 5    bottom.  Sir, this is another invoice from Med-Tech; correct?

 6    A      Correct.

 7    Q      To Eagle-1; correct?

 8    A      Yes.

 9    Q      And this was for, again, one electrode ECG Fast Race 4,

10    100 pack, $89; correct?

11    A      Yes.

12    Q      So the total due plus tax was $97.68; correct?

13    A      Yes.

14    Q      I'm sorry.  Just one final invoice.

15           If you look at -- I'm placing on the screen what's been

16    marked on the bottom as 86036.

17           Sir, again, this is another invoice from Med-Tech;

18    correct?  I'm sorry.  I think it's the two-page --

19    A      Yes.

20    Q      Do you have that in front of you?

21    A      Yes, I see.  Yes.

22    Q      And the description was for two exam table paper,

23    standard, smooth, $39.50 each; correct?

24    A      Correct.

25    Q      The total amount was $79?
```

```
 1   A     Yes.

 2   Q     With tax, it came to $86.70; correct?

 3   A     Yes.

 4   Q     Sir, these are all legitimate invoices to Eagle-1

 5   Health Care, aren't they?

 6   A     Yes.

 7   Q     This was for all real equipment that you supplied through

 8   your company, Med-Tech, to Eagle-1 Health Care?

 9   A     Disposables, all of them are disposables, yes.

10   Q     I'm sorry.  I'm using the word equipment, I guess --

11   A     Right.

12   Q     -- to relate to disposables too, but it's disposables --

13   A     Yes.

14   Q     -- specifically?

15   A     Yes.

16   Q     And that's where Mr. Sarkissian worked, the dates on those

17   invoices, the end of 2010; correct?

18   A     Correct.

19   Q     That was the clinic that Mr. Sarkissian worked with a

20   Dr. Pfupajena?

21   A     I don't remember the doctor's name, you know.  I don't pay

22   attention.  It's a long time ago, and I don't know.

23   Q     Now, sir --

24   A     I don't -- I'm sorry.  Yes.  Go ahead.

25   Q     Sir, on Friday, you were discussing the way that you
```

1    left with the invoice; correct?

2    A    Correct.

3    Q    And came back with a check signed by Dr. Bascoy; correct?

4    A    Correct.

5    Q    And, sir, you testified that you would eventually, I think

6    it was a couple of days later, give cash to Mr. Sarkissian; is

7    that correct?

8    A    Correct.

9    Q    And you weren't there when Mr. Sarkissian delivered that

10   cash to Dr. Bascoy, were you?

11        MS. OSTILLER:  Objection.  Assumes facts not in

12   evidence.

13        THE COURT:  Sustained.

14   BY MR. JOSEPHS:

15   Q    Sir, were you with Mr. Sarkissian after he left your

16   office with the cash?

17   A    No.

18   Q    You have no idea what Mr. Sarkissian did with the cash; is

19   that correct?

20   A    Correct.

21   Q    Now, sir, on Friday you were discussing with the

22   prosecutor -- you said a couple of times that you were doing

23   money laundering.  Do you recall that?

24   A    Yes.

25   Q    You characterized your transactions with Mr. Sarkissian as

 1   money laundering.  Do you recall that?

 2   A    Yes.

 3   Q    Why did you use the term "money laundering"?

 4   A    I guess that's when you cash checks and give the money

 5   back.

 6   Q    So to you, cashing checks and giving money back is money

 7   laundering?

 8   A    Yes.

 9   Q    That's how you define money laundering?

10   A    Yes.

11   Q    Sir, you were cashing checks; correct?

12   A    Uh-huh.

13   Q    You have no idea what those checks represented; correct?

14   A    I don't understand the question.

15   Q    I'll rephrase.  I apologize.

16        You don't know what services were being provided at the

17   Sunset Clinic, do you?

18   A    Not exactly, but I assumed.

19   Q    You assumed?

20   A    I assumed that is a clinic, medical clinic, and they do

21   some services by what they were buying from me.

22   Q    Sir, you have no idea how Dr. Bascoy or L'Tanya Smith were

23   practicing medicine; correct?

24   A    Correct.

25   Q    You don't know whether something is medically necessary or

1    not?

2    A    Yes, correct.

3    Q    And so you have no idea what those checks were from that

4    were signed by Dr. Bascoy; correct?

5    A    I don't understand the question.

6    Q    Well, sir, you characterized the transactions as money

7    laundering; right?

8    A    Yes.

9    Q    But, sir, you have no idea what money laundering means, do

10   you?

11   A    That's what I know about money laundering, yes.

12   Q    To you, money laundering is the equivalent of cashing

13   checks; correct?

14   A    And giving back cash, yes.

15   Q    Okay.  Sir, you have no idea why Dr. Bascoy wanted cash,

16   do you?

17           MS. WILLIAMS:  Objection.  Assumes facts not in

18   evidence.

19           THE COURT:  Sustained.

20   BY MR. JOSEPHS:

21   Q    Now, I want to direct your attention to something else

22   that you said on Friday before we left, which is Mr. Sarkissian

23   told you that he was paying patients.  Do you recall saying

24   that?

25   A    Not that he's paying the patient, but the money, the cash

1              CERTIFICATE OF OFFICIAL REPORTER

2

3

4

5              I, MAREA WOOLRICH, FEDERAL OFFICIAL REALTIME COURT

6    REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE

7    CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT

8    TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING

9    IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY

10   REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT

11   THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE

12   REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

13

14

15              DATED THIS  20TH  DAY OF MAY, 2016.

16

17

18         /S/ MAREA WOOLRICH

19         MAREA WOOLRICH, CSR NO. 12698, CRR
           FEDERAL OFFICIAL COURT REPORTER
20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

# EXHIBIT 10

**EXHIBIT 10**

```
 1              UNITED STATES DISTRICT COURT

 2        CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

 3         HONORABLE PHILIP S. GUTIERREZ, U.S. DISTRICT JUDGE

 4

 5    UNITED STATES OF AMERICA,            )
                                           )
 6                      PLAINTIFF,         ) CASE NO.
                                           ) CR 13-719(A)
 7          VS.                            )
                                           )
 8    EDGAR POGOSIAN,                      )
         AKA "EDGAR HAKOBYAN,"             )
 9    KAREN SARKISSIAN,                    )
         AKA "GARY SARKISSIAN,"            )
10                                         )
                        DEFENDANTS.        )
11    _____)

12

13

14

15
                        REPORTER'S TRANSCRIPT OF
16                        JURY TRIAL - DAY 5
                     WEDNESDAY, FEBRUARY 10, 2016
17                         FIRST SESSION
                       LOS ANGELES, CALIFORNIA
18

19

20

21

22      _____
23
                   MAREA WOOLRICH, CSR 12698, CCRR
24             FEDERAL OFFICIAL COURT REPORTER
             255 EAST TEMPLE STREET, ROOM 181-K
25              LOS ANGELES, CALIFORNIA 90012
                    mareawoolrich@aol.com
```

UNITED STATES DISTRICT COURT

**APPEARANCES OF COUNSEL:**

**FOR THE PLAINTIFF:**

    EILEEN M. DECKER
    UNITED STATES ATTORNEY
    BY:  CATHY OSTILLER
    KRISTIN WILLIAMS
    CASSIE PALMER
    ASSISTANT UNITED STATES ATTORNEYS
    UNITED STATES COURTHOUSE
    312 NORTH SPRING STREET
    LOS ANGELES, CA 90012

**FOR DEFENDANT EDGAR POGOSIAN:**

    LAW OFFICES OF PAT HARRIS
    BY:  PAT HARRIS
    225 SOUTH LAKE AVENUE, SUITE 300
    PASADENA, CA 91101

**FOR DEFENDANT KAREN SARKISSIAN:**

    SPERTUS, LANDES & UMHOFER
    BY:  JAMES SPERTUS
    SAMUEL JOSEPHS
    1990 S. BUNDY DRIVE, SUITE 705
    LOS ANGELES, CA 90025

**UNITED STATES DISTRICT COURT**

```
 1                      I N D E X

 2                 FEBRUARY 10, 2016

 3  FIRST SESSION

 4  ---------------------------------------------------------

 5              CHRONOLOGICAL INDEX OF WITNESSES

 6
```

```
 7  WITNESSES                                         PAGE

 8   SALVADOR CASTILLO
          DIRECT EXAMINATION BY MS. PALMER              15
 9        CROSS-EXAMINATION BY MR. SPERTUS              20
          REDIRECT EXAMINATION BY MS. PALMER            26
10
    DARRYL TWEDT
11        DIRECT EXAMINATION (RESUMED)                  28
          BY MS. OSTILLER
12        CROSS-EXAMINATION BY MR. SPERTUS              56
```

```
13

14  ---------------------------------------------------------

15                    INDEX OF EXHIBITS

16

17                 RECEIVED INTO EVIDENCE

```

```
18   EXHIBIT NO. 421                                   55
     EXHIBIT NO. 422                                   39
19   EXHIBIT NO. 423                                   44
     EXHIBIT NO. 424                                   51
20
```

```
21

22

23

24

25
```

```
 1   you questions.
 2   A    Well, there was two places.
 3   Q    So the prosecutor was asking you about the clinic, but
 4   there were actually two separate facilities that you went to in
 5   the Los Angeles area; correct?
 6   A    Yes.
 7   Q    Now, the person who recommended these two separate
 8   Los Angeles clinics to you was your friend, Serrano; right?
 9   A    Yes.
10   Q    And was Serrano a friend of yours who you met through the
11   center you described?
12   A    Yes.
13   Q    So he was the one who informed you of the pain clinic and
14   the other clinic in the Los Angeles area where you can get help
15   for your conditions; correct?
16   A    Yes.
17   Q    Approximately how old is Serrano?
18   A    Well, he passed away.  He must have been about 60.
19   Q    But he was a retired friend of yours from the center;
20   right?
21   A    Yes.
22   Q    Mr. Serrano never paid you any money to go to Los Angeles
23   for treatment for your conditions, did he?
24   A    No.
25   Q    Now, the prosecutor who asked you questions this morning
```

```
1                    CERTIFICATE OF OFFICIAL REPORTER

2

3

4

5             I, MAREA WOOLRICH, FEDERAL OFFICIAL REALTIME COURT

6    REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE

7    CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT

8    TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING

9    IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY

10   REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT

11   THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE

12   REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

13

14

15                         DATED THIS  24TH  DAY OF APRIL, 2016.

16

17

18              /S/ MAREA WOOLRICH
                _____
19              MAREA WOOLRICH, CSR NO. 12698, CRR
                FEDERAL OFFICIAL COURT REPORTER
20

21

22

23

24

25
```

**UNITED STATES DISTRICT COURT**

# EXHIBIT 11

**EXHIBIT 11**

```
 1              UNITED STATES DISTRICT COURT

 2        CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

 3          HONORABLE PHILIP S. GUTIERREZ, U.S. DISTRICT JUDGE

 4

 5   UNITED STATES OF AMERICA,          )
                                        )
 6                   PLAINTIFF,         ) CASE NO.
                                        ) CR 13-719(A)
 7        VS.                           )
                                        )
 8   EDGAR POGOSIAN,                    )
        AKA "EDGAR HAKOBYAN"            )
 9   KAREN SARKISSIAN,                  )
        AKA "GARY SARKISSIAN,"          )
10                                      )
                     DEFENDANTS.        )
11   _____)

12

13

14

15
                    REPORTER'S TRANSCRIPT OF
16                   JURY TRIAL - DAY 3
                  FRIDAY, FEBRUARY 5, 2016
17                     FIRST SESSION
                  LOS ANGELES, CALIFORNIA
18

19

20

21

22       _____
23
                 MAREA WOOLRICH, CSR 12698, CCRR
24            FEDERAL OFFICIAL COURT REPORTER
             255 EAST TEMPLE STREET, ROOM 181-K
25            LOS ANGELES, CALIFORNIA 90012
                    mareawoolrich@aol.com
```

UNITED STATES DISTRICT COURT

```
 1                    APPEARANCES OF COUNSEL:

 2


 3   FOR THE PLAINTIFF:

 4       EILEEN M. DECKER
         UNITED STATES ATTORNEY
 5       BY:  CATHY OSTILLER
         KRISTIN WILLIAMS
 6       CASSIE PALMER
         ASSISTANT UNITED STATES ATTORNEYS
 7       UNITED STATES COURTHOUSE
         312 NORTH SPRING STREET
 8       LOS ANGELES, CA 90012

 9


10   FOR DEFENDANT EDGAR POGOSIAN:

11       LAW OFFICES OF PAT HARRIS
         BY:  PAT HARRIS
12       225 SOUTH LAKE AVENUE, SUITE 300
         PASADENA, CA 91101
13

14   FOR DEFENDANT KAREN SARKISSIAN:

15       SPERTUS, LANDES & UMHOFER
         BY:  JAMES SPERTUS
16       SAMUEL JOSEPHS
         1990 S. BUNDY DRIVE, SUITE 705
17       LOS ANGELES, CA 90025

18

19

20

21

22

23

24

25
```

```
1                         I N D E X

2                  FRIDAY, FEBRUARY 5, 2016

3

4    --------------------------------------------------------

5              CHRONOLOGICAL INDEX OF WITNESSES

6

7    WITNESSES                                        PAGE

8
```

```
     KEITH KUNTZ
9         CROSS-EXAMINATION (CONTINUED)               5
          BY MR. SPERTUS
10        REDIRECT EXAMINATION BY MS. WILLIAMS        33
          RECROSS-EXAMINATION BY MR. SPERTUS          37
11
     ANGELO CRUZ
12        DIRECT EXAMINATION BY MS. OSTILLER          40
          CROSS-EXAMINATION BY MR. HARRIS             74
13        CROSS-EXAMINATION BY MR. SPERTUS            74
          REDIRECT EXAMINATION BY MS. OSTILLER        90
14        RECROSS-EXAMINATION BY MR. SPERTUS          94

15   MIGUEL PONCE TERRIQUEZ
          DIRECT EXAMINATION BY MS. PALMER            98
16        CROSS-EXAMINATION BY MR. SPERTUS           105
          REDIRECT EXAMINATION BY MS. PALMER         106
17
     MARTA LOPEZ
18        DIRECT EXAMINATION BY MS. OSTILLER         108

19   ANGELICA GOTTARDI
          DIRECT EXAMINATION BY MS. PALMER           111
20        CROSS-EXAMINATION BY MR. HARRIS            150
          CROSS-EXAMINATION BY MR. SPERTUS           162
21        REDIRECT EXAMINATION BY MS. PALMER         174
          RECROSS-EXAMINATION BY MR. HARRIS          177
22        FURTHER REDIRECT EXAMINATION               177
          BY MS. PALMER
23        FURTHER RECROSS-EXAMINATION                178
          BY MR. HARRIS
24
     SYLVIA PEREZ
25        DIRECT EXAMINATION BY MS. WILLIAMS         179
```

4

1          **INDEX OF EXHIBITS**

2

3

                    RECEIVED INTO EVIDENCE

4

5     EXHIBIT NO. 7                                68
      EXHIBIT NO. 9                                54
6     EXHIBIT NO. 11                              129
      EXHIBIT NO. 13                              126
7     EXHIBIT NO. 18                               61
      EXHIBIT NO. 20                              123
8     EXHIBIT NOS. 203 AND 204                    137
      EXHIBIT NO. 300                             143
9     EXHIBIT NO. 420                             181
      EXHIBIT NO. 503                              66
10    EXHIBIT NOS. 600 THROUGH 640                116
      EXHIBIT NOS. 971 THROUGH 977                114

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

```
1   goes up like this and like this (indicating) and a walker and
2   something that you can use to go to the bathroom in or that you
3   can take a bath inside the bathroom sitting down.
4   BY MS. PALMER:
5   Q    So those were things you actually received.  What did you
6   understand you would receive before you went to the medical
7   place when the people picked you up?
8   A    Those are the only things.
9            THE INTERPRETER:  Counsel, would you mind repeating
10  the question for interpreter, please?
11           MS. PALMER:  Yes, of course.
12  BY MS. PALMER:
13  Q    So you mentioned the things that you received.  But before
14  you went --
15  A    Yes.
16  Q    -- before the people picked you up and took you somewhere,
17  you said you were told you would receive certain things.  What
18  were those things?
19  A    It's just those things that they gave me, the chair, the
20  walker, and that thing you use to go to the bathroom in.
21  Q    Were you ever promised a power wheelchair if you went to
22  the clinic?
23           MR. SPERTUS:  Objection.  Leading, Your Honor.
24           THE COURT:  Overruled.
25           THE WITNESS:  No.
```

```
 1                    CERTIFICATE OF OFFICIAL REPORTER

 2

 3

 4

 5              I, MAREA WOOLRICH, FEDERAL OFFICIAL REALTIME COURT

 6   REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE

 7   CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT

 8   TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING

 9   IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY

10   REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT

11   THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE

12   REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

13

14

15                    DATED THIS  26TH  DAY OF APRIL, 2016.

16

17

18                    /S/ MAREA WOOLRICH

19                    MAREA WOOLRICH, CSR NO. 12698, CRR
                      FEDERAL OFFICIAL COURT REPORTER
20

21

22

23

24

25
```

**UNITED STATES DISTRICT COURT**

# EXHIBIT 12

**EXHIBIT 12**

Riverside, CA 92507

United States District Judge
255 E. Temple Street, Courtroom 880
Los Angeles, CA 90012


Honorable Philip S. Gutierrez,

My name is Haik Aramyan and I currently study Biology at the University of California Riverside. Daniel Sarkissian, a full-time student like myself, is one of my closest childhood friends who I have known for as long as I can remember. His father, Gary (Karen) Sarkissian, has thus been a part of my life since I was a small child. Gary has always been a soft spoken yet cheerful individual who is always mindful of his demeanor. His delightful attitude and overall caring personality has left me with a very bold impression of the true quality of his character. In all the years I have known Daniel and his father I cannot recall a single instance in which Gary has expressed any sort of negative feeling or conduct. Being a man of few words, it is difficult to predict what he may be thinking at any given time, but simply spending a few moments with this gentleman is enough to allow one to capture a sense of the genuine kindness he has to offer. His ability to always stay in good spirits despite the difficulties of life has always motivated me to keep my chin up despite the difficulties life has to offer. I find it remarkable the amount of happiness and love that Gary expresses and shares with those around him on a daily basis.


Sincerely,

Haik
(818) 321-8991

# EXHIBIT 13

**EXHIBIT 13**

Zareh Aramyan
13037 Delano St
Los Angeles, CA 91401
Ph. 818-287-5418

**Honorable Philip S. Gutierrez,**
**United States District Judge**
**255 E. Temple St, Courtroom 880**
**Los Angeles, CA 90012**

Dear Judge Philip S. Gutierrez,

My name is Zareh Aramyan. I am currently employed by the office of Phillip R. Fleshner, M.D., as a medical assistant. The news about Gary Sarkissian (or Karen, as his friends call him) having legal troubles were unexpected and disheartening for me. I strongly believe in justice and everyone's equality before the law. Yet, I take the liberty of asking Your Honor to read this letter, the solely purpose of which is to express my personal perspective of Karen.

I first met Karen in Armenia, where both of us are from, in late 1980-s. Upon my arrival to United States in 1999 he and his family were among the first fellow countrymen I met, and our acquaintance has grown into friendship over the years. From the day one Karen has been there for me and my family, willing to help with everything from a simple advice to physical help, something that is so vital for newly arrived. There were too many live situations to recount. I am thankful to him for his patience and insistence when he helped me with most of the important decisions from my son's schooling to family relationships. Years ago, upon learning about the business I was about to start, he immediately came forward with support. The emphasis of our countless conversations was always the same – doing business the rightful, legitimate way.

Of course, friendship is a two-way street, but Karen is outstanding in terms of being a reliable person. Another quality I praise in him is his sense of responsibility. Whether it's about my broken car 70 miles away, or our mutual friend's kid having fever at 3 am, when he says "I'll be there in an hour with help", he will be there. Being a very generous person in every aspect, he is willing to help and support even someone he hardly knows.

Karen has a son about the same age as my son. I saw him grow up. Karen's devotion as a father was always something I tried to take example from. I wish I could be as good as him as a parent.

In his personal life which I witnessed for many years, Karen leaves a strong impression of a very modest, soft-spoken, yet straightforward person. Short temper is something I have never seen in him. Knowing him for long time I believe it comes from his faith in God, which grew stronger over the years. To my surprise, because it happened to a man with much of a secular background. Karen is an active member of Armenian Church, having done a lot of charity work. His influence was crucial for me in finding my faith too, which I am very thankful to him too.

I truly hope that the circumstances will allow Karen to be with his family, his friends and everyone who has benefited by his kindness and dedication.

Sincerely
Zareh Aramyan

# EXHIBIT 14

**EXHIBIT 14**

Honorable Phillip S. Gutierrez

United States District Judge

255 E. Temple Street Courtroom 880

Los Angeles CA 90012

My name is Marina Arshakyan, I know Karen Sarkissian for 17 years, he has been a family friend ever since. He is coming from an intelligent and respected family.

I can describe him as a hard-working, loyal, respectful, intelligent and educated person. He's a wonderful Dad, loyal husband and grateful son. He takes care of his elderly parents who need him every day, he finds time every day to go to their house and take care of whatever they need. As a friend he goes above and beyond to help his friends and relatives.

Karen is goodhearted, sweet person, very honest and sometimes also very naive. He would never hurt anyone in his life. It is a true blessing to have friend like him in our life.

He has been a truly unique and great friend to our family. In 1999 when our family was new to this country having limited support and limited access to community resources my Dad got serious health problems. Karen was there for us helping my brother to get access to health care resources and take my Dad to doctors and hospitals trying to get all the care he needed. And during the years I learned that Karen is the first person who will be there when one is in difficult situation, like he has always been there for us.

There are a lot of people unable to feel happy when a friend is successful. But Karen is not like that. He is always happy to see his friends and relatives to succeed and he is always ready to support them with everything he can.

We all make mistakes in our lives, and I'm sure he will never ever do anything intentionally to hurt or harm anyone.

Sometimes he is naïve and trusts people a lot, and they take advantage of his kindness and loyalty. The charges that he is facing are inconsistent with his true self. Karen is a Man among men.

Respectfully,

Marina Arshakyan

CEO of New Life Hospice Care, Inc.

# EXHIBIT 15

**EXHIBIT 15**

Honorable Phillip S.Gutierrez

United States District Judge

255 E. Temple Street Courtroom 880

Los Angeles CA 90012

My name is Ani Avetisyan, I'm 14 years old and I'm a student at Woodrow Wilson Middle School in Glendale, currently in 8th grade. My address is 316, North Maryland Avenue #210 Glendale CA 91206.

Karen Sarkissian is my uncle. He is a very charismatic, caring, helpful and selfless individual to everyone around him.   I know him for fourteen years, since the day I was born.

Since my childhood I remember him being not only my uncle but my elder friend, treating me as an equal. We have been through thick and thin together and have knocked down many barriers along the way. He has consistently stayed as one of my main supporters and has witnessed me overcome obstacles in life, helping me along the way. He has taught me the importance of friendship and how exactly to maintain one. It is accurate to say that has been my number one fan and has constantly encouraged me to go forward during times when I didn't find that as an option. I couldn't have asked for a better person to help me through my times in need and to guide me along the journey that has yet to be conquered.   He is not an ordinary uncle; he is a friend and a mentor a very dear person to me.

Karen has been the person that I go to for advice for different purposes, whether it's about how to interpret and behave in a certain situation or simply to help me in with schoolwork, mainly for areas that I lack in or somewhat struggle with comprehending it.  He tutors me in Algebra and physical science. He patiently explains everything until he is confident that I have grasped the subject fully. It's hard to think about the fact that I can't exactly help him much in the situation that he's currently in although he has persistently stayed by my side during times when I needed the moral support and comfort of a family member. He has helped me make decisions in life such as pursuing a career in the future, although it is slightly early. He was the one who encouraged me to participate in acting classes that will help me with self-confidence and to come out of my shell and comfort zone. He has always made me realize and understand what is and what isn't beneficial for me.

Karen is an honest, trustworthy and a caring person who will do anything for his friends and relatives.

The conviction he is facing is far away from his truly amazing character.


Thank you for your consideration,

Ani Avetisyan

# EXHIBIT 16

**EXHIBIT 16**

Honorable Phillip S. Gutierrez

United States District Judge

255 E. Temple Street Courtroom 880

Los Angeles CA 90012

My name is Hayk Avetisyan and I have graduated from the Yerevan State University after which completed the 6 months training course at the Fletcher School of Law and Diplomacy, Medford, MA, USA.

I have met my wife Suzanne while being at Fletcher School in June 2000 and got married in 2001. Since then we live in Los Angeles CA.  I have met Gary Sarkissian in 2000, I know him for 16 years.

We became really good friends since then. I had many relatives and friends residing in the United States. When I was moving to the United States from Armenia and I thought I will get support from them. But in fact Gary was the only one who helped me with the integration process and made it much easier for me. Frankly he was one and the only guy who was willing to share his own experience (he immigrated to the USA much earlier). He explained all the written and unwritten regulations and laws of the American lifestyle, where to start and how to get involved in the American life. I can surely state that thanks to Gary I became a law-abiding US citizen and a father of two wonderful children.

This may sound irrelevant to people who have not themselves experienced immigration, but for the new immigrant like me it was a huge hand of help that I never got from other people whom I knew for years. Gary was and is not only a good friend and just a man with very big heart, but I assure that he is an incredible uncle, brother, father and son.

My daughter and son love him so much and I am proud that they have a very strong relationship with their uncle. My kids love spending time with their uncle, they even have established some traditions together. Gary has to take them either together or most likely separately to movies almost every weekend. Why most likely separate, because kids do not want to share his love and attention, this is the scale of love to the uncle. Only Gary can do mathematics, with my kids, he is the only person whom they trust with it.

He treats my children like his own. He has a very clever and honest son who is an honor student at UCSC. Daniel is our pride and our future physician. I believe he will become a famous doctor since he grew up in a family that values education and working hard for achieving career goals. Gary is doing everything he can for his son and it is really touching to see father and son relationship, how they love each other and how do they support each other, it is truly amazing.

Gary is exemplary brother. The way he treats his sister is just remarkable and can be a good example for many people. He doesn't need his sister to ask him for help or anything else, he just knows, he is the first person to be by her side. I witnessed what he has done for her sister when my wife had health problems. I am so lucky that we have Gary as part of our family, because due to some personal

circumstances sometimes I have to be out of the Unites States but I feel safe and comfortable since I know that Gary is with them.

Gary is also an example for me of how the thankful and caring son should treat his parents. For several years I used to live in the same apartment with Gary's parents and I do not remember even one day that he was not visiting them, besides calling several times a day. Gary's parents have health problems as well and you have to see how he treated them, how he does manage to help them, or take to doctors or get medicine for them and so on. It continues today because his parents are getting older and the problems are getting bigger.

I appreciate people who work hard to support their family, their loved ones and their friends Gary was too young when he immigrated to the United States and started his new life. He has gone through many difficulties, working very hard.

I could briefly describe Gary Sarkissian as a good friend willing to help everybody, a wonderful brother, caring uncle and son.   The conviction he is facing is far away from his true character.

Thank you,

Hayk Avetisyan

# EXHIBIT 17

**EXHIBIT 17**

Elias Ayala
4058 Princeton St.
Los Angeles, CA 90023

Honorable Philip S. Gutierrez
United States District Judge
255 E. Temple Street, Courtroom 880
Los Angeles, CA 90012

Honorable judge,

My name is Elias Ayala and I have know Gary for about 8 years now. I
met him through my girlfriend and her family. From our first meetings,
I have always known Gary to be a very gentle and intelligent man. I
have seen him be a stand up man on numerous occasions.

He is very knowledgeable and has helped me as well as many on others
on many occasions. Earlier his year, my father got sick and very
suddenly passed away. Gary was one of the first people to reach out
and offer any kind of help that he could. This is typical Gary. He is
caring and compassionate and would never do anything to wrong anyone.
We also lost my father-in-law and my mother-in-law recently all in a
matter of a few months. The amount of support we have received from
Gary is unbelievable. He has taken us on as his own family and not
many people would do that without expecting something in return. Given
the fact that this man is facing his own personal struggles, he has
still taken the time and put in the effort to care for us and be our
support system. This is his usual self though. This is what is
expected. His acts of kindness towards people are admirable. He has
never been anything less than an amazing person to us and many others.
His actions are always pure and honest and with caring and loving
intent.

I plead that you are lenient with your ruling, as I strongly believe
that Gary means no harm to anyone. He didn't immigrate to this country
to be anything other than a law abiding citizen and live a honest and
full life. Gary is an outstanding man that has time and time again
shown us why he is so respected by so many people. I know that given
the chance he will have no further involvement in the criminal justice
system and I truly believe that. His conviction is completely out of
character because Gary is a stand-up man! He prides himself on living
life to the fullest, getting an education and making something of
yourself with hard work. He not only believes that for himself and his
family, but for many people that know him, and he tries to get others
to see life the same way. In my eyes, someone that hasn't had many
role models, Gary is no criminal, but certainly someone to look up to.

Thank you for your time,

Elias Ayala



# EXHIBIT 18

**EXHIBIT 18**

Dulce Barajas
1430 Nieto Ln
Los Angeles, CA 90033

Honorable Philip S. Gutierrez
United States District Judge
255 E. Temple Street, Courtroom 880
Los Angeles, CA 90012

Honorable Judge,

My name is Dulce Barajas and I have known Gary Sarkissian for several years. We were introduced by a family friend. Ever since our first meeting, he has displayed extreme integrity and compassion and loyalty to myself and all around him.

A few years back I was struggling to make ends meet and was desperately seeking a second job just to provide for my two children and I. After hearing my struggle, Gary notified me of a job opening at his work place. For someone that at the time didn't know me too well, I considered this a great act of kindness. To this day I maintain both my jobs because he has been generous enough to allow for flexibility with my schedule. Anyone else might not have been so understanding. He is not only someone I see in the workplace, but someone I look up to because he has never carried himself in a manner that is less than loyal and professional.

Through all of these years, I have yet to see him commit a selfish act. He has demonstrated nothing but kindness and willingness to help others without expectations of something in return. I have seen him often go out of his was to help others, whether it is something small like buying someone food, giving someone a ride home, or simply having a conversation when one is needed.

It is not within his character to disregard the laws or commit dishonest acts. I have always known him to be a respectable, reliable, honest and hard working man that has demonstrated an exceptional quality of leadership, professionalism, kindness and patience.

I ask for your consideration in this matter and full heartedly believe that Gary Sarkissian is and has always been of good intentions.

Sincerely,

Dulce Barajas

# EXHIBIT 19

**EXHIBIT 19**

To: Honorable Philip S. Gutierrez
United States District Judge
255 E. Temple Street, Courtroom 880
Los Angeles, CA 90012

Your Honor,

I have been a lifelong friend of Karen. I have learned that Karen has been charged with "Fraud" and I voluntarily provide a character reference on his behalf. I have been his friend for 16 years and I know him to be a good man who is in distress by his present circumstances.

Karen called me when he was arrested for the charge and he has had my support ever since I found out about these news.

Karen is a man of integrity and honesty. He is a community-minded individual who regularly puts the needs of others before his own. He is a responsible father who takes good care of his family. Being Karen's friend means a lot to me. I'm an immigrant and I know the difficulty of adapting to a new culture. Karen has always helped me with most of my immigrant needs. He has also encouraged me to learn the values of this country, and pushed me to attend language school. I'm thankful that I had an opportunity in life to meet Karen.

This offence is Karen's first criminal charge. He has always been an outstanding citizen. I understand the distressing circumstances that Karen faces. I am confident that he will continue to be a valuable member of the society. I wish for him the best outcome for this case and I shall support him as all his family member and friends do.

If necessary, I am willing to give oral evidence to the court for Karen. You may contact me on (323) 395-7899.

Sincerely,
Matvey Baranov                04/25/16

# EXHIBIT 20

**EXHIBIT 20**

Honorable Philip S. Gutierrez
United States District Judge
255 E. Temple Street, Courtroom 880
Los Angeles, CA 90012


Dear Honorable Philip S. Gutierrez,


My name is Lilit Brutyan. I am a photographer and work as a
retoucher/editor in Hyperion Digital Inc. I am writing this letter to urge
leniency in the sentencing of my very close friend Karen Sarkissian.

I have known Karen for 12 years, since I moved with my family to the USA.
Karen has consistently proven himself to be a loyal and dedicated person,
amazing father and friend. Having known him for twelve years, I can
honestly say that he is a person whom you always want to have around.  I
have seen many aspects of Karen's personality. I have always found him to
be extremely kind, wise, honest and very helpful among his friends and
family. Karen is the one , who helped me to find the job , when we were in
very hard financial situation. One of the most appreciative things about
Karen is that he is very delicate , careful, sensitive person, who understands
you from the first second and tries to help in all ways he can. Karen is also
the father of my son's best friend who's always been helpful and generous in
many ways to my son. We consider him as a part of our family.

Knowing Karen has been a blessing. He is a man of virtue and pure soul.
There are very few people like him in the world and I consider myself
exceptionally lucky to have known him.

I am writing this from my heart and want to believe, that my honest
description will help Karen.

Sincerely,

                                    04.27.16

Lilit Brutyan
Tel. 818.284.0492

# EXHIBIT 21

**EXHIBIT 21**

Zara Erzinkian
775 Breeze Hill Road # 1123
Vista, CA 92081
erzinkian@gmail.com
608-332-8986

May 2, 2016

Honorable Philip S. Gutierrez
United States District Judge
255 E. Temple Street, Courtroom 880
Los Angeles, CA 90012

The Honorable Philip S. Gutierrez:

Let me introduce myself, my name is Zara Erzinkian. I am a Senior Supply Planner at Medtronic. I am also
a small business owner - David Bacco Chocolatier, based in San Diego.

I have known Gary Sarkissian for over 25 years. When I moved to California from Wisconsin in 2010, I
have found many of my childhood and school friends from Armenia residing in Los Angeles. I am
referring to friends that we were in the same class and all throughout Grad School, and in the same
group of friends. Gary is one of them.
As I was starting to establish my business in San Diego, I had tremendous help from Gary in every step
involved; from paperwork to getting very valuable advice on business strategies, for example, he
suggested (and helped) to set up our tables at various Farmers Markets in the area. And thanks to Gary,
we did, and it was one of the best decisions we had made to secure a cash flow for a small startup
company. I am sure it may sound a cliché but Gary really is a person who is genuinely kind, soft spoken,
trustworthy, a very hard worker and an amazing father and husband to his family.

I am fully aware of the charges against Gary, and needless to say, simply shocked by it. The decision
making process can be difficult especially when you don't know the person standing in front of you. So I
hope you will look at my letter and many others you will receive, and understand that Gary Sarkissian is
a kind of person that everyone loves and respects, let that be a factor in your decision.

Thank you,

Zara Erzinkian

# EXHIBIT 22

**EXHIBIT 22**

To:        **Honorable Philip S. Gutierrez, United States District Judge**
                **255 E. Temple Street, Courtroom 880, Los Angeles, CA 90012**

From:     **Ekaterina Filimonova, Green Card Holder**
                **6207 Coldwater Canyon Ave., #46, N. Hollywood, CA 91606, (818) 799-5222**

**Honorable Philip Gutierrez,**

My name is Ekaterina Filimonova. I am 43 years old, mother of two, an interpreter.

I met Gary personally in 2005, but even before that, I had heard about him from many of our future common friends. Every time his name was mentioned, it was a situation where one of my friends needed help: anything from helping with the move, since he won't spare himself helping his friends, to mediation between feuding spouses, since he is a man of poise and wisdom.

Throughout the years of our friendship, Gary has helped me out in so many situations that it is hard for me to pick one or two.
He did not exactly save me in the fire, but sometimes the seemingly small things count the most.
Knowing that I didn't have a car (and I didn't have it for quite a few years) and that I couldn't stand the California heat (I get heat strokes and migraines lasting for days when the temperature goes above 90 degrees), he would go out of his way to get me a ride when I had to go somewhere far, and for me this is en par with saving my life.

When I finally passed my driving test and needed to buy a car, he spent about three weeks looking for a suitable car, meeting with the sellers to evaluate the car's technical condition.

When my husband's father passed away and my husband went to Armenia to say his last goodbye, I had two severe migraine attacks. The first time, Gary had to rush to our place in the middle of the night to pick me up, drive me to the Emergency and stay with my daughter in the waiting room for several hours while I was receiving pain medication through the IV. The second time, I was so disoriented because of the pain, that I got stranded somewhere in Hollywood on my way home and couldn't drive anymore. I had to call Gary. He came all the way to Hollywood with a friend who took my car away, drove me to the Emergency, went to pick up my daughter from school, and then came back for me to the hospital. For me as a mother, there was no bigger relieve than to know that my child was in safe hands when I was incapacitated with excruciating pain and couldn't take care of her.

Being privy to Gary's family life, but without going into much personal detail, I can with all responsibility say that Gary is a loving and caring son, the most devoted father, exceptionally decent and supporting husband and a true gentleman.

From my husband I know that among their common friends Gary is considered a man of honor, duty and wisdom. At some point, all of them have turned to him for advice or help.
Personally knowing Gary as a law-abiding and reasonable man with untainted reputation, who puts the well-being of his family above all, I can hardly believe that he would willingly make a decision, which could put his family in the harm's way or cause them grief. I am sure that whatever happened must have been an unfortunate confluence of circumstances.

Sincerely,

Ekaterina Filimonova

# EXHIBIT 23

**EXHIBIT 23**

Maribel Garcia
7826 Denver St.
Paramount Ca. 90723
May 3, 2016.

Honorable Philip S. Gutierrez:
United States District Judge
255 E. Temple St. Courtroom 880
Los Angeles, Ca. 90012

Your honor, my name is Maribel Garcia. I am an Artist that grew up in Los Angeles; I met Gary through mutual friends who also share an interest in fine art. Seeing him in different shows discussing a broad range of art styles we began to establish a great friendship. He has been an art critic to my work and possesses great qualities in inspiring lots of work as well. Donating canvases and making supplies accessible has been a big part of my continuous artistic growth.

I have seen nothing but great things from Gary in the four years of knowing him. He has never jeopardized anyone's being or even character in any sense of the word. He is a very responsible and sympathetic man who loves to help wherever he can and is constantly asking questions to support his friends in every way. His honesty and commitment to do so have won my respect.

Just in the conversations and acts of kindness I saw him display in his day to day life was an exultation to believe in the greater goodness human beings are capable of. I admire how sensible and genuine this man has been to myself and his close friends I've encountered. Gary is looked up to by many around him; I cannot see how he would be involved in criminal case. He is a man of great character, and I write this letter on behalf of a close relationship built upon years to express how admirable he really is.

Sincerely,

Maribel Garcia.

# EXHIBIT 24

**EXHIBIT 24**

Edouard H. Grigorian
3017 Alabama St
La Crescenta, CA 91214

To:   Honorable Philip S. Gutierrez
      United States District Judge
      255 E. Temple Street, Courtroom 880
      Los Angeles, CA 90012

Monday, May 09, 2016

Your Honor,

I am an attorney, practicing immigration law in Glendale, California. I have been a public service employee with the Executive Office of Los Angeles County Board of Supervisors from July, 1999.

I have known Gary Sarkissian for about 20 years, since we've first met at a restaurant, where I was a part-time parking attendant and Gary was a waiter. As immigrants, we had similar difficulties and concerns to deal with in our quests of finding a path in this new country. I did not have family here, so over period of time Gary's family became my second home, where I could always count on compassion, advice and help.

My grand farther told me once: "if you want to figure out who you are dealing with, try comparing him to an animal, and you will see the very nature of the person." Gary always resembled a bear to me, a big hearted and kind teddy bear. Through the years, I've come to know Gary as a responsible parent, reliable friend and simply a kindhearted person.

As friends, we have shared a lot of happy and sad days, but I think this one episode would show how much kindness and compassion there is in his heart. In 2005, I was hospitalized and spent over a month at a hospital about 25 miles away. Gary used to come visit me at the hospital literally every day. We even used to joke that he should be moving-in next door. His visits were like an ointment for my pain...

Having first-hand knowledge of Gary's character, I plead to Your Honor to consider Gary's personal qualifications when imposing the sentence. It is my deepest belief that Gary is an honest and law abiding individual. At times he is very naive and excessively trusting, but I am sure this experience will teach him a lesson he will not forget. After having several long conversations with him on the subject, I am confident that Gary will have no further involvement with the criminal justice system once his present obligations are fulfilled.

As Mark Twain once said "The proper office of a friend is to side with you when you are in the wrong. Nearly anybody will side with you when you are in the right." I submit that Gary is in wrong, and I plead to Your Honor for leniency for my good friend Gary.

If you wish to verify the content of this statement, please do not hesitate to contact me at 818-748-7580. Thank you for your time and consideration, Your Honor.

Sincerely,

Edouard H. Grigorian

# EXHIBIT 25

**EXHIBIT 25**

Honorable Philip S. Gutierrez
United States District Judge
255 E. Temple Street, Courtroom 880

Los Angeles, CA  90012

Armine Hovakimian – current last name has been changed from Sarkissian to Hovakimian due to citizenship.  Currently work as an Eligibility Worker II in LA County DPSS services. Previous employers – Bank of America and Garda World. Reside at 1815 Grismer Avenue #206, Burbank, CA, 91504.

### Character Letter for Karen Gary Sarkissian

Your Honor, I met my future husband Karen Gary Sarkissian in 1988 at Yerevan Polytechnic University where we both graduated with Bachelors Degree in Mechanical Engineering in 1993. That same year we became Husband and Wife and Gary traveled to United States for further education.  After a year I was able to join him and not too long after our son Daniel has been born on January 29, 1996.  We spent unforgettable years together sharing growth of our son, traveling, and adopting to a new country at the same time. For all those years I knew Gary as a calm, caring, loving person dedicated to his parents, friends, and family and mostly to his son.  He has been a loving husband and would work hard in order for me to stay home and take care of our son even though we had financial difficulties.  For the first six years we lived with his parents and a sister in a small apartment. I left my family members in Armenia but Gary's parents welcome me as their daughter.  Through those years Gary has been by my side even supporting my family members in Armenia.  We have been married for almost 20 years currently don't live together but still care about one another, still good friends and he still supports me financially due to living arrangements.

I know Gary's parents for more than 20 years and can state that they raise a great son; therefore he is sharing all his love with his son Daniel as of today. I remember how Gary would buy random gifts to brighten up our daily life and to make his son happy. It could be a little toy or a dog that he brought for his son; puppy Charlie became our family member for 12 years. Even though tired after a long week he would arrange some time to spend weekends at the beach, park, watch a movie or make barbeque with friends. Besides fun and school, we would involve our son into sports and at the age of ten he joined  Water Pollo team after his Dad footsteps. Gary played one of the major roles for Daniel to become almost professional Water Pollo Goalie that helped Glendale High School win CIF championship for the first time. Gary would try his best to be present at the games and practices even though working long hours.  Besides sports Gary would help Daniel with Math homework and some creative projects as "our Universe" which still hanging in Daniel's room.  Currently our son studying at the University of Santa Cruz for his second year not involved in Water Polo but definitely stronger person due to those

years. We raised a smart, strong, independent, caring and loving son that pursing his goals in neuroscience.  Gary has definitely an input into those goals and has continuous financial and moral support to make it possible for Daniel to become a doctor one day. Last year Daniel had an accident and first called his Dad to drive to Santa Cruz to help with accident complications; Gary was there same day.  Lastly, Daniel is 20 year old man but still needs his Dad around and close as much as possible.

I strongly belief that Gary will not have any further involvement with criminal justice and the conviction was out of character. We would never forget that tragic morning when Police invaded our home, almost breaking our front door, woke up Daniel pointing guns at his face without any explanation, and myself wearing just a nightgown and to open a door to a dozen of officers.  They handcuff Gary in front of us and took him to court.  I would never forget an upset, confused, and sad face Gary had that morning. Our family had a major shock on that April morning and still trying to cope with the news.  Gary tried hard to proof he is a dedicated citizen – working, paying taxes, supporting family and friends, and living quite, positive, and healthy life.

Best regards,

Armine Sarkissian Hovakimian

# EXHIBIT 26

**EXHIBIT 26**

Andrey Karapetyan
5638 Shadow Ridge Dr.
Castro Valley, CA 94552

April 27, 2016

Honorable Philip S. Guiterrez
United States District Judge
255 E. Temple Street, Courtroom 880
Los Angeles, CA 90012

Your Honor,

I hereby provide this reference letter for Karen Sarkissian to be presented at Your Court.

First, please let me briefly introduce myself. I was born in Armenia and in 2004 came to the United States to pursue Master's degree in Business Administration. In 2006 I graduated from UCLA, Anderson School of Management, and since then I have been working in financial services industry, specializing in corporate finance field. My most recent work experience, for last 3 years, has been with Wells Fargo, San Francisco, where I work as VP of Finance Analytics in consumer lending group.

I have known Karen for 38 years, almost all of my life. We were attending the same school back in Armenia and that is when we became friends for the rest of our lives. Our friendship also went through test of time, when we were apart for 11 consecutive years and if anything it became much stronger and we became much more connected. Throughout such a long time, obviously we both have seen very happy and extremely difficult times. However, there are two particular episodes in my life that I would like to highlight. I lost both my parents when I was very young, at age of 22. It was a very unexpected and the biggest loss in my life. Karen deeply shared with me my pain, especially due to the fact that he could not be next to me because of circumstances. Despite distance though, his care, love and unconditional friendship helped me get stronger and get through. We have grown like brothers and have been members of each other's family. I know he was feeling that he also lost his family those tragic days. Fast forward about ten years and yet another unexpected surprise was waiting for me. In 2004, same year I got accepted to UCLA, I was diagnosed with Non Hodgkin lymphoma. Obviously, it was shocking not only for me, but for everyone. After initial shock however we decided that we would just need to fight. Karen has been shoulder to shoulder with me through all the steps of chemotherapy and radiation treatment. His kindness, understanding and love gave me strength again and literally revitalized me. Thank God, my disease has been in remission since. But you know when you so closely face death you can only overcome disease and win by relying on love and support of your family. And I am thankful and blessed to have Karen in my life. Karen and I are not brothers by birth, but we certainly are by life.

Karen is an incredibly kind person, always willing and ready to help, especially to the ones that are in trouble or unfortunate. He is a real family man and is the greatest son, parent, brother and uncle I have ever seen. His biggest quality though is his loyalty. This is some quality that is hard to find these days. Despite how complicated his life is or circumstances are he would never sacrifice or compromise his loyalty to friends, family, colleagues, community and society. He is a big guy and so is his heart.

The circumstances Karen is going though right now are so untypical to his nature and it is simply unimaginable. I am more than confident though that this is just a temporary difficulty and a setback in his otherwise bright future life path dedicated to family, friends and community.

If you require any additional information or wish to verify the contents of this statement, please do not hesitate to contact me at (323) 304-6767.


Sincerely,


Andrey Karapetyan

# EXHIBIT 27

**EXHIBIT 27**

Armine Karapetyan
5638 Shadow Ridge Dr.
Castro Valley, CA 94552

April 29, 2016

Honorable Philip S. Guiterrez
United States District Judge
255 E. Temple Street, Courtroom 880
Los Angeles, CA 90012

Your Honor,

I am graduating from Dental Hygiene Program in May and looking forward to pursue my career as Dental Hygiene clinician. I am very excited to work in healthcare field and promote oral health and hygiene education in my community.

I met Karen first time back in 2004 when he came to the LAX airport to welcome me to the United States. I had heard a lot about Karen from my husband before, about how great friends they were and how all those years apart and long distance could not impact their friendship. However, when I started to know Karen myself I was surprised by the fragile and sensitive heart behind that big and handsome man. He went out of his way to support my husband during his illness and treatment. He provided me all the strength I so desperately needed those difficult days and very soon he became my best friend too. I am very much amazed how caring and loving parent he is to his son and how much he cares about his parents, the most amazing people I have ever known.

Now, after so many years of living in the US, when I glance back and analyze all the hardship we have been through to establish ourselves in this country I cannot thank Karen enough for his continuous support and enormous humanity. He has been like an uncle to my children and always been ready to devote himself to our family. It is very hard to express my true gratitude towards Karen. He is so kind and willing to help that when I was in search for a patient for my Dental Hygiene Board examination he without hesitation offered me his help and volunteered to fly to San Francisco for just a day to be my patient just to help me out. What else can someone wish for than having a friend who is willing and ready to help you no matter what he is going through and what kind of burden is on his own shoulders. My only wish is that he is always next to us with his positive attitude, helpful guidance and unconditional friendship. I deeply cherish our friendship and cannot imagine my husband being apart from his dearest and closest friend ever. I strongly believe that the world would be much a better place if there were more people like Karen.

Sincerely,

Armine Karapetyan

# EXHIBIT 28

**EXHIBIT 28**

To: Honorable Philip S. Gutierrez

Letter written by, Ray Karapetyan, a lifelong friend of Gary Sarkissian.

Ray Karapetyan, I am a father, husband, and an entrepreneur mainly in Real Estate. I have known Gary since 1998. Gary and his family lived next door to us in Glendale CA. We were neighbors for a long time, hence became lifelong friends and continue that tradition since.

I personally have not met a human being who is more kind hearted, more honorable and a true friend like Gary. I truly am thankful and lucky that I can call this guy a friend. He has always come to help me out whenever in need; we have always shared fun family ceremonies together, whether it was baptisms, birthdays, weddings etc. Our families, including my parents have always had close ties, and continue to do so until today with Gary's parents.

Gary was always honest, delivered what he promised and was a man of his word! He has always helped people in need even if it jeopardized his life.

The story I am about to share with you has stuck with me since it happened and until today I get goose bumps every time I share it with someone.

This story occurred in 1998 or 1999 to be exact. I was moving to San Jose area to play hockey for the San Jose Sharks junior hockey program. Gary being a true friend and a crazy hockey fan, volunteered to help me and ride along with me in the car helping me move my belongings and set up in San Jose as I arrived.

After a long drive as we were about to exit the freeway, we suddenly noticed a flipped over car right on the blind turn as you exit the freeway. We barely steered to the side avoiding the flipped over car. As we stopped, we noticed the driver unconscious in the car with her seat belt still intact. Gary, without hesitation, jumped out of our car ran to the scene, while yelling at me to go and try to stop the exiting cars, very dangerous and courageous act to say the least. Following his lead, I immediately ran to the exit and started waving my

hands up in the air trying to stop the cars or at least to have them slow down so they would not hit us or the flipped over car, which would have instantly killed that unconscious driver. At this point Gary had already taken out the driver and carried her to the side of the ramp where it was safe. I only noticed all this when the paramedics and the Highway patrol arrived. Thankfully they were really close to the scene and arrived in a matter of minutes. Of course it seemed like hours to us since we were simply acting on our adrenalin and had no clue what we were doing.

To summarize a rather lengthy story, if it was not for Gary's kindness and heroics, Sandra Cano, would probably have not survived. Of course later we found out that by moving her, we could have actually killed her if she had any broken bones, but thankfully and by God's will, all that was meant to be and it all worked out.

Gary simply saved someone's life. As Gary flew down to Los Angeles, of course I stayed to play there for the entire season. Sandra Cano visited almost my every game in a kind thankful gesture and she made sure she told every sole in that ice rink that #10 and his friend saved her life. She always joked that we made her like this brutal game! She always asked me how Gary was doing in Los Angeles and she never forgot him.

Gary is the most kind hearted and the most honorable friend that one could have. He was the most law biting citizen and it is truly shocking as I learned that he was going through this mischief. This unfortunate situation and mistake has caused tremendous harm to him and his family, and as his lifelong friend I can say with utmost confidence, that once he fulfills his responsibilities in this case, Gary will never ever be crossing paths with the criminal justice system again. I truly believe in Gary and wish him the best from the bottom of my heart.


Sincerely,

Ray Karapetyan

#10

July 25, 2016

# EXHIBIT 29

**EXHIBIT 29**

Սուրբ Գէորգ Հայաստանեայց
Առաքելական Եկեղեցի



St. Kevork Armenian
Apostolic Church

Տէր Մամբրէ Քահանա Քեսաբեան
Հոգեւոր Հովիվ

Rev. Fr. Mampre Kesabyan

Honorable Philip S. Gutierrez

United States District Judge

255 E. Temple Street, Courtroom 880

Los Angeles, CA 90012

As a spiritual pastor of Glendale city's St. Kevork Armenian Apostolic Church of Western Armenian Diocese in the United States, for more than seven years, among our believers, I had the pleasure to witness continues presence of Karen Sarkissian, with his prays and true Christian behavior.

As a conscientious believer, Karen was always providing volunteer services for needs of our Church, tacking part during charity contributions, and participating as a valuable member of our Church during events of religious and community life.

For sure, I can characterize Karen Sarkissian as a person with a true Christian ethics, law obeying citizen, lowed husband and responsible father.


Religious Pastor of

St. Kevork Armenian Christian Church

Rev. Fr. Mampre Kesabyan

Los Angeles

27th April, 2016

# EXHIBIT 30

**EXHIBIT 30**

April 29, 2016

Honorable Philip S. Gutierrez
United States District Judge
255 E. Temple Street, Courtroom 880
Los Angeles, CA 90012

Dear Honorable Philip S. Gutierrez,

My name is Khoren Keshishyan. I received a Masters Degree in Yerevan State Engineering University for architecture and design.

In 2004, my family and I came to the United States of America and restarted our lives from the very beginning. From the very first days since moving to the United States, I had the privilege of meeting Karen Sarkissian and his family. He has since become my best friend.

Since the first day of meeting Karen, he did everything he could to help my family settle down in a new country. From simple things such as teaching me how pay bills to how to drive cars. It is because of him and his friendly personality that I was able to settle down in a new country.

Almost 12 years later, today, Karen is by my side through my good and bad days. Our sons are the closest of friends, just like us.

Karen is a great human-being, friend and most importantly father. The state that Karen is in right now, doesn't match the person that he really is.


Sincerely yours,

Khoren Keshishyan

# EXHIBIT 31

**EXHIBIT 31**

April 26, 2016

Honorable Philip S. Gutierrez
United States District Judge
255 E. Temple Street, Courtroom 880
Los Angeles, CA 90012

Dear Honorable Philip S. Gutierrez,

I am writing this letter to urge leniency in the sentencing of Karen Sarkissian.

My name is Sahak Keshishyan, I am a childhood friend of Karen's son, Daniel. Daniel and I lived across the street from each other throughout my entire childhood. I practically grew up in Daniel's house. Mine and Daniel's friendship begun in 2005, and since then Karen has been an uncle figure to me.

I have always said that I've learned more from my father and his friends than I have in school. Karen, being one of my father's best friends, is definitely the highest up on that list.

When I, at the young age of 16. said that I wanted to start an auto brokerage, nobody took me seriously. Nobody but Karen that is. With his years of experience and unwavering guidance, I was able to grow a profitable business from literally nothing. All my businesses success I owe to this one man who believed in me.

Karen was the greatest father my friend Daniel could ask for and I fear how Daniel will cope without him. He was at every water polo game. He was always the first to invite us into his home. He treated us with kindness and when we were in his home, we left with newfound knowledge, bestowed upon us from his seemingly never-ending pool of wisdom.

I don't believe that the Karen I know today could have committed the crimes he's accused of. He's one of the people who told me time and time again that success is not defined by how much money you make but by your deeds and the happiness of your family. He's helped tear down my former materialistic mindset and taught me the importance of giving to those who have less than me. He has not only made me a better person, but has motivated me to improve the lives of others.

Pope Francis once said, "A little bit of mercy makes the world less cold and more just."

With all that being said, all I ask is for you to show leniency towards a truly great human being. He is nothing but a positive influence to his family and friends.


Respectfully,

*Sahak Keshishyan*

Sahak Keshishyan

# EXHIBIT 32

**EXHIBIT 32**

June 20, 2016

Honorable Philip S. Gutierrez
United States District Judge
255 E. Temple Street, Courtroom 889
Los Angeles, CA 90012

Your Honor,

My name is Vahe Khachatryan, I am the owner of South West Express Limousine Services.

I am writing to plead for your leniency when sentencing Gary Sarkissian, who is my dearest friend. I have known Gary for almost 10 years, and I can assure you that these recent unfortunate circumstances are not indicative of the kind of person he is in reality.

I feel strongly about Gary, and about his future, and I want to try to make you feel the same. Gary is a person of good moral character. He has been trustworthy and loyal to his family, friends, and everyone who knows him.

He respects others' space, privacy, possessions, health and safety. I witnessed many times how he helped those in need no matter whether he knew the person or not. And he has never been greedy, always trying to do everything he could. I have seen him regularly helping homeless people, with food, clothes or money, and I am sure a bad person wouldn't do that.

He readily came to help me whenever I needed at the time when I just started my business and needed a helping hand and an advice. He was ready to help me whenever I had any problem with a car or driver donating his personal and sometimes even his family time.

It is out of his character to have any conflict with criminal justice system and I believe that Gary's honesty and responsibility are an absolutely guarantee that he will never have anything like that in the future. I hope that you will take this into consideration when considering his case.


Thank you

Vahe Khacnatryan
1428 Glenwood Rd #210
Glendale, CA 91201

# EXHIBIT 33

**EXHIBIT 33**

Honorable Philip S.Guiterrez

United States District Judge

255 E. Temple Street, Courtroom 880

Los Angeles, CA 90012

July 7, 2016

My name is Gevorg Manukyan, I am a Real Estate Property Manager.  I reside at 11046 Valerio Street, Sun Valley, CA 91352.  I have personally known Gary Sarkissian since 2009. I can describe him as an extremely kind, family oriented, dependable, well regarded and just a good person who is always ready to extend his aid to anybody in need. There are too many positive characteristics that I can portray of Gary, however just what to mention one particular side.

Gary being few years older than the youngsters in my age has always been teaching us to respect the laws, stay out of trouble, work hard and earn your living with your own labor.

I can tell without a doubt that he is incredibly remorseful of what he has done and I do beg you Your Honor to oppose the minimum sentence, since every single day of him being away will affect the quality of lives of his loved ones.

Sincerely,

Gevorg Manukyan

# EXHIBIT 34

**EXHIBIT 34**

April 28, 2016

Honorable Philip S. Gutierrez
United States District Judge
255 E. Temple St., Courtroom 880
Los Angeles, CA 90012

Honorable Mr. Philip S. Gutierrez,

My name is Arman Matevosyan, and I'm an Engineer Mechanic. I graduated from Yerevan State University in 1992 with a Master's Degree in Engineering. In 2004, my family and I immigrated to the United States. In 2009, I met Mr. Karen Sarkissian. For the past seven years, he has been a valuable friend that I was fortunate to be acquainted with. In 2012, when I decided to open my auto repair shop, Karen was my backbone. Not only did he help me with valuable advice, but he voluntarily helped in the physical aspect of constructing and remodeling a work station. Since day one, he has been a real friend, a law obeying citizen, and a hard worker. While being in his company, I have observed how respected he was, how knowledgeable he was and ready to share his knowledge in the form of advice with us, his friends. He is known as the head of a great family in which he is the loving and caring husband as well as a model father to his son. I can assure you that he is a valuable member of the Armenian community, an exemplary Christian family man, and a great friend. I'm deeply saddened by the situation he has found himself in, and I'm hoping and praying that he will get out of this as soon as possible.

Sincerely,

Arman Matevosyan

# EXHIBIT 35

**EXHIBIT 35**

June 22, 2016

Honorable Philip S. Gutierrez
United States District Judge
255 E. Temple Street, Courtroom 880
Los Angeles, CA 90012

Your Honor,

I am a Pharmacy Technician and currently a babysitting Mom who is really concerned with the trouble which happened to one of my close friends. And I am writing this letter with a hope that it will help you to see what kind of a person is Gary Sarkissian, despite of transgression that led us all to this point. I was not a witness to the charges being brought against Gary, but I can attest to the strength of his character and his honesty.

I have known Gary as a family friend for almost 20 years and in that time I have seen many aspects of Gary's personality. I have always found him to be extremely kind, dependable, honest, and well regarded among his peers.

He has dedicated many hours of his weekend to the old, my grandmother and her elderly friends by taking them out, since they don't go out a lot from their homes. He organized activities for the aged and kids and spends time with them making everyone happy. He is bound to leave you with a smile, every time you see him.

Gary has a son who is at the UCLA now, one who needs his father to be there for him and to be part of his life. I am asking you: please use your best judgment, but make it possible that Gary can be back to his family as soon as possible.

I hope this letter will give you an idea of his good character and you to give him a second chance to prove this was an unusual occurrence.

Thank you for taking time to read this letter.

Sincerely,

Gayane Musayelyan

1428 Glenwood rd #210

Glendale, CA 91201

# EXHIBIT 36

**EXHIBIT 36**

Honorable Phillip S. Gutierrez

United States District Judge

255 E. Temple Street Courtroom 880

Los Angeles CA 90012


July 17, 2016


Your Honor,

I, Agavni Ouzounian, DOB 11/25/1944 am a phlebotomist at Glendale Adventist Medical Center, Glendale CA. I reside at 13012 Debby Street, Van Nuys, CA 91401. I am a family friend of Gary Sarkissian. I have known Gary's parents for almost fifty years.

Gary comes from a family of honest, educated and hard-working individual. Gary has been well brought up growing polite and acting quiet and pleasant way, because he has been taught this behavior at home. He grew up as an honest, kind and polite person. Our families continued the friendship after we moved to the United States. Gary is a very caring individual, an exemplary father, son and a husband.

He has been actively involved in raising his son, who is an undergraduate student, who is pursuing career in neuroscience. Daniel is one of the few students who is accepted this year to continue his studies at UCLA. Gary has been teaching his son the value of education and virtue of being a law abiding citizen.

In 2006 Gary's father was hospitalized at Glendale Adventist Medical Center where I have been working for over 20 years. The first person who rushed to see him there was Gary, who arrived even before the paramedics. Gary stayed in the hospital with his father taking care of him for several days while he was hospitalized. His mother, my friend and her daughter arrived at the hospital later on, by this time Gary had taken care of everything, and fortunately his father was already in stable condition. He simply did not want his mother and pregnant sister to be worried; he by himself took care of the situation. His parents are truly blessed to have such a caring, kind and loving son.

Gary is deeply regretting of the mistakes he made, those which led to this conviction. His family also has been truly saddened by what has happened, having difficulties to adjust to the current situation.

His elderly parents need his care and attention daily, he visits them on regular basis and takes care of their needs. He is truly an incredible person, loving, caring and very kind individual.  A type of person that anyone would feel honored to have as a friend or a relative.


Thank you,


Agavni Ouzounian

# EXHIBIT 37

**EXHIBIT 37**

June 15, 2016

Honorable Philip S. Gutierrez
United States District Judge
255 E. Temple Street,
Courtroom 880 Los Angeles,
CA 90012

Your Honor,

My name is Nelli Panosyan, MD.,(from Armenia) currently retired, living in Los Angeles CA. I am writing this letter in reference to Gary Sarkissian, who is appearing before your court.

Gary asked me to write a character reference letter, but the truth is that I was already going to write this before his request when I learned about the unfortunate circumstances and the charges he is facing.

I have known Gary from the day he was borne back in Armenia. His parents and I have been neighbors and close friends from our childhood and I believe that I am in the position to speak of Gary's moral character and his human nature. This kid was growing in front of me for years and I hope you will and please do take this letter into consideration when making your decision

Gary is an honest and goodhearted person. He has always been kind and generous with others. I remember this guy taking care of his grandparents helping them with house chores and shopping since he was a teenager. When he was playing with his fellow kids there was never any fight or quarrel: he could always find a right word for everyone.

He has a strong sense of duty, which applies to his job, family, friends, and community. He also possesses a great deal of integrity, and constantly strives to make sure he is doing the right thing.

It must be difficult to make a decision like this when you don't actually know much about the person standing in front of you. But I hope that you will take a look at my letter (and many others like mine) and will understand that Gary is a kind of person whose nature and character are absolutely opposite to those sad circumstances that he currently appeared.

On the contrary he is someone around whom people come together feeling secure and warm. That has to say something, so please let that be a factor in your decision please.

Thank you,

Sincerely,

Nelli Panosyan

1516 N. Western Ave

#104 Los Angeles, Ca

90027

# EXHIBIT 38

**EXHIBIT 38**

Albert Rutledge
P.O. Box 1446
Rancho Cucamonga, CA 91729


April 25, 2016


Honorable Philip S. Gutierrez,
United States District Judge
255 E. Temple St, Courtroom 880
Los Angeles, CA 90012


Honorable Philip S. Gutierrez,

I'm Sgt. Albert Rutledge, retired from US Armed Forces. I had an opportunity in the month of June of 2004 of meeting Gary Sarkissian on a hot summer day in Inglewood, CA at a 7-Eleven Store on Manchester Ave. As I was working on my car in the parking lot, I noticed a man walking out of the store, he spotted me trying to get my car started. This is when he made his way over to me. The man walked over to me to see if he could lend a hand and he offered his help. I said, sure since I really didn't know what was wrong with it. As we were tending to my car, we introduced ourselves and we continued talking.

After getting my car started, we stood in the parking lot for a while and continued our conversation. Gary seemed to be a really nice, friendly and down to earth type person. I later asked Gary if he went to church and he said that he had a church home. He said, he attended an Armenian Orthodox Church. I told him that my church home is at Zion Hill Baptist Church in Los Angeles where I am the drummer for the church. He thought that was interesting that I play the drums. I extended an invitation to him to come by sometime and fellowship with me because I really appreciated what he did by helping me. He showed a lot of concern. A couple of weeks later, Gary did take me up on my invite and he came to visit us actually a few times and each time he seemed to really enjoy the service. Gary has also donated clothes to our Clothes Closet for the homeless.

I befriended Mr. Sarkissian because I found out that he was a person who cared about others. We have a lasting friendship.


Sincerely,

Sgt. Albert Rutledge

# EXHIBIT 39

**EXHIBIT 39**

Gayane Sahakyan
6700 Whitsett Avenue, #4
N. Hollywood, CA 91606

Honorable Philip S. Gutierrez
United States District Judge
255 E. Temple Street, Courtroom 880
Los Angeles, CA 90012

Honorable Philip S. Gutierrez,

My name is Gayane Sahakyan. I'm currently employed at Encino Yamaha Music School as a piano teacher.

I met Gary Sarkissian and his family in 2000 at my friends. Our families became friends and with years our friendship grew. My son and Gary's son are about the same age they became close friends too. In 2000 me and my family just moved to United States and as many other immigrants we were experiencing difficulties in our everyday life. Gary was the one who was always there for my family with his helping hand. We could rely on him any time we needed any kind of support and he was doing it very sincerely and from his heart.

Gary is an excellent example of a family man. His acts are showing that his priorities are his family, his son. No wonder Gary was the one among our friends who would always find time to take our kids to the park, to play soccer, to the movies etc.

When I became a single mother my son was only 10 y. old. Needless to say how difficult it is to raise a child alone. Since Gary was like a family for us, he was always keeping his eye on my son. Making sure his grades are good, helping with school projects, spending a lot of time with him talking about the education, how important it is to have a good and healthy environment and how to stay away from drugs and other dangers.

My son is 22 years old now and he still sees Gary as his best friend and adviser. I still remember that day when Gary dropped of my son and I wasn't home on time because I had to stay longer at my work. So I told Gary that it totally ok if he just leaves. I knew that he had things scheduled and he needed to leave. But he said he can't leave my son alone because the child is not 12 y. old yet. And he postponed his things and stayed for another 1.5 hours until I came home. That impressed me very much. Gary is a person who shows with his acts how responsible, honest and caring he is. He's a loving and very dedicated son for his parents, an excellent uncle, a true friend you can always rely on. He is surrounded with very good people. They all are family oriented, educated and intelligent. I'm sure Gary will never interact with someone dishonest or someone who is involved in any kind of illegal activities.

Sincerely,

Gayane Sahakyan
Cell: (818) 299-0399

# EXHIBIT 40

**EXHIBIT 40**

Hasmik Sahakyan
4871 Klump Avenue, Apt 104
N. Hollywood, CA 91601

Honorable Philip S. Gutierrez
United States District Judge
255 E. Temple Street, Courtroom 880
Los Angeles, CA 90012

Honorable Philip S. Gutierrez,

My name is Hasmik Sahakyan and I am single mom and currently employed as a Director of Finance and Payroll at Serviz, Inc and as Administrator at Lankershim ADHC, Inc.
I know Gary Sarkissian from April of 2011, we met at my sister's Birthday Party and since are very good friends.
We have been in very good friendship since then, however, I knew him as an amazing person when, about 2 years ago I started to have very serious problems with my teenage son who started to use Marijuana and started to go on a wrong path (my son was detained several times, was placed in the camp, etc and our relationship as a son and mother were totally broken). And nothing seemed to work for me, my son was getting worse and worse, refusing any types of treatments, choosing being in and out of placements and juvenile hall.
When I shared my problem with Gary, he took my pain as his personal and started to build relationship with my son and talking to him for hours. It looked like a magic for me, because my son was not talking to any one from family and friends. With a great patience, little by little, Gary became a role model for my son and he agreed to enroll to Tarzana Treatment Center for Rehabilitation only because of Gary. Gary is going step by step with him throughout this very hard process, and I cannot imagine what I would do or where my son would be without Gary. He is a life saver for my son at this time, he is teaching my son to obey the law, respect others, to be honest person.
Knowing Gary very well (especially for past 2 years), I strongly believe that Gary will never be involved in anything that is illegal or dishonest.
In many other occasions Gary demonstrated himself as a true friend, always being there for his family and friends.

Sincerely,

Hasmik Sahakyan
Mobile: 818-731-5546
Office:  818-616-7772

# EXHIBIT 41

**EXHIBIT 41**

Daniel Sarkissian
University of California Santa Cruz
Neuroscience Major, PreMed
113 4th rear Avenue, Santa Cruz, CA, 95062

Honorable Philip S. Gutierrez
United States District Judge
255 E. Temple Street, Courtroom 880
Los Angeles, CA 90012

Character Letter

My name is Daniel Sarkissian, and my current occupation in the community is studying

neuroscience at the University of California, Santa Cruz, with the intention to go to medical

school. I am part of the Brain, Mind and Consciousness society, the ACE Pre-Health club and

Secretary of the Armenian Student Association at UCSC. Gary Sarkissian is my father, and has

been more than just a father, but my closest friend for my 20 years of being alive. My father

immigrated to the United States from Armenia after the collapse of the Soviet Union, and he

always told me that they moved here so that when I was born, I would have the opportunity to

succeed in what I want to do. He would take my friends and I to parks when I was a child, spend

quality time with us and take us to dinner after. When I got into a car accident on October 5th,

2015, after I was brutally rear ended against my will, I called my father, and he immediately

drove up to Santa Cruz, which is a 5 hour drive, and lent me his car. My housemates were

astounded by the fact that my father drove up the same because his son got in an accident.

Gary is an exceptional father and a human being, because I do not know of many parents who

would drive five hours to lend their child their car and fly back the next day. There have been

months, even years, when I watched my father work 7 days a week for at least 8 hours a day,

and I never heard a single complaint from him. When I used to play water polo for a club team

during my high school years, he would always drive me and my teammates to the games. Also,

no matter how bad I may have played as a goalie during the game, Gary never put me down,

but rather he told me to pick myself up, because losing was not the end of the world. A young goalie like myself needed motivation, and my father was the one to lift my spirits no matter the situation. Plenty of parents on my team would scold their children because they did not play well, but my father is a civilized human being, and knows that violence and discontent will not make me play any better, it will adversely ruin my self esteem and cause me to play worse. His support throughout my club and high school water polo career helped me to be the starting goalie for Glendale High School's Varsity Water Polo team that won the CIF-SS championship for division 5. I made the cover of the Glendale NewsPress the next morning, which was the epitome of my success that was without a doubt unachievable without his support. My father always supported my decision to go to a university far from home, knowing that it was in the best interest of my future. Many of my friends parents would not let their children leave town to go to school, but my father was always supportive of that decision. I personally believe it is essential for a boy to grow up with a father figure, as the pathway to manhood can only be guided with someone who has completed that path, and I was gracious to have my father there for me throughout this journey. My father has given me motivation week in and week out to keep me so I never get too stressed out or lose focus. His main goal in life was to ensure my education and so I can be as successful as possible, and right now I am on the journey to medical school and it would not be possible without the moral and financial support of my father. I truly believe my father will be a law abiding citizen for the rest of his life, especially because has no intention to harm others. I believe this conviction is grossly out of character, because I was shell shocked to be greeted by the police at 6:00am, only to witness the arrest of my father. I know that my father is a trustworthy human being and would never intentionally harm someone. I would have never imagined this day to come, and I am still in disbelief that such a thing would happen. With that being said, I wish for you to acknowledge my father as an

empathetic human being, who cares about his community and family, like any respectful American should.

Sincerely,

Daniel Sarkissian

# EXHIBIT 42

**EXHIBIT 42**

Honorable Philip S Gutierrez
United States District Judge
255 E Temple Street, Courtroom 880
Los Angeles, CA 90012

My name is Hovanes Sarkissian. I am a Medical Doctor by my education and I have a PhD degree in Health Sciences from former Soviet Union. I headed the Department of Medical Oncology in Oncology Center in Armenia and was Medical Director in Diagnostic Center. When I immigrated to USA in 1993 I brought my family here for a better future of my children. I have passed examinations for foreign medical doctors and have the right to be titled as M.D. though not licensed to practice in California.

Gary Sarkissian is my son and I know him for 45 years. Since his early childhood he has always been a very kind and gentle boy. He has always been supportive and nice to his fellows and protective and helping to his younger sister. When his sister was born he was 8 years old. He has helped a lot in her care. We could trust him his sister for a while when we needed to do something at home. When she grew older he used to take her out for a walk and play with her in the backyard.

Starting from 6 years old Gary was enrolled in diving sport practices. When he grew older from at 8 he started practices and from 10 to 15 he practiced water polo. Because of his personality and physical fitness, his balanced and helpful nature Gary enjoyed his friends respect and was always considered as a conciliator in teenage conflicts and run-ins.

In 1988 the situation in Armenia started deteriorating rapidly with the advent of perestroika and beginning of national independence movement. The economy was destroyed; there were constant strikes and rallies in the city of Yerevan. Schools worked sporadically and students did not attend classes for weeks.

Gary tried to help his family with whatever he could: staying in long lines for grocery and bread, trying to get gas or diesel fuel to use in custom-made apartment heater. He was also regularly visiting his grandparents taking care of his Grandpa who suffered from Parkinson's disease. He used to help him shaving, taking a bath dressing et ct. Gary started working at Oncology Center as a volunteer and later was hired as a CNA in ICU Department. He was very interested in continuing his career in Health Care and kindhearted to patients. Nurses in ICU preferred to have their shifts whit Gary because he was very helpful and they felt certain that the patients will have all they need. He faced a case of a sudden death of a patient when CPR attempts failed. It was too much to take for a 17- years old and he decided to choose a different path for his future career.

After his graduation from the high school Gary entered Yerevan State Polytechnic Institute in September 1988. Classes were irregular, students and professors spent a lot of time at rallies and political meetings.

In December 1988 a devastating Earthquake happened in Armenia. According to official reports it took 25000 lives. Numerous cities and villages were totally destroyed. Gary was 17 at that time and he

volunteered to go to the city of Gyumri with a company of friends and stayed there for two weeks working on debris of Earthquake and resting along campfire. 17-years old boys were trying to dig out still alive victims of earthquake and pulling out corps of dead. When he returned back he was totally changed: he has seen death, a lot of horrible things and human sufferings.

While at the Institute, Gary worked for an Electronic Systems company as an electrician assistant in order to support our family and to have his own petty cash. In 1993 Gary has graduated the Institute and having Soviet Union passport came to USA to learn English and continue his education. I was here at that time on a business visa. The rest of our family joined us in 1994. I had difficulties with supporting my family, I was studying to pass my tests, my wife had to learn English and my daughter was at school. Gary did everything to support the family: went to work as a waiter at weekends and was working at daytime in a jewelry company. He surrendered his education classes in order to support our family. It was mostly because of his support that we could rent an apartment and continue our efforts to integrate into the new community. He could not continue his further education here because his wife arrived to this country in 1995 and he to support his own family.

Gary is a very good son and is a very devoted parent. He is there for everyone who needs him. He is very helpful, considerate and absolutely unselfish. He calls us at least twice a day checking on us and making sure that we are fine and asking if we need something. We rely on him in most of our everyday life problems.

He is in daily communication with his son texting him and calling everyday being up-to-date of what is going with him day by day. His son and he used to be friends since his son's childhood. He is an only confidant for his son Daniel and there is nothing that Daniel would hide from his father.

Gary is a caregiver for one of his friends, Mr. Stamboltsyan, who is legally blind. He is an educated person, a programmer, used to work in computer laboratory at UCLA. As his health condition worsened and he stopped working his personal life was messed up: the wife left him and he had to live alone. Gary came to his help. He started taking care of his friend. Currently Mr. Stamboltsyan is totally dependent on Gary's care: Gary does grocery shopping, meal preparation, helps him with hygiene and all other activities of daily living. Thanks to Gary Mr. Stamboltsyan has a chance to remain relatively functional in the community.

Gary is a goodhearted person and would never do any harm to anyone. All those, who know him, would tell about him only positive things. I am absolutely sure that he is an honest person who will be committed to follow the laws and will never have any further involvement with criminal justice system.

Our family and relatives belong to educated and cultured circles of Armenian society. My wife and I graduated from Medical School in Armenia, my aunt and uncle were medical doctors, my wife's uncle was a Professor of Microbiology teaching in Veterinary Academy and my sister is a Professor of Architecture teaching in Armenia. Both Gary's Grandfathers have been veterans of World War Two. We have never had any history of unlawful activities in our family. Gary has been brought up and educated in strongest traditions of respecting the community and family values obeying, the laws and rules. I am

sure that this unfortunate circumstance absolutely does not match to Gary's previous life and conviction is out of his character.


Sincerely,

Hovanes Sarkissian, M.D.
316 N Maryland Ave #210
Glendale, CA 91206

# EXHIBIT 43

**EXHIBIT 43**

Honorable Philip S. Gutierrez

United States District Judge

255 E.Temple Street, Courtroom 880 Los Angeles, CA 90012


July 24, 2016


I, Ruzan Sarkissian am a California licensed dentist. I reside at 316 N. Maryland Ave. Unit 105, Glendale CA. I know Gary Sarkissian for more than 10 years. His parents are my neighbors, we are not related. Gary's parents and he are the first people who welcomed us in the building and we became very close since then. His family is greatly admired and respected in our building. Gary is a very kind and polite person who is willing to help anyone who would approach him.

I have been licensed for several years but was working in different clinics and have always wanted to start my own business. However, I never had any support that was needed to open my own dental clinic. I told about this Gary and he said that it was a great idea that I had to start my own business, my own dental office. He has helped me tremendously if it was not for him I would not have opened my dental clinic Oak Dental. Since, I had limited resources Gary helped my husband and I to clean and remodel the old dental clinic that I purchased. He would tirelessly help us paint and furnish the office. He even spent his own resources to buy materials for my office just because he is warmhearted person.

Gary is a great son and father; he visits his elderly parents every day. I see him in our building carrying grocery bags with food and other supplies for his parents. He usually accompanies them to the doctor's appointments and helps them with their daily activities. He is such caring son that I truly admire him. Gary is great father for his son who is doing very well in school, currently he is an undergraduate student at UCLA. Gary supports his son educational endeavors.

Your honor please take into consideration my letter when making a decision, Gary has a great character and the conviction he is facing is not in any way related to his true personality.


Thank you,


Ruzan Sarkissian

# EXHIBIT 44

**EXHIBIT 44**

Honorable Phillip S.Gutierrez

United States District Judge

255 E. Temple Street Courtroom 880

Los Angeles CA 90012


My name is Suzanne Sarkissian, I hold a Bachelor's Degree in Psychology from California State University Northridge and Master's Degree in Social Work from the University of Southern California.

I am writing a character for the person who has been by my side since the day I was born, my older brother. I know him for thirty-seven years.

He is by far the best brother anyone could have asked for.  Karen is sweet, humble, caring and compassionate person; the list can go on and on.  Karen has always supported me in any possible way since my childhood and it continues to this day.  As a child I knew he was the go to person for any problems that I may have encountered.  I always knew that I got my back covered.

He has never hesitated to help anyone that he can help in one way or another.  He has helped so many of his friends and relatives; he even puts his own interests aside just to reach out others in need.  He is an honest and a trustworthy person who will never let anyone down.  He will go beyond his limits to do what he has promised that he will do.  He never complains even when it is obvious that he is going through a though period in his life, simply because he does not want to hurt people that he loves.

Karen is a very caring uncle to my children ages fourteen and nine.  He is involved in the upbringing of his niece and nephew.  My children have a strong bond with their uncle who is always there to support them in any possible way he can.  My daughter is going through the difficult period in her life, as some teenagers do, her uncle is the only person that she truly trusts and respects.  He is supporting he acting endeavors, he pays for her acting classes, takes her to each class and waits for her there and brings her back home.  He helps my son with his schoolwork, he spend a whole night building a Mission Santa Cruz model for my son's school project which we had a difficulty building.  Karen tutors my children in mathematics, he patiently explains them the problems for as long as it may take.

Karen and my husband met sixteen years ago while we were dating.  They became very good friends ever since.

Karen is a caring son for our parents he visits them daily and takes care of the chores that they may have.  He takes them outside for walks or shopping, to doctor's visits.  He repairs anything that might be broken at their home.  He was always has been an exemplary son, our relatives and friends have all admired him as a wonderful human being.  Our parents are aging and they depend on him a lot, they need his support and caring more than usual. And these are just few examples what he has done for my family and I.

We had a very difficult life when came to the United States it was our strong family ties that helped us get through the tough times.

Karen has always been a lawful citizen has never committed any wrongdoings and has always in encouraged his son and my children his niece and nephew to focus on education and being a good community member.  He comes from a family of law-abiding citizens, no one in our family and extended family has ever committed a crime.

Karen is one of the nicest individuals one came meet in his life.  Anyone who has ever met him has only expressed kind and warm words regarding him.  This conviction that he is facing is so far away from his true character, he is not a criminal.   He has suffered so much because of this case, the high stress levels eventually led him to developing diabetes.

Thank you for your consideration,

Suzanne Sarkissian

# EXHIBIT 45

**EXHIBIT 45**

Vicktoria Sarkissian
404 Porter Street
Glendale, CA 91205

Honorable Philip S. Gutierrez
United States District Judge
255 E. Temple Street, Courtroom 880
Los Angeles, CA 90012

Honorable Philip S. Gutierrez,

I, Vicktoria Sarkissian know Gary (Karen) Sarkissian for more than 15 years. First we met at our children music school.
A friend in need a friend indeed!
Karen is distinguished as an honest, kind, reliable and great person. He is a kind of person who is always there, at the right time, to give you a hand of help. Whenever I did not have time I could always relay on Karen to pick up my son from school.
He has unique, individual approach to all his friends. Usually, he sacrifices his time and energy to help his friend in everyday life as well as in any future projects, I will not forget as while one of our mutual friend was traveling abroad, Karen was visiting his friend's parents daily and helping them with all their needs.
Karen is very self-critical and self demanding person, he always keeps his promises. I can say he us such type of person that is hard to find. He is devoted to his son and always finds time to take care about almost everything. His son is happy to be with him and loves him very much. He constantly looks after his education, cultural development and whereabouts. Karen took his son to music lessons, sport trainings, traveling. He would gather children around and create new game to keep them happy. We often met at concert halls.
Karen is hard working and responsible person. He is working hard to support his family. He is very sociable and easily gets admiration of others due to his kind character and willingness to help those who need his attention.
If I can, I would kindly ask you to consider all mentioned above during the hearing of his case.

Sincerely,

Vicktoria Sarkissian
Cell: (818) 319-9991

# EXHIBIT 46

**EXHIBIT 46**

Yana Seviyeva
1116 E Maple St., Apt 203
Glendale CA 91205
(818) 960-8258

April 21, 2016

Honorable Philip S. Gutierrez,
United States District Judge
255 E. Temple St, Courtroom 880
Los Angeles, CA  90012

Honorable Philip S. Gutierrez,

My name is Yana Seviyeva. I am working at Home Health field as a biller.
First I meet Gary at our mutual friend's house in March 2006, at her son's
birthday party. Our children build up a good relationship, so did we.
When the whole world became just dark for me, I realized that Gary is an
absolutely amazing friend that anyone wishes to have.
In June, 2006 I was diagnosed with brain tumor. It was a very hard time for me,
and my family. In April 2007 I had a surgery in Cedars Sinai Hospital. Gary was
there with me and my family during my stay in hospital. He was helping my
mom and was taking care of my son. After I was discharged from hospital, he
was visiting me and my family during the week helping my mom with grocery
shopping and everything we needed even though he had his own family to take
care of. He became a part of my family. My mom treats him like a son.
Gary is educated, honest, hard working, kind and responsible person who will
sacrifice his time and energy to help other people.
I'm blessed to have a friend like Gary!

Sincerely
Yana Seviyeva

# EXHIBIT 47

**EXHIBIT 47**

Honorable Philip S Gutierrez
United States District Judge
255 E Temple Street, Courtroom 880
Los Angeles, CA 90012

My name is Karine Shakarian, born on January 10, 1948. I am a medical doctor by my education. I have met my husband when studying at Yerevan State Medical School. We married after graduation of the medical school and we happily lived together for 46 years until this great calamity happened to our family. And I am writing this letter to tell you a little more about the character of my son.

Karen (Gary) Sarkissian is my son. He was born in 1971. He was always a gentle and dutiful child. When our daughter was born in 1979 Karen was so happy and he helped us a lot though he was only an 8-years-old boy. Since then he was always a "big brother" figure for his sister and she knew, that she can always relay on him.

Karen went to school at 6 and he started diving practices at the same age. He had always very good grades at the school and teachers were praising him at each school meeting. I don't remember any complaints from teachers regarding his studying or his conduct.

When our daughter went to school Karen was walking her to school and helping her with homework, though he was very busy with his classes and water polo practices.

These relations continued for the rest of their adult life: my daughter always asks for his help or advise, even being happily married for many years. Karen is very close with his niece and nephew, doing a lot for them: he finds time to help them with homework, picks up from the school, taking them to sports and performances.

Karen used to visit my parents regularly when they were alive. He was a student at Polytechnic Institute at that time but would always find time to visit his grandparents who lived alone and help them with their daily needs. He was checking my father's blood pressure, helping him to shave and dress. He used to help my mother with grocery shopping and some household tasks. Sometimes he was coming to see his grandparents with his friends and they would help my parents all together. My parents felt so happy, saying that with his every visit they get more energy and life.

In December 1988 when the dreadful earthquake happened in Armenia Karen being 17 years old with a group of his friends went to the devastated area. They lived almost two weeks in tents helping the rescuers to dig out injured people from the ruins and pulling out those who were already dead.

Those were difficult times in Armenia and people experienced problems staying in long lines for food and fuel to warm their houses. We had water and electricity for only one hour a day. Even with my husband being a Head of Medical Oncology Department and I being a teacher in a Nursing School we had problems with putting food on table. Karen worked as an Electrician assistant to support our family and help us to meet ends.

When we immigrated to United States we had difficulties with adjustment process. Everything was unknown: it was a new country, new life, a new language. There were certain hardships to overcome and Karen worked hard to support our family and help us to adapt. He worked as a waiter, did hard a labor at a jewelry factory, worked as a driver in a pharmacy delivering medications, worked in construction doing hard flooring.

Since the moment when his son was born he became the most caring and loving parent I know. He became a best friend with his son helping him in his every step. My grandson Daniel graduated from the school with high grades and like his Dad he played water polo. His team won CIF Championship of California in 2014. Currently my grandson is an "A" student at UCSC majoring in Neuroscience and Biology. His dream is to become a medical doctor and be a specialist in Neuroscience. And all this was achieved because of positive influence of my son Karen and his careful guidance.

Karen has a lot of friends and he enjoys their respect and friendship. He is always ready to help any of them, even putting aside his own wants. Everyone knows that he is a person on whom they can really relay on.

Karen is a very caring son, he takes care of me and my husband helping us with everything we need, starting from help in online bills submission to making right choices when we make decisions. He calls us at least twice a day and comes almost every day to check if we need anything. Or he just simply says hello, because he knows how important is his being there for us.

I am proud of my son and cannot imagine my life being apart from him. We have a good and educated family and our children have been brought up in traditions of honesty and respect. I give my guaranties that my son will never have any problems with criminal justice system.

I am absolutely convinced that conviction is out of his character and he is no harm to the society.

Sincerely,

Karine Shakarian,
316 N Maryland Ave #210
Glendale, CA 91206

# EXHIBIT 48

**EXHIBIT 48**

Honorable Phillip Gutierrez

United States District Judge

255 E. Temple Street Courtroom 880

Los Angeles CA 9001

My name is Irina Shinyaeva, I was born in 1983.

I am a mother of two children and currently I work for the City of Los Angeles as an Eligibility Worker II in the Department of Public Social Services.

I have first met Karen at a friend's party back in 2003. At the very first exchange he left on me a good impression of an honest man. Our further communications proved that he is a very helpful person, who is never indifferent to the problems of his friends and contacts.

He has actively participated in organizing youth and children events such as Halloween and Christmas parties for kids from low income families. He became known and appreciated as a person who never feels sorry to spare his time and resources for the needs of people around.

I have witnessed his selflessness and good heartedness when he readily participated in fundraising action for restoration of our church dome, which was in a faulty condition for the last twenty years because of lack of helpers and resources.

The most remembered moment about Karen for me is the day when he volunteered to be the Santa Claus at a Christmas party. We were looking for a Russian speaking person to play the role of Santa but never expected that Karen could be so

spontaneously cheerful and surprising. Children were excited and so happy to have such a charming Santa Claus who even somehow managed to give each of them at the end a small Christmas gift.  I will always remember that delight and joy in children's eyes when the party was over and they had to go home.

As a mother of two children I know how difficult is it to take care of your family and share your time between the family and community needs. I always admired Karen's ability to be temperate and balanced despite of all stressful situations and respected him as a person who is able to give you reassurance and positive energy.


Sincerely,

Irina Shinyaeva, Eligibility Worker II,

Department of Public Social Services, City of Los Angeles.

# EXHIBIT 49

**EXHIBIT 49**

Valerie Smolyanskaya
7076 Hawthorn Ave. #104
Los Angeles, CA 90028

Honorable Philip S. Gutierrez
United States District Judge
255 E. Temple Street, Courtroom 880
Los Angeles, CA 90012

Honorable Judge,

Let me simply start off by saying that Gary Sarkissian is undoubtedly one of the best men I know. This is not an exaggeration but possibly an understatement. He is kind and compassionate and will drop anything for anyone at any time. He is honest and trustworthy and not many people that claim to have those qualities display them as much as he has to my family and myself.

My name is Valerie Smolyanskaya and I met Gary about 15 years ago, when I was only a kid around 12 years old. He was friends with my mother. I would see him often and we got to know each other well. Even back then I could always count on him, whether it was for a ride to the mall, some starbucks or some silly teenage thing that was of little importance. He has remained in our lives ever since. He was not only always there for me but for my whole family. He is just that one smart and handy man that everyone goes to for everything and he never turns you down. Gary has shown his character to my family and myself many times, but never so much as in the past 2 years.

The past few years have been a very trying time for my family and myself. I lost my father a few months back and Gary was there to help our family with whatever we needed even though he was already going through his own hardships. A few months later, I received news that my mother was sick and as soon as I called Gary to tell him the news he was already on his way to support me. This wasn't surprising to me; he is always a great support. He helped me in ever way that he could. His selflessness and willingness to help myself as well as anyone who ever needs him is very admirable. He was right by my side when my mother passed, and considering everything that he himself was going through at the time, I respect him because he has always stepped up when I needed him. When anyone needs him! He is just that kind of loyal person. With all the hardships of what he is facing, he still made himself fully available to my family and myself. He is a father figure to us and I have tremendous respect for him.

For me, I know that I can always count on this man for ANYTHING because I know if it is within his power he will not let me down! It is not within his character to be dishonest or untruthful or disobedient of the law so I plead with you to please consider that he is a stand up man that I am certain will have no further involvement with the criminal justice system after his responsibilities in this case are fulfilled. I full heartedly ask that you please additionally consider that Gary is an all around great man that is loved and respected by many people due to his admirable character and has nothing but good intentions.

Thank you,

Valerie Smolyanskaya

# EXHIBIT 50

**EXHIBIT 50**

Val Stamboltsian
202 W. Elk Ave., Unit E,
Glendale, CA, 91204
Tel.: (818) 605-5044 (mobile)

      Honorable Philip S. Gutierrez
      United States District Judge
      255 E. Temple Street, Courtroom 880
      Los Angeles, CA 90012

Your Honor,
This letter is on behalf of Mr. Gary Sarkissian, my personal caregiver for the
last 3 years.

First, let me introduce myself. My name is Val Stamboltsian, I am 70 years old
male, naturalized US Citizen, divorced, retired IT professional, residing in
Glendale, CA. I am also a legally blind person.
The place of my last employment is the UCLA David Geffen School of Medicine,
where I spent about 10 years, working at various positions in the fields of
Computer Science and Applied Mathematics.

Prior to my arrival to the US in 1991, I was living in the former USSR, where
I got my professional education and my highest scientific degree, namely, Ph.D.
in Mechanics. In terms of employment there, I was mostly involved in academic
research in the fields of Mathematics and Mechanics.

After 10 years tenure at UCLA, I decided to retire in 2006, due to increasing
difficulty to commute, caused by my deteriorating eyesight. Around that time
I met Gary, who was brought to my place by a close friend of mine. I remember
the first impression of him as being a smart, softly spoken, calm and seemingly
reliable person. Over the time, we became friends, enjoying each other's company
on countless occasions.

After my divorce and separation in 2013 I started living alone, without much
needed assistance from the family members. Blindness imposes severe limitations
to the routine everyday lifestyle, thus decreasing the quality of life. Here it
was when Gary has come to the rescue: he offered to me to be my caregiver, which
I gladly accepted.

Since that I can't overestimate the amount of care and help given to me by dear
Gary, can tell for sure that I do not imagine my life without him. He visits me on a daily basis,
helping me with most of the household tasks such as laundry, grocery shopping and, most
importantly, with the food preparation. Being himself an amazing cook, he generously shares his
trade secrets, while preparing delicious meals for me. Other than that, Gary drives me to various
places, which I can't reach on my own: doctor's and dental offices, pharmacies, shopping
places, and places where events of my interest are held.

Recently I learned about his legal troubles, which came as a big surprise to me,
since it is hard to imagine, that such an honest person can be on the wrong side

of the law. Anyway, I hope that he will eventually overcome legal problems and keep helping me to enjoy the quality of life.

If the need arises, I'll be glad to testify in person on behalf of Mr. Gary Sarkissian. I can be reached at the address and telephone provided.

Kind regards,

Val Stamboltsian.

# EXHIBIT 51

**EXHIBIT 51**

**To:**       **Honorable Philip S. Gutierrez, United States District Judge**
              **255 E. Temple Street, Courtroom 880, Los Angeles, CA 90012**

**From:**     **Paruyr Zoryan, US Citizen**
              **6207 Coldwater Canyon Ave., #46, N. Hollywood, CA 91606, (310) 714-1460**

**Honorable Philip S. Gutierrez,**

My name is Paruyr Zoryan. I am a general contractor, a US citizen, and I consider myself very lucky to be able to call Mr. Gary Sarkissian my friend.

We met back in 1989 when I enrolled at the Yerevan State University of Technology, where he was a 1st Year student. We almost immediately became friends, and I can safely say that in Gary I found the most loyal friend anyone could wish for.

Sometime after graduation, Gary immigrated to the United States, and we seemed to have lost connection. However, when I came to the United States in 2002, he immediately found me through common friends and offered help. I left my family back in Armenia; I was alone, needed a place to stay; needed a job. Gary took me in, showed me the ropes, supported me until I got on my feet, helped me find a job.

Years later, when my family came over and my marriage unfortunately fell apart, my son and I needed a place to stay, and once again, Gary opened the doors of his home for me without a minute of hesitation.

Like they say, it never rains but it pours: about the same time, I learned that my father was terminally ill and had to go back to Armenia instantly. I could not pull my son out of school in the middle of the school year for an indefinite period of time, and Gary offered me to look after him while I was gone.

In fact, I could go on for pages remembering all the instances Gary was there for me in word and deed. I can only say that without him I would not have been able to make it on this country. I am absolutely sure that I am not the only one to speak so highly of Gary. Anyone who really knows him will take my view: he is one of the most honest, fair and straightforward men I have ever known. I have no doubt, that whatever misstep he might have taken it was a misinformed decision, unconscious honest mistake, made probably on somebody's bad advice. I firmly believe that even if he did take a misstep, this experience will make him more guarded in his decisions and in the choice of his advisers in the future.

Respectfully,

Paruyr Zoryan

# EXHIBIT 52

**EXHIBIT 52**

Honorable Philip S. Gutierrez
United States District Judge
255 E. Temple Street, Courtroom 880
Los Angeles, CA 90012

Armen L. Mikayelyan, Esq.
15745 Royal Oak Road,
Encino, CA, 91436
818-472-7472
amikaeli@hotmail.com

July 20, 2016

Your Honor,

I am writing to ask for Your leniency for Gary Sarkissian (Karen).

I want to tell you few words about my family story. I am an attorney and graduate of Moscow State University (1993), Boston University (LLM, 1997) and Harvard Law School (ITP, 1999). In May 2015, I was admitted to practice of law in New York State.

In 2001, I was appointed by the Board of Russian oil Company OAO NK Yukos as Director of Yukos CIS Investment, an Armenian subsidiary of Yukos OIL which was a holding company of multibillion assets structured under Dutch foundations. In 2003, Yukos came under attacks of Putin government and, via series of rigged auctions, was taken away from its rightful shareholders.

In December 2008, my wife, 9 month old daughter Sophie and I fled Russian-controlled Armenia when I refused to comply with Russian government representatives requests to surrender control over the Armenian subsidiary, which was the only way for them to acquire control over Dutch foundations. The political nature of criminal charges brought against me by Armenian authorities at request of Russians was mentioned in 2011 and 2012 United States State Department Country Reports on Human Rights Practices (Armenia). In October 2015, Immigration court granted my application for asylum in the US.

Being deprived of an opportunity to return home and being away from family and friends, at some point, my wife and I realized that that we needed to start our lives anew.  We needed new friends and Karen has become one of them. We knew him since early 2009. Karen is a brother of our friend, Suzanne, and we had numerous opportunities to interact with him and his family in social occasions.

Just one example demonstrating his good heart. While my immigration documents were in process since December 2009, I had no Driver License. This was a serious predicament for my family's at that time. When Karen learned (purely by an accident) of our problem, he volunteered to help us out by driving us for errands every day, be it taking Sophie to day care, visits to grocery store, children playground, occasional night trips to pharmacy and etc. Karen's

support was especially important when in May 2010 my wife had minor complications after giving a birth to our second daughter, Maria, and had to have numerous visits to doctors.

Since then I feel very much indebted to him and, I hope, this letter will help  Karen to get some leniency in sentencing.

Cordially,

Armen L. Mikayelyan

# EXHIBIT 53

**EXHIBIT 53**

Honorable Philips S. Gutierrez
United States District Judge
255 E. Temple Street, Courtroom 880
Los Angeles, CA 90025

Honorable Judge,

My name is Srbuhi Uzunyan and I am a U.S. Citizen. I am an Economist by profession, however I am currently a homemaker. I have known Gary Sarkissian for about 31 years now as we used to be great neighbors in Armenia.

Gary is a very honest, and kind person. I have known him since he was a 14 year-old in High School. He was a very smart student as he would consistently bring home good grades. He was member of various student organizations and took part in many afterschool volunteering activities. He has never been in trouble as a child, teenager nor as an adult as long as I can remember him.  He comes from a very loving family; I became good friends with his mother Karine, who is a woman of high moral and ethical believes and has instilled the same values in Gary. He graduated from Polytechnic Institute in Armenia and became an engineer. As an engineer, he was a volunteer member of an organization that would fundraise and raise money to rebuild and remodel impoverished kindergartens in the rural areas of Armenia.

As his family moved to United States, I did not see Gary for a number of years until my family and I moved to the U.S. as well. I saw Gary then as an adult, who still remained that caring and loving individual.  He eventually got married and now has a High School graduate son. He is a great Father, a loving husband and a wonderful son to his parents. He has mentored my children ever since they were little. I always felt confident in leaving them under his supervision knowing that they will learn only the best from him.

I recently found out that Gary was in trouble with the law and felt compelled to let the court know that Gary is genuinely an honest, loving and caring person. I am confident that he feels regret and will not have any further involvement in activities that would get him in trouble.

Thank you for your attention,

Srbuhi Uzunyan

# EXHIBIT 54

**EXHIBIT 54**

Honorable Philips S. Gutierrez
United States District Judge
255 E. Temple Street, Courtroom 880
Los Angeles, CA 90025

Honorable Judge,

It is an honor for me to write a letter in the hopes that it will help you see what kind of a person Gary Sarkissian born in 1971 is, despite the reason that led us to this point.

I have known Gary Sarkissian for 30 years, and in that time I have had a chance to see many aspects of Gary's personality.  We have been next door neighbors from back home in Armenia and with our wonderful friendship it is a pleasure to keep in touch until this day. To keep a friendship for 30 years it should already be a clue what kind of amazing person Gary is.

I have always found Gary to be extremely kind, dependable, well regarded among his family, friends, relatives, neighbors, and anyone whom had the chance to get to know him. Gary is a caring father, husband, son, brother and an amazing friend. He has a wonderful, golden personality and is always the first one to be there for anyone in the need of help and treats everyone with respect like he would treat his own family members. Gary is hardworking, honest, and never gives problems, instead uses his Godly knowledge to help and resolve problems.

I hope that you find this letter helpful in your quest of the truth. Should you need further information please don't hesitate to contact me at (818)624-6963

Sincerely,

Mary Gevorkian
07/28/2016

# EXHIBIT 55

**EXHIBIT 55**

Honorable Philips S. Gutierrez
United States District Judge
255 E. Temple Street, Courtroom 880
Los Angeles, CA 90025

Honorable Judge Gutierrez,

My name is Hayk Balagyozyan and I would like to share with you a little about Gary Sarkissyan. I have a Bachelor's Degree in Business Law and Accounting with a Minor in Finance. Currently I am working on my Master's Degree in Public Administration. I have been employed with the Los Angeles County for past six years and had the opportunity to work in various Departments such as Public Social Services, Public Health and currently I am employed with the Treasurer and Tax Collector, Public Administrators Office as a Deputy Public Administrator, Investigations Division.

I have known Gary Sarkissian for my entire life, all the way back from Armenia; he was my next door neighbor. Our parents also, are dear friends to this day. He comes from a very good and educated family that has exceptionally high moral and ethical beliefs.

Gary is about 16 years older than me and has always played the role of a "big brother" throughout my life. When I was a child, he taught me right from wrong and never failed to point me in the right direction. As an adult, I still turn to him for guidance when I come across difficult times. Gary was always able to put me on the right track by pointing out and advocating honesty, ethics, rule of law and social responsibility; and he himself, has lived his life by those believes.

When my family moved to the United States, Gary helped us get settled in and was the first person to introduce me to the American way of life and the values it holds. He told me the opportunities in this country are limitless and that by working had I can achieve anything. He also stressed and made me understand that unlike the country that we came from, United States is a country of law, and the respect for the law is the reason why it's great and why we ultimately ended up here.  He steered and encouraged me to go to college, get an education and be a productive member of society.

Gary is an individual of high moral character and has lived his entire life in a way that brought pride and honor to his family and friends. Ha has never been evolved in any activity of criminal or even questionable character. Being human however, we all might find ourselves in a position that does not bring honor to our families and friends and I believe that Gary found himself in that position.

I do not know what put Gary in this position and brought him to the attention of the Court. What I do know, and feel very strongly about, is the fact that this event is an outlier in his life.

Knowing Gary, I strongly believe that he feels remorse and has learned a valuable lesson from the situation that he has found himself in.

Honorable Judge, please take into consideration the fact that Gary is and has been an exemplary member of society and that the reasons why he found himself in front of you are not reflections of his character.


Thank you for your considerateness,

Hayk Balagyozyan

# EXHIBIT 56

**EXHIBIT 56**

Honorable Phillip S. Gutierrez

United States Direct Judge

255 E. Temple Street, Courtroom 880

Los Angeles, CA 90012


July 25, 2016


Your Honor,

      My name is Anna Aylozyan. I am a state employee, married, with 3 children. I want to share with you my association with Gary Sarkissian. I know him from back home in Armenia. Our families are close friends. Our mothers are both MD's that have worked together as professors for a medical university in Armenia. I remember Gary as always being a good friend. Our family moved to the United States before Gary's family. A few years later, they moved here as well. Our friendship continued. I know Gary as an honest person, caring and kind. He is a good son; during his father's sickness he was in the hospital by his side most of the time.

      He is also a good father. His son is a good student, and this year he will be attending UCLA because he wants to become a physician. Recently, my family went through a tragedy. My only brother died. Gary helped me get through the most difficult time in my life. I needed comfort and support, and Gary was able to stay with my family through this difficult, sad time. I can depend on Gary because I know he is an honest, trustworthy person that will always be there in the most challenging times to do anything in his power to help out.


Thank you for your time,


Anna Aylozyan

# EXHIBIT 57

**EXHIBIT 57**

Honorable Phillip S. Gutierrez

United States Direct Judge

255 E. Temple Street, Courtroom 880

Los Angeles, CA 90012


July 27, 2016


Your Honor,


     I, Ani Fndikyan am writing this letter to you in regards to Gary Sarkissian. I am a student at Galaxy Medical College, in their pharmacy technician program. I am working at Los Angeles Valley College Child Care Center as a teacher's aid. I am from Armenia, and arrived to the US 8 years ago. I have 3 children.

     I have known Gary for the past 10 years. Gary's parents are best friends with my parents in law. They are a good family. Gary is a very nice person. On December 22, 2015 my husband tragically passed away. It was terrible, shocking, and unexpected. When Gary heard the news, he came to grieve with us, comfort us, and spend time with us while we were living a nightmare. He helped us get through the long, sad days. He still tries to visit us as much as he can; having someone so thoughtful has helped us get through this. I would say that Gary has been there for us through thick and thin, and has helped us in so many different ways.


Thank you,


Ani Fndikyan

# EXHIBIT 58

**EXHIBIT 58**

Date:   July 20, 2016

From:   Shoushan Movsesian

      6930 De Celis Place, Unit 2 Van Nuys, CA  91406


To:   Honorable Phillip S. Gutierrez

United States District Judge

255 E. Temple Street, Courtroom 880

Los Angeles, CA  90012

      Re: Gary Sarkissian


Dear Honorable Judge Gutierrez:


My name is Shoushan Movsesian. I am a Private Professional Fiduciary and my practice is located in Glendale. I have been a Licensed Professional Fiduciary since 2009 and became a partner in the firm in 2011.

I am writing to introduce to you Gary Sarkissian that I have gotten know over the years.  Our families have a long standing friendship and I have known Gary for approximately 25 years.  Throughout that time I have witnessed Gary's positive human attributes on numerous occasions.

First and foremost he is genuinely a family man; a devoted father to his son Daniel, a loving son to his parents Karine and Hovanes and a protective brother to his younger sister Suzanne.  He is the pillar of their family, always caring about everyone around him before himself.  Gary is a tremendous support system for his son: encouraging his educational pursuit, guiding him take on volunteering at a hospital to serve the community.  He calls his parents daily to check on their well-being, he visits them on a regular basis and organizes family gatherings.

I have experienced Gary's kindness first hand, when I went through a very painful divorce.  He was supportive with kind words and understanding. He would drive his mother to my house at a moment's notice to provide me with companionship and moral support.  You often get to know someone during difficult times, and he was certainly kind to me with positive words of encouragement. I can say with confidence that anybody who knows Gary personally, will only express positive feelings about him.  He is truly a gentle and kind individual.

Your Honor, please take the above into consideration.


Truly Yours,

Shoushan Movsesian