EILEEN M. DECKER
United States Attorney
LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division
CATHY J. OSTILLER (Cal. Bar No. 174582)
Assistant United States Attorney
Deputy Chief, General Crimes Section
KRISTEN A. WILLIAMS (Cal. Bar No. 263594)
Assistant United States Attorney
Major Frauds Section
        1100 United States Courthouse
        312 North Spring Street
        Los Angeles, California 90012
        Telephone: (213) 894-6159/0526
        Facsimile: (213) 894-6269
        E-mail:   cathy.ostiller@usdoj.gov
                  kristen.williams@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 13-00719(A)-PSG-4 |
|---|---|
| Plaintiff, | GOVERNMENT'S OBJECTIONS TO PRESENTENCE REPORT AND SENTENCING POSITION REGARDING DEFENDANT KAREN SARKISSIAN; DECLARATION OF KRISTEN A. WILLIAMS AND EXHIBITS THERETO |
| v. | |
| KAREN SARKISSIAN, aka "Gary Sarkissian," | Hearing Date:  September 12, 2016 Hearing Time:  10:00AM Location:      Courtroom of the Honorable Philip S. Gutierrez |
| Defendant. | |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Cathy J. Ostiller and Kristen A. Williams, hereby files its objections to the Presentence Report (CR 352) and sentencing position regarding defendant KAREN "GARY" SARKISSIAN.

1    This objection/position is based upon the attached memorandum of

2  points and authorities, the attached Declaration of Kristen A.

3  Williams and exhibits thereto, the files and records in this case,

4  the Presentence Report, and such further evidence and argument as the

5  Court may permit.

6

7  Dated: August 12, 2016          Respectfully submitted,

8                                  EILEEN M. DECKER
                                   United States Attorney
9
                                   LAWRENCE S. MIDDLETON
10                                 Assistant United States Attorney
                                   Chief, Criminal Division
11

12                                 _____/s/_____
                                   CATHY J. OSTILLER
13                                 KRISTEN A. WILLIAMS
                                   Assistant United States Attorneys
14
                                   Attorneys for Plaintiff
15                                 UNITED STATES OF AMERICA

16

17

18

19

20

21

22

23

24

25

26

27

28

2

**TABLE OF CONTENTS**

MEMORANDUM OF POINTS AND AUTHORITIES...............................1

I.    INTRODUCTION................................................1

II.   FACTUAL AND PROCEDURAL BACKGROUND...........................2

      A.    Charged Fraudulent Conduct............................2

      B.    Additional Fraudulent Conduct.........................3

            1.    Laundering of Sunset Clinic Health Care Fraud
                  Proceeds through Med-Tech.......................3

            2.    Other Laundering of Funds and Structuring.......4

            3.    Health Care Fraud and Laundering of Health Care
                  Fraud Proceeds at Eagle-1 Healthcare (the "North
                  Virgil Clinic").................................5

            4.    Health Care Fraud and Laundering of Health Care
                  Fraud Proceeds at California Medical Care.......6

      C.    Presentence Report....................................7

III.  OBJECTIONS TO PRESENTENCE REPORT............................8

      A.    Recommendation That the Obstruction Enhancement Not
            Apply.................................................8

      B.    Inclusion of Referral Losses and Restitution.........10

            1.    Sunset Clinic's Direct Billings................11

            2.    Sunset Clinic's Referral Billings..............14

IV.   PROPOSED GUIDELINES CALCULATIONS...........................17

V.    ARGUMENT...................................................18

      A.    Legal Standard.......................................18

      B.    A 63-Month Sentence Is Reasonable in Light of the
            Nature and Circumstance of the Offense and Defendant's
            History and Characteristics..........................19

      C.    A 63-Month Sentence Is Reasonable Because It Reflects
            the Seriousness of the Offense, Promotes Respect for
            the Law, and Provides a Just Punishment..............20

      D.    A 63-Month Sentence Is Reasonable Because It Protects
            the Public from Defendant's Crime and Affords Adequate
            Deterrence...........................................21

        E.    A 63-Month Sentence Is Reasonable Because It Does Not
              Create Unwarranted Sentencing Disparities.................22

VI.   CONCLUSION.....................................................23

DECLARATION OF KRISTEN A. WILLIAMS................................25

1

**TABLE OF AUTHORITIES**

2

CASES

3

United States v. Cantrell,
4     433 F.3d  (9th Cir. 2006)..................................18

5

United States v. Knows His Gun,
      438 F.3d 913 (9th Cir. 2006)............................18
6

United States v. Mares,
7     402 F.3d 511 (5th Cir. 2005)............................22

8

United States v. Nichols,
      464 F.3d 1117 (9th Cir. 2006)...........................18
9

STATUTES

10

18 U.S.C. § 1347.............................................1

11

18 U.S.C. § 1516............................................10

12

18 U.S.C. § 1956(h)..........................................1

13

18 U.S.C. § 3553(a).........................................20

14

OTHER AUTHORITIES

15

U.S.S.G. § 2B1.1(a)(2)......................................17

16

U.S.S.G. § 2B1.1(b)(1)(K)...................................17

17

U.S.S.G. § 2S1.1(b)(2)(B)...................................17

18

U.S.S.G. § 2S1.1(b)(3)......................................18

19

U.S.S.G. §§ 2S1.1(a)(1), 2B1.1(a)(2)........................17

20

U.S.S.G. § 3D1.2(d).........................................18

21

U.S.S.G. § 3D1.3............................................18

22

23

24

25

26

27

28

1

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2

**I.   INTRODUCTION**

3      On February 25, 2016, following a nearly four-week trial,

4  defendant KAREN "GARY" SARKISSIAN ("defendant") was found guilty by a

5  jury on all of the money laundering and health care fraud counts in

6  which he had been charged.[1]  The convictions stemmed from defendant's

7  role in a scheme to defraud Medicare through the submission of

8  fraudulent claims associated with a clinic on Sunset Boulevard (the

9  "Sunset Clinic") that defendant managed, and his laundering of the

10 proceeds of that fraud.  As discussed below, the government agrees

11 with the United States Probation Office's ("USPO") recommendation of

12 a 63-month sentence, but arrives at that sentence through a different

13 Guidelines calculation.  Such a sentence is reasonable, and no

14 greater than necessary, to serve the interests of punishment and

15 deterrence, as well as the other sentencing factors laid out in

16 Section 3553(a).

17     This morning, defendant filed a lengthy sentencing position

18 recommending a much lower, ten-month sentence.  (CR 386.)  The

19 government intends to respond to the specific points raised in that

20 position (as well as any amended Presentence Report ("PSR")) when it

21 files its supplemental position on September 2, 2016.

22

23

24

25 _____

26     [1] Specifically, defendant was found guilty of conspiracy to
   commit money laundering, in violation of 18 U.S.C. § 1956(h) (Count
27 1); money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i)
   (Counts 12-15, 17-18); and health care fraud, in violation of 18
28 U.S.C. § 1347 (Counts 20-24).

## II. FACTUAL AND PROCEDURAL BACKGROUND[2]

### A. Charged Fraudulent Conduct

Because the Court is well familiar with the contours of the conduct for which defendant was found guilty, the government will only briefly summarize it here and will address the evidence regarding loss, which the government anticipates will be the primary disputed issue, in the section devoted to its objections to the PSR.

Between July 2009 and March 2010, defendant managed the Sunset Clinic, which was associated with (and used the Medicare provider number of) Dr. Louis Bascoy, at that time an 81-year-old physician whose primary clinic was located elsewhere in Los Angeles.[3] (PSR ¶ 30 & n.1.) Dr. Bascoy, however, only visited the Sunset Clinic on a handful of occasions and does not appear to have seen patients; instead, it was defendant and co-defendant L'Tanya Smith who really controlled the Sunset Clinic, with defendant running the operation and Smith as the physician's assistant ("PA") who saw almost all of the patients. (PSR ¶ 31.) Those patients had been recruited to come to the clinic and were brought there by marketers who communicated with and were paid by defendant. (PSR ¶ 32.) Smith admitted ordered the same, improbable battery of medically unnecessary services and items for the patients, services which sometimes were never even performed. (PSR ¶ 32.) As the USPO recognized, defendant "worked with Smith in effecting the scheme," playing a "central and significant" role based on the length of time he was affiliated with the clinic, his involvement in submitting claims to Medicare, and his

---

[2] To the extent the facts described below exceed those discussed in the PSR, the are contained in discovery previously produced to defendant or testimony admitted at trial.

[3] Dr. Bascoy passed away in May 2014. (PSR ¶ 43.)

laundering of significant amounts of the Sunset Clinic's Medicare reimbursements. (PSR ¶ 60.)

In order to launder those proceeds, defendant controlled the checkbook for the Sunset Clinic bank account and obtained blank, pre-signed checks from Dr. Bascoy, checks that were later made out to sham corporations IFA Group ("IFA") and UFA Group ("UFA") in what appears to be defendant's handwriting and falsely indicated the checks were for advertising or consulting, even though IFA and UFA provided no such services. (PSR ¶ 39.) In just the less-than-three-week period between February 22, 2010, and March 10, 2010, defendant (1) wrote eight checks totaling $72,475 from the Sunset Clinic to IFA and UFA, sometimes splitting up amounts between the two companies on the same day; (2) accompanied co-defendant Aramyan, president of IFA and UFA, to the bank to negotiate at least some of those checks; and (3) had more than 30 telephone calls with co-defendant Hakobyan, who, with Aramyan, controlled IFA and UFA. (PSR ¶ 39 & n.3.) In using these sham corporations to launder the Sunset Clinic's health care fraud proceeds, defendant not only conspired with Hakobyan and Aramyan, but also became part of an extensive network of health care entities using IFA and UFA (and their predecessors) to launder the proceeds of health care fraud, a network that included several of the entities receiving referrals from the Sunset Clinic.

**B.    Additional Fraudulent Conduct**

    1.    <u>Laundering of Sunset Clinic Health Care Fraud Proceeds through Med-Tech</u>

As discussed above, defendant also arranged to have $88,574.90 in checks written out of the Sunset Clinic bank account and made payable to Med-Tech, a medical equipment company owned by Jerayr

3

Rostamian.  (PSR ¶ 40.)  Defendant provided Rostamian checks from the
Sunset Clinic (signed by Dr. Bascoy and containing fictitious memo
lines) so that Rostamian could launder the money and return it to
defendant in cash, minus a 10-12% commission.  (PSR ¶ 40.)

2.  Other Laundering of Funds and Structuring

In 2009, the FBI conducted an undercover operation in which it
recorded defendant making arrangements with and ultimately cashing
checks for a confidential informant for the government.  Defendant
conducted four check and cash exchanges (totaling approximately
$25,555) with the confidential informant in June and July 2009 at the
Sunset Clinic.  (PSR ¶¶ 68-69.)  Defendant requested that the checks
be structured in amounts of less than $10,000 (thus avoiding a
transaction reporting requirement), added fictitious payees and
dates, arranged for the cashing of these checks with a check-cashing
service, and then returned the cash to the confidential informant.
(PSR ¶ 69.)

Defendant was also involved with laundering Medicare proceeds
from a bank account fraudulently opened under the name of Dr. R.C.
(PSR ¶ 67.)  Dr. R.C. had sought employment at a clinic on 10545
Burbank Blvd. in North Hollywood and filled out a Medicare
application for a provider number.  However, that provider number was
delayed and Dr. R.C. never ended up working there, never saw any
patients there, and never opened up a Wells Fargo bank account for
the clinic.  Nonetheless, checks written on a Wells Fargo bank
account under Dr. R.C.'s name and the Burbank Blvd. clinic address,
apparently without his authority, were negotiated at G&A Check
Cashing ("G&A").  (PSR ¶ 67.)  Materials obtained from G&A connect
defendant with those fraudulent Dr. R.C. checks, including checks

4

1  written to Med-Tech, which, as discussed above, was a company

2  defendant used to launder Sunset Clinic money.  Defendant's name and

3  phone number were also associated with the cashing of other checks

4  from other medical entities.  (PSR ¶ 67.)  Together, he was

5  associated with the cashing of more than $275,000 worth of checks

6  through G&A in March and April 2009.[4]  (PSR ¶ 67.)

7          3.    <u>Health Care Fraud and Laundering of Health Care Fraud</u>
              <u>Proceeds at Eagle-1 Healthcare (the "North Virgil</u>
8            <u>Clinic")</u>

9      Defendant was engaged in health care fraud at another clinic

10  shortly after the charged conduct associated with the Sunset Clinic.

11  Defendant was employed as the manager of a clinic located at 640

12  North Virgil in Los Angeles (the "North Virgil Clinic") between June

13  2010 and February 2011.  (PSR ¶ 108 & n.8.)  The North Virgil Clinic

14  was associated with Dr. Howard Pfupajena.  Defendant told Dr.

15  Pfupajena that he would handle the business side of the clinic

16  through a company (Med-Tech) that he described as being a management

17  company he operated (although, as discussed above, Med-Tech was

18  actually a company operated by Rostamian).  Defendant instructed Dr.

19  Pfupajena to write checks to Med-Tech.

20      Like the patients at the Sunset Clinic at issue in this case,

21  the patients at the North Virgil Clinic were primarily Medicare

22  beneficiaries for whom Dr. Pfupajena was not the primary care

23  physician.  At this clinic, defendant continued to work with co-

24  defendant Smith, who routinely prescribed a high volume of medically

25

26          [4] G&A and associated individuals were charged with a conspiracy
   that lasted from 2006 to 2012 in which G&A would conduct
27  transactions, often for medical businesses, while failing to file
   necessary currency transaction reports for transactions over $10,000.
28  <u>See</u> CR 12-00560-JFW.  G&A was convicted of conspiracy and failure to
   <u>maintain</u> an effective anti-money laundering program.  (PSR ¶ 67 n.7.)

                                    5

1    unnecessary orthotics and forged Dr. Pfupajena's signature on the

2    prescriptions.  Defendant at times visited the clinic's biller to

3    discuss billing, which was not a part of defendant's agreed upon

4    managerial role and supports that he was involved in billing for the

5    fraudulent services occurring at the clinic.  Defendant, not Dr.

6    Pfupajena, paid co-defendant Smith and appeared to Dr. Pfupajena to

7    be working with co-defendant Smith in running the fraudulent clinic.

8    When Dr. Pfupajena confronted defendant and co-defendant Smith about

9    the excessive DME referrals and prescriptions in November or December

10   2010, both were nonchalant.

11          4.   Health Care Fraud and Laundering of Health Care Fraud
                 Proceeds at California Medical Care

12

13       Although defendant apparently did not disclose this in his

14   presentence interview (see PSR ¶¶ 106-18), defendant worked at

15   another clinic with co-defendant Smith after the Sunset Clinic:

16   California Medical Care ("CMC").  CMC was associated with Dr. S.S.

17   and did diagnostic testing, much like the testing at issue in this

18   case.  (CR 207 at 22.)  Dr. S.S. identified defendant as CMC's

19   manager and stated that defendant handled the Medicare reimbursements

20   and expenses for CMC from September through December 2010.  (Id.)

21   There were a number of crossover beneficiaries between the Sunset

22   Clinic and CMC -- i.e., beneficiaries on whose behalf Medicare was

23   billed by first the Sunset Clinic and shortly thereafter by CMC,

24   suggesting that defendant brought those patients, or at least their

25   Medicare information, from the Sunset Clinic to CMC.  (Id. at 23.)

26       A review of the patient files for some of these crossover

27   beneficiaries reveals that, while working with defendant at CMC, co-

28   defendant Smith at times ordered the exact same tests less than a

                                      6

year after she had ordered them at the Sunset Clinic, but with
supposedly different clinical indications supporting them. (Id.)

Rostamian also identified CMC as defendant's company and stated
that the company did not have any diagnostic testing machines,
despite the fact that CMC billed Medicare for diagnostic testing.
(Id. at 24.)  Rostamian had an arrangement with defendant to launder
funds for CMC through Med-Tech, much in the same way that he had for
defendant at the Sunset Clinic. (Id.)

### C.   Presence Report

The United States Probation Office issued its Presentence Report
("PSR") on May 6, 2016.  (CR 352.)  In the PSR, the Probation Officer
calculated a total offense level of 24 and a Criminal History
Category of I, which corresponds to a Guidelines range of 51-63
months.  (PSR ¶ 132.)  In the letter accompanying the PSR, the
Probation Officer recommended a sentence of 63 months' imprisonment,
at the high end of the Guidelines range.  (CR 351 at 2.)  That high-
end recommendation was based upon the fact that defendant's money
laundering did not enhance the applicable Guidelines range, his money
laundering and health care fraud involvement extended beyond the
Sunset Clinic conduct charged.  (Id. at 5.)  The Probation Officer
also recommended a three-year term of supervised release and
conditions, payment of a $1,200 special assessment, and payment of
restitution in the amount of $451,599.  (Id. at 1-2.)

The government agrees with the USPO's recommended sentence, but
not with its Guidelines or restitution calculations.  Specifically,
the government disagrees with the application of a two-level
adjustment for obstruction of justice and disagrees with the loss
calculation, which the government believes should include the losses

7

associated with the Sunset Clinic's referrals.  Because that loss should be higher, the restitution amount should also be higher.

## III.  OBJECTIONS TO PRESENTENCE REPORT

### A.    Recommendation That the Obstruction Enhancement Not Apply

The PSR bases its application of the obstruction adjustment on the apparently backdated DSA between Smith and her purported supervising physician, Dr. Louis Bascoy (now deceased), that was produced to Medicare investigators as a part of their investigation into the Sunset Clinic.  (PSR ¶ 45.)  According to reports, Fraud Investigator Angelo Cruz visited the Sunset Clinic on January 26, 2010, and spoke to defendant and Smith.  (Exh. A to the Williams Decl. at 26.)  During that conversation, defendant and Smith claimed that there was a DSA between Smith and Dr. Bascoy authorizing Smith to order and prescribe various services and items at the Sunset Clinic.  (Id. at 27.)  They did not provide the agreement, however; defendant said it was not in the office and represented he would send it to Cruz.  (Id.)  The same day, Cruz went to Dr. Bascoy's other clinic location on Cesar Chavez Boulevard and asked the office manager there, Margarita Dosal, for the DSA, to which she replied that there was not one in the file.  (Id. at 30.)

On January 29, 2010, Cruz met with Dr. Bascoy, who provided a copy of a DSA that was dated July 6, 2009.  Dr. Bascoy stated that, despite the date on the DSA, he signed it on January 28, 2010, when defendant and Smith brought it to him to sign.  (Id. at 31.)  Dr. Bascoy said he did not prepare the DSA.  (Id.)

At trial, the government only introduced some of this evidence -- namely, Cruz's inability to obtain the DSA from defendant, Smith, or Dosal on January 26, 2010, when he requested it, as well as his

8

ultimate receipt of it from Dr. Bascoy and his subsequent decision that it was not a valid DSA.  From these facts, as well as the strange appearance of the document itself (it included a lengthy, oddly-specific handwritten portion at the end), the government argued at trial that the DSA was suspect and should not be relied upon as representing that Dr. Bascoy had truly authorized all of the Sunset Clinic's claims.  Because Dr. Bascoy's statements with respect to the backdating itself (including how it was achieved and at whose insistence) were hearsay, that evidence was not introduced.

While the government believes that the backdating occurred (and believes there is a strong inference of that even absent Dr. Bascoy's testimony), it recommends that the Court not include an obstruction enhancement for several reasons.

First, the evidence of defendant's particular involvement in the backdating (as opposed to the more general suspicious nature of the document) relies entirely on Dr. Bascoy's statements, which can no longer be tested or explored.

Second, the conduct is encompassed within the scheme itself, as part of the efforts to defraud Medicare, and did not represent a separate attempt to obstruct the federal criminal investigation.  As charged, one of the manner and means of the scheme to defraud Medicare was the creation of false documentation to support fraudulent claims submitted to Medicare.  (FSI ¶ 43(d); CR 47.)  That false documentation would only have been used if Medicare in some way investigated the clinic (by conducting a pre-payment or post-payment audit, for example).  Although the created item at issue here is a DSA rather than fabricated medical documentation, it was still created as a part of the fraudulent documentation to support the

billed claims in the event of an investigation and to further the scheme to defraud Medicare.[5]

Third, to apply the enhancement here would create a disparate impact among similarly situated defendants.  To the undersigned's knowledge, similar obstruction enhancements have neither been recommended nor applied in other health care fraud cases in the district in similar situations (<u>i.e.</u>, submitting false documentation in the course of a Medicare investigation when that conduct is subsumed within the charged scheme).  To do so here would create an unwarranted disparity between health care fraud defendants.

Therefore, the government recommends that the obstruction enhancement not be applied.  The conduct, nonetheless, is an aggravating factor that sets defendant's case apart from one in which fraudulent documentation was not, in fact, provided to Medicare.

**B.    Inclusion of Referral Losses and Restitution**

The USPO declined to include the additional losses associated with the Sunset Clinic referrals into its loss calculation because if found "insufficient evidence that Smith's conduct in connection with these referrals was part of defendant's jointly undertaken activity with Smith." (PSR ¶ 41 n.5.)  The USPO has already determined that Smith should be held accountable for those referral losses.  (<u>See</u> CR 337 (Smith PSR) ¶ 38.)  Defendant should be, as well.

In addressing this issue, the government will look the evidence supporting defendant's association with the Sunset Clinic losses as well (even though the PSR already correctly attributes those to him)

---

[5] This is not to say the conduct is not obstructive.  Indeed, it could separately violate 18 U.S.C. § 1516 (Obstruction of a Federal Audit).

10

because evidence regarding defendant's awareness of and control over the Sunset Clinic activities bears on whether referral losses stemming from Sunset Clinic were reasonably foreseeable to him.

### 1.   Sunset Clinic's Direct Billings

In just nine months, the Sunset Clinic submitted approximately $1,232,329 in claims to Medicare and was paid approximately $451,599 by Medicare for those claims for the same services that Smith has already admitted were medically unnecessary diagnostic tests and sometimes never even performed.  (PSR ¶ 41.)  The jury found defendant guilty of the scheme that encompassed this pattern of billing for medically unnecessary services that sometimes never happened and which included the specific charged executions of the scheme: the claims for medically unnecessary allergy tests that were not performed.  (PSR ¶¶ 2, 10-14.)  As the USPO already recognized in its loss determination (PSR ¶ 41, 49), there is ample evidence that defendant is responsible for these losses caused by his jointly undertaken criminal activity with Smith.

First, defendant was the manager of the clinic and controlled its operations, including the billing (PSR ¶ 41), which was (a) done by one of his close associates[6] in his office (b) using a billing company with which he dealt and (c) was documented in Medicare Remittance Notices that he received and kept.  As manager, he would know that there was only one care provider present and only one exam room available at any time, making it impossible for the clinic to see the more than 20 patients a day (and somedays as many as 60) for

---

[6] Yelena Smolanskya was with defendant when he (a) dealt with Bascoy and (b) assisted an FBI confidential informant in structuring checks.

11

which the Sunset Clinic regularly billed Medicare.  (Exh. B to Williams Decl.)  Those claims contradicted Smith's statements to Medicare investigators (in defendant's presence) that she usually saw 5-8 patients a day and never more than 10.  It also appears as though, in some cases, defendant caused more services to be billed to Medicare through the Sunset Clinic than even co-schemer Smith was aware of, given that superbills signed by Smith do not include the allergy tests for which the Sunset Clinic nonetheless billed.

As manager, defendant also kept tight control over the Sunset Clinic patient files, which by their contents raised eyebrows.  The files contained a battery of test order forms for every patient for tests referred out to other providers, sometimes without the corresponding test results to verify that the tests had actually been performed.  Defendant kept these files containing that evidence of the fraud locked in his office, and initially refused even to provide them to Dr. Bascoy, supposedly the physician in charge of the clinic.

Second, defendant arranged for patients to be recruited and brought into the clinic through marketers, but did not disclose as much when speaking to Medicare investigators.  Clinic employees testified that he dealt with and paid those marketers.  The use of marketers and recruited patients is not only one of the hallmarks of a fraudulent clinic, according to expert testimony at trial, but also underscores the lack of medical necessity for the items and services billed to Medicare by the Sunset Clinic:  simply put, patients who really need services do not need to be recruited to go get them.

Third, as Medicare investigators found, there was no valid delegation of services agreement ("DSA") setting forth what sorts of services Dr. Bascoy had authorized Smith to perform in his stead and

under what circumstances between July 2009 when the Sunset Clinic allegedly first started performing services and January 27, 2010. (PSR ¶ 43.)  Defendant knew as much because, although required to have a copy of that DSA at the Sunset Clinic, defendant told investigators there was not a copy there and then appears to have had some involvement in creating a backdated version of that DSA, to make it appear as though Dr. Bascoy had authorized Smith to order and prescribe all of the services and items billed through the Sunset Clinic thus far.  (PSR ¶ 34-35.)  That lack of a DSA not only tainted that large swath of claims (Medicare assessed an overpayment of $313,955.54[7] against the Sunset Clinic based on the lack of a valid DSA and Smith's expired license during the period when the Sunset Clinic submitted claims (PSR ¶ 43)), but also underscores that this clinic was only nominally associated with Dr. Bascoy and really controlled by co-schemers defendant and Smith.

Fourth, defendant's coordination of the laundering of more than $160,000 of the Sunset Clinic's Medicare reimbursements -- $72,475 with IFA and UFA and more than $80,000 through a different company, Med-Tech, as discussed above – underscores his involvement in the fraudulent conduct.  It is evidence of his knowledge of the impossibly high volume of billings coming out of this small, single-provider clinic, as well as the lack of medical necessity for those claims, given that much of that laundering money was likely turned

---

[7] This overpayment assessment only accounts for certain ways in which the claims were fraudulent.  Those investigators did not, for example, have the benefit of Smith's admissions as part of her guilty plea that the items and services ordered were not medically necessary and sometimes not even provided.  Thus, the assessment does not adequately cover the losses to Medicare caused by the scheme, which involved broader fraudulent conduct.

13

into cash to pay for the recruitment of patients who otherwise would have had no occasion to travel so far to a clinic that was not affiliated with their primary care physician.

Fifth, defendant – not Dr. Bascoy and not even co-schemer Smith – appears to have been the primary beneficiary of this scheme, receiving $90,000 through his company, GN Group, which is more than three times as much as licensed professionals Smith and Dr. Bascoy received.[8]  (PSR ¶ 123.)  As noted above, he may have benefitted even more, given the more than $160,000 from the Sunset Clinic that he laundered, which was turned into untraceable cash through the money laundering conspiracy.  Logic dictates that the greatest beneficiary of the scheme is primarily responsible for it.

2.   Sunset Clinic's Referral Billings

Medicare providers billed Medicare for $10,980,265 in claims based on the medically unnecessary services and items ordered and prescribed by Smith out of the Sunset Clinic, for which Medicare paid them approximately $3,555,987.  (PSR ¶ 41 n.5.)  These referrals came out of the clinic defendant managed and were signed by the same co-schemer in the course of the same fraud scheme associated with the Sunset Clinic's direct billings.

According to expert testimony at trial, fraudulent clinics such as the Sunset Clinic are often involved in kickback referral relationships with other fraudulent providers, effectively selling patient information to other fraudulent providers that then use the

---

[8] Although defendant claimed to the USPO to have made $2,500 a month working at the Sunset Clinic ($37,500 over the course of its nine-month operation) (PSR ¶ 109), there is no record of such regular salary payments for defendant in either the GN Group or the Sunset Clinic bank records.

14

information to bill Medicare.  Although the expert testified that those kickbacks are often in cash, which is difficult to trace through financial analysis, the existence of such a referral relationship here is supported by evidence and logic.  There would be no need for Smith to routinely order a battery of medically unnecessary tests for which the Sunset Clinic did not bill unless a referral relationship dictated that those tests be ordered.  A kickback relationship would explain the large number of referrals sent to some providers (Ronald Carlish Medical Corporation ("RCMC") submitted claims based on referrals of more than 630 of the Sunset Clinic's 955 beneficiaries, for example).

The evidence also supports that defendant coordinated these referral relationships.  As discussed below, defendant – not Smith – was the one at the Sunset Clinic with the connections to the money laundering corporations shared by the Sunset Clinic, RCMC, Metto, and Reliable Diagnostics.  He also paid the marketers to bring patients to the Sunset Clinic, patients that represented a commodity he could sell to other fraudulent providers through referral relationships.  Additionally, he benefitted the most from the scheme.  Therefore, it was more than reasonably foreseeable that these claims would be submitted – and losses to Medicare incurred – since that was the foundation of the referral relationships: the ability to use the recruited Medicare beneficiary information to bill Medicare for tests that were unnecessarily ordered by the Sunset Clinic and then referred out.

More than $1.9 million ($1,913,987.90) in claims – and $444,353.54 in payments – were based on referrals from the Sunset Clinic and were submitted by RCMC, Metto, and Reliable Diagnostics,

15

all depositors to the same corporations defendant used to launder the proceeds of the Sunset Clinic's fraud.  It was undisputed at trial that the other depositors to the sham money laundering corporations were engaged in fraud – defendant argued as much in trying to distinguish the Sunset Clinic from those other entities.  There was considerable evidence about the fraud associated with RCMC, in particular, which received more than 63% of its referrals from the Sunset Clinic.  RCMC was managed by Heinz "Hank" Hauf[9] and allegedly interpreted diagnostic tests for the Sunset Clinic, even though (1) RCMC did not have much, if any, testing equipment to actually conduct any tests; (2) test interpretations for pulmonary function tests bearing Dr. Carlish's electronic signature had not, in fact, been interpreted by him; and (3) RCMC's own patient files lack some of the test order forms, test data, and interpretations (purportedly from RCMC) that are found in the Sunset Clinic files.  (CR 202, at 5-6.)

Finally, as discussed above, defendant was aware that the Sunset Clinic purportedly had far more patients than it could have legitimately seen in any given day.  Thus, it stands to reason that he knew that a significant portion of the enormous $10.9 in referral billings associated with the Sunset Clinic in less than a year was likewise fictional, based on services and items ordered for patients that physically could not have even been seen.

Therefore, defendant, like Smith, should be held responsible for the additional millions in losses to Medicare that came out of the Sunset Clinic's referrals.  This includes increasing defendant's

---

[9] According to testimony at trial, Hauf also managed the fraudulent diagnostic clinic for Dr. Claude Cahen, a related defendant, see CR 14-178-PSG.

16

restitution amount to $4,007,586 to include, as the USPO did with Smith, the actual losses to Medicare from these other providers' billings.

**IV.   PROPOSED GUIDELINES CALCULATIONS**

Based on the above objections, the government submits that the correct Guidelines calculation for the health care fraud is:

| | | |
|---|---|---|
| Base Offense Level: | 6 | [U.S.S.G. § 2B1.1(a)(2)] |
| Specific Offense Characteristics | | |
| Loss of more than $9,500,000 But not more than $25,000,000: | +20 | [U.S.S.G. § 2B1.1(b)(1)(K)] |
| | 26 | |

The government also submits that the correct calculation for the money laundering is as follows:

| | | |
|---|---|---|
| Base Offense Level: | 20 | [U.S.S.G. §§ 2S1.1(a)(1), 2B1.1(a)(2), (b)(1)(H)] |
| Convicted under Section 1956: | +2 | [U.S.S.G. § 2S1.1(b)(2)(B)] |
| Sophisticated Laundering: | +2 | [U.S.S.G. § 2S1.1(b)(3)] |
| | 24 | |

Because that money laundering offense level of 24 is less than the health care fraud offense level of 26, the health care fraud offense level should be used.  See U.S.S.G. § 3D1.2(d) and Application Note 6; U.S.S.G. § 3D1.3 and Application Note 3.  A total offense level of 26, with a criminal history category of I, corresponds to a Guidelines range of 63-78 months in custody.

1  **V.    ARGUMENT**

2       **A.   Legal Standard**

3       While not definitive, the Guidelines range provides the starting

4  point for finding a reasonable sentence and must then be considered

5  with the factors set forth in Section 3553(a).  <u>See</u> <u>United States v.</u>

6  <u>Cantrell</u>, 433 F.3d 1296, 1279 (9th Cir. 2006).

7            To comply with the requirements of Booker, the district
           court must have sufficiently considered the Guidelines as
8          well as the other factors listed in § 3553(a).  This
           requirement does not necessitate a specific articulation of
9          each factor separately, but rather a showing that the
           district court considered the statutorily-designated
10         factors in imposing a sentence.

11 <u>United States v. Nichols</u>, 464 F.3d 1117, 1125 (9th Cir. 2006)

12 (quoting <u>United States v. Knows His Gun</u>, 438 F.3d 913, 918 (9th Cir.

13 2006)).

14      The Section 3553(a) factors are as follows:

15      (1)  The nature and circumstances of the offense and the
       history and characteristics of the defendant;
16
       (2)  The need for the sentence imposed:
17
            (A)  To reflect the seriousness of the offense, to
18     promote respect for the law, and to provide just punishment
       for the offense;
19
            (B)  To afford adequate deterrence to criminal
20     conduct;

21          (C)  To protect the public from further crimes of the
       defendant; and
22
            (D)  To provide the defendant with needed educational
23     or vocational training, medical care, or other correctional
       treatment in the most effective manner;
24
       (3)  The kinds of sentences available;
25
       (4)  The kinds of sentence and the sentencing range
26     established [for the offense and the defendant as set forth
       in the Sentencing Guidelines];
27
       (5)  Any pertinent policy statement . . . ;
28

(6)   The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7)   The need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

**B.   A 63-Month Sentence Is Reasonable in Light of the Nature and Circumstance of the Offense and Defendant's History and Characteristics**

As noted above, defendant is a repeat player in the health care fraud arena, having been involved with several fraudulent clinics and money laundering/check-cashing schemes that supported those clinics. With his regular co-schemer Smith, he caused the Sunset Clinic to engage in over $1 million in Medicare fraud and enabled other Medicare providers to engage in another $10.9 million in Medicare fraud.

Defendant's crime is a serious one.  His behavior victimized not only Medicare, a particularly vulnerable government program, but also the Medicare beneficiaries whose information was used to support the fraudulent claims and who were taken to fraudulent clinics that appeared to have little to do with legitimate medical practice.  The Medicare beneficiaries defendant used were individuals who, by virtue of their age and lack of familiarity with the English language and Medicare system, were not in a position to understand all the ways in which their information was being used or complain about the fraudulent scheme.

Defendant has no criminal history, which is to his credit, but this has been taken into account in the Guidelines calculation.

Defendant also has an advanced degree (in engineering) (PSR ¶ 104) and significant professional work experience (although much of that appears to be associated with businesses likely engaged in fraud) (PSR ¶¶ 108-09 & n.8, 111 & n.9, 113 & n.10).  He currently works for a marijuana clinic.  (PSR ¶ 106; http://losangeles420evaluations.com/ (Nirvana Clinic website); https://weedmaps.com/doctors/nirvana-clinic (advertisement for clinic).)  In this respect, defendant is different from many defendants this Court sees (who have few options aside from crime) and had the opportunity to turn that education and experience into legitimate work.  He chose not to.

For all of these reasons, a low-end Guidelines range sentence of 63 months is reasonable.

**C.   A 63-Month Sentence Is Reasonable Because It Reflects the Seriousness of the Offense, Promotes Respect for the Law, and Provides a Just Punishment**

As discussed above, there is no question that defendant's offense and relevant conduct is serious because of the impact it had on Medicare and Medicare beneficiaries.

Moreover, defendant's conduct evidences his lack of respect for the law.  Defendant recruited patients and turned them into a commodity for the Sunset Clinic and the other providers it supplied with referrals.  This is not defendant's first foray into fraud and crime.  This is not the only time he has partnered with co-defendant Smith to commit fraud.  He has cheated Medicare and participated in the money laundering networks that make that fraud possible.  When applying for citizenship to this country, signing that application under penalty of perjury, he lied about his connection to the Sunset

Clinic, attempting to conceal that fraud and gain citizenship through deceit.

For these reasons, as well, a 63-month sentence is necessary.

**D.   A 63-Month Sentence Is Reasonable Because It Protects the Public from Defendant's Crime and Affords Adequate Deterrence**

As noted above, defendant's conduct exposed Medicare to significant losses.  In a time of skyrocketing health costs, the costs of fraud are an unnecessary strain on an already overworked program, jeopardizing the continued ability of that program to provide health care to those most in need.  Defendant's conduct also exposed Medicare beneficiaries to further unauthorized use of their personal information by similarly inclined fraudsters.  A significant sentence is warranted to protect the public from defendant, particularly given that defendant does not appear inclined to stop engaging in the fraud that has been his bread-and-butter for many years now.  Defendant's current substance abuse (PSR ¶ 100) also suggests he is unstable and could present a further danger to the public; the best place to address these issues is in custody.[10]

Moreover, the need to deter others like defendant strongly justifies a substantial custodial sentence here.  Health care fraud costs Medicare billions nationwide and hundreds of millions in Los Angeles alone.  Deterrence is even more significant in cases like this one.  The government regularly sees fraudulent clinics that seem to be in the business of generating medically unnecessary prescriptions and orders; when Medicare flags one for fraud, the individuals simply open up another clinic, leaving Medicare unaware

---

[10] This also raises questions about his current employment at a medical marijuana dispensary.

21

1    that the same individuals are often working behind the scenes.  Here,

2    defendant and his co-schemer bounced from clinic to clinic,

3    continuing the scheme at each and racking up the fraudulent billing.

4    Defendant's peers and the public, in general, must not be left with

5    the impression that defendant's conduct is acceptable, legal, or

6    without serious consequences.

7         For these reasons, the government believes that a sentence of 63

8    months' imprisonment is necessary to protect the public and deter

9    other individuals from taking advantage of Medicare.

10        **E.    A 63-Month Sentence Is Reasonable Because It Does Not
               Create Unwarranted Sentencing Disparities**

12        A sentence within the Sentencing Guidelines range may be the

13   best way to satisfy this factor.  See United States v. Mares, 402

14   F.3d 511, 518-519 (5th Cir. 2005).  The government's recommendation

15   represents the low-end of the Guideline range, and so is commensurate

16   with what others in defendant's position would receive.

17        In addition, this sentence is consistent with other sentences of

18   owners and managers of Medicare providers (clinics and durable

19   medical equipment ("DME") suppliers) in this District.  For example,

20   defendant Susanna Artsruni received a 76-month custodial sentence in

21   the related case, United States v. Artsruni, et al., CR 13-00052-MMM

22   (PSG), based on her convictions for health care fraud and money

23   laundering in connection with Mid Valley Medical Supply, the DME

24   supplier she owned and enrolled as a Medicare provider, and with her

25   work as an office manager at two other fraudulent clinics, the

26   Vermont and Rampart Clinics referenced in the First Superseding

27   Indictment in this case.  (Mid Valley and the two fraudulent clinics

28   also deposited funds with companies owned and operated by co-

defendants Hakobyan and Aramyan.)  While that sentence was based partly on some aggravating factors not present here – including more than $25,000,000 in losses, many of which were related to referrals out of the Vermont and Rampart Clinics she managed, and conduct occurring while she was on pretrial release related to separate health care fraud charges – the government's recommendation here is also lower than that sentence and so takes some of those differences into account.  Additionally, Artsruni's sentence demonstrates the need for a significant custodial sentence for someone who, like defendant, did a considerable amount of damage to Medicare through her work managing a clinic that committed its own fraud and also led to large volume of fraudulent referrals.

The government's 63-month sentencing recommendation for defendant is also consistent with the sentences received by co-defendants Hakobyan (57 months) and Aramyan (51 months) in this case, both of whom pled guilty to money laundering conspiracy and tax charges (and thus qualified for acceptance of responsibility), but were not charged with health care fraud, and were subject to a lower loss amount than defendant (just over $1 million).  It also is consistent with the sentence that the government is recommending for co-defendant Smith (57 months -- <u>see</u> CR 364).  Smith pled guilty (and thus qualifies for acceptance of responsibility) and is a licensed medical professional (and thus subject to an abuse of position of trust enhancement) but was not charged with money laundering.

## VI.  CONCLUSION

For the foregoing reasons, the government objects to the PSR's application of the obstruction enhancement and exclusion of the Sunset Clinic referral losses from the loss calculation and

restitution amount, but otherwise has no objections to the PSR.
Nonetheless, the government agrees with the USPO's recommendation of
a 63-month sentence, followed by a three-year term of supervised
release, a special assessment of $1,200, and restitution in the
amount of $4,007,586.


Dated: August 12, 2016          Respectfully submitted,

                                EILEEN M. DECKER
                                United States Attorney

                                LAWRENCE S. MIDDLETON
                                Assistant United States Attorney
                                Chief, Criminal Division


                                _____/s/_____
                                CATHY J. OSTILLER
                                KRISTEN A. WILLIAMS
                                Assistant United States Attorneys

                                Attorneys for Plaintiff
                                UNITED STATES OF AMERICA

**<u>DECLARATION OF KRISTEN A. WILLIAMS</u>**

I, Kristen A. Williams, state and declare as follows:

1.    I am an Assistant United States Attorney ("AUSA") for the Central District of California and am one of the attorneys assigned to the prosecution of <u>United States v. Khachatour Hakobyan, et al.</u>, CR No. 13-00719(A)-PSG.  I make this declaration in support of the Government's Objections to Presentence Report and Sentencing Position Regarding Defendant Karen Sarkissian.

2.    Attached hereto as Exhibits A is a true and correct (but redacted) copy of reports prepared by government witness Angelo Cruz that were produced to defendants in discovery in this case.

3.    Attached hereto as Exhibit B is a true and correct copy of government trial exhibit 937 admitted by the Court during the trial in this matter and referenced in the government's filing.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief and that this declaration was executed on August 12, 2016, at Los Angeles, California.


_____/s/_____
KRISTEN A. WILLIAMS

25

CERTIFICATE OF SERVICE

I, ALEJANDRA SOTO, declare:

That I am a citizen of the United States and resident or employed in Los Angeles County, California; that my business address is the Office of United States Attorney, United States Courthouse, 312 North Spring Street, Los Angeles, California 90012; that I am over the age of eighteen years, and am not a party to the above-entitled action;

That I am employed by the United States Attorney for the Central District of California who is a member of the Bar of the United States District Court for the Central District of California, at whose direction I served a copy:

GOVERNMENT'S OBJECTIONS TO PRESENTENCE REPORT AND SENTENCING POSITION REGARDING DEFENDANT KAREN SARKISSIAN; DECLARATION OF KRISTEN A. WILLIAMS AND EXHIBITS THERETO

service was:

[✓] Placed in a closed envelope, for collection and interoffice delivery addressed as follows:

[] Placed in a sealed envelope for collection and mailing via United States Mail addressed as follows:

[] By courier pick-up addressed as follows:

[] By facsimile as follows:

[] By e-mail as follows:

[] By federal express as follows:

USPO. Laurene Harding
U.S. Probation Office
312 N. Spring Street, 6th Floor
Los Angeles, CA 90012

This Certificate is executed on August 12, 2016, at Los Angeles, California.

I certify under penalty of perjury that the foregoing is true and correct.

_____
ALEJANDRA SOTO