TRACY L. WILKISON
Acting United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
RACHEL N. AGRESS (Cal. Bar No. 281703)
ANDREW M. ROACH (Cal. Bar No. 293375)
Assistant United States Attorneys
General Crimes Section
    1200 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-0487/0306
    Facsimile: (213) 894-0141
    E-mail:   Rachel.Agress@usdoj.gov
              Andrew.Roach@usdoj.gov

BYRON R. TUYAY (Cal. Bar No. 308049)
Assistant United States Attorney
Riverside Branch Office
    3403 Tenth Street, Suite 200
    Riverside, California 92501
    Telephone:  (951) 276-6230
    Facsimile:  (951) 276-6202
    E-mail:    Byron.Tuyay@usdoj.gov


Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>       Plaintiff,<br><br>          v.<br><br>KAREN SARKISSIAN,<br>  aka "Gary Sarkissian,"<br><br>       Defendant. | No. CR 13-00719(A)-PSG-4<br><br>GOVERNMENT'S OBJECTIONS TO <u>PRESENTENCE REPORT AND SENTENCING</u> <u>POSITION REGARDING DEFENDANT KAREN</u> <u>SARKISSIAN</u><br><br>Hearing Date:  November 5, 2021<br>Hearing Time:  10:00AM<br>Location:     Courtroom of the<br>                Honorable Philip S.<br>                Gutierrez |

      Plaintiff United States of America, by and through its counsel

of record, the Acting United States Attorney for the Central District

of California and Assistant United States Attorneys Rachel N. Agress, Andrew M. Roach, and Byron R. Tuyay, hereby files its objections to the Presentence Report (Dkt. 590, "PSR") prepared by the United States Probation and Pretrial Services Office ("USPO") and the USPO's September 24, 2021 sentencing recommendation letter (Dkt. 589 ("Sent. Rec. Ltr.")) and the government's sentencing position regarding defendant KAREN "GARY" SARKISSIAN.

This objection/position is based upon the attached memorandum of points and authorities, the files and records in this case, the Presentence Report, the facts as set out in the Government's Opposition to Defendant's Motions for Judgement of Acquittal or, in the Alternative, for New Trial (Dkt. 583), and such further evidence and argument as the Court may permit.

Dated: October 24, 2021         Respectfully submitted,

TRACY L. WILKISON
Acting United States Attorney

SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division


_____/s/_____
RACHEL N. AGRESS
ANDREW M. ROACH
BYRON R. TUYAY
Assistant United States Attorneys

Attorneys for Plaintiff
UNITED STATES OF AMERICA

## **TABLE OF CONTENTS**

MEMORANDUM OF POINTS AND AUTHORITIES.................................1

I.   INTRODUCTION....................................................1

II.  FACTUAL AND PROCEDURAL BACKGROUND...............................2

     A.   Charged Fraudulent Conduct................................2

     B.   Additional Fraudulent Conduct.............................5

          1.   Laundering of Sunset Clinic Health Care Fraud
               Proceeds through Med-Tech............................5

          2.   Other Laundering of Funds and Structuring...........5

          3.   Health Care Fraud and Laundering of Health Care
               Fraud Proceeds at Eagle-1 Healthcare (the "North
               Virgil Clinic").....................................7

          4.   Health Care Fraud and Laundering of Health Care
               Fraud Proceeds at California Medical Care...........8

          5.   Health Care Fraud at Inglewood Clinic...............9

          6.   Health Care Fraud and Laundering at HiChoice
               While Defendant Was "Employed" There...............9

     C.   Presentence Report.......................................10

III. OBJECTIONS TO PRESENTENCE REPORT...............................11

     A.   Intended Loss Amount Based on What Medicare Did and
          Would Have Paid on the Sunset Clinic Claims.............11

     B.   Intended Loss Amount Based on What Medicare Did and
          Would Have Paid on the Sunset Clinic Claims.............12

IV.  PROPOSED GUIDELINES CALCULATIONS...............................15

V.   ARGUMENT.......................................................16

     A.   Legal Standard...........................................16

     B.   A 63-Month Sentence Is Reasonable in Light of the
          Nature and Circumstance of the Offense and Defendant's
          History and Characteristics.............................17

     C.   A 63-Month Sentence Is Reasonable Because It Reflects
          the Seriousness of the Offense, Promotes Respect for
          the Law, and Provides a Just Punishment.................18

     D.   A 63-Month Sentence Is Reasonable Because It Protects
          the Public from Defendant's Crime and Affords Adequate

Deterrence..............................................19

    E.   A 63-Month Sentence Is Reasonable Because It Does Not
       Create Unwarranted Sentencing Disparities................20

VI.  CONCLUSION....................................................22

1

## **TABLE OF AUTHORITIES**

2

CASES

3

United States v. Cantrell,
4       433 F.3d  (9th Cir. 2006).................................16

5  United States v. Jennings,
        711 F.3d 1144 (9th Cir. 2013)..........................14
6
   United States v. Juan-Gonzalez,
7       493 F. App'x 852 (9th Cir. 2012).......................14

8  United States v. Knows His Gun,
        438 F.3d 913 (9th Cir. 2006)...........................16
9
   United States v. Mares,
10      402 F.3d 511 (5th Cir. 2005)...........................20

11 United States v. Nichols,
        464 F.3d 1117 (9th Cir. 2006)..........................16

12

STATUTES

13

18 U.S.C. § 1347.............................................1

14 18 U.S.C. § 1956(h).........................................1

15 18 U.S.C. § 3553(a)........................................17

16

OTHER AUTHORITIES

17

U.S.S.G. § 2B1.1(a)(2).....................................15

18 U.S.S.G. § 2B1.1(b)(1)(K).................................15

19 U.S.S.G. § 2S1.1(b)(2)(B).................................15

20 U.S.S.G. § 2S1.1(b)(3)....................................12

21 U.S.S.G. § 2S1.1(b)(3)....................................15

22 U.S.S.G. § 3D1.2..........................................15

23 U.S.S.G. § 3D1.3..........................................15

24 U.S.S.G. §§ 2S1.1(a)(1), 2B1.1(a)(2).....................15

25

26

27

28

1

**MEMORANDUM OF POINTS AND AUTHORITIES**

2

**I.    INTRODUCTION**

3      On July 27, 2021, following a seven-day trial, defendant KAREN

4 "GARY" SARKISSIAN ("defendant") was found guilty by a jury on all of

5 the health care fraud and money laundering counts in which he had

6 been charged.[1]   The convictions stemmed from defendant's role in a

7 scheme to defraud Medicare through the submission of fraudulent

8 claims associated with a clinic on Sunset Boulevard (the "Sunset

9 Clinic") that defendant founded, directed, and managed, and his

10 laundering of the proceeds of that fraud.

11      As discussed below, the government agrees with the calculation

12 in the PSR of a total offense level of 24 but arrives at that offense

13 level through a different calculation.   The government maintains that

14 an enhancement for sophisticated laundering is warranted due to the

15 evidence at trial showing that defendant took steps following the

16 visit by a Medicare investigator, Angelo Cruz, to obfuscate his

17 receipt of Medicare fraud proceeds through use of shell companies and

18 false invoices.

19      The government agrees that, with a Criminal History Category of

20 I, the applicable Guidelines range is 51 to 63 months' imprisonment.

21 Given the orchestrating role that defendant played in the offense

22 conduct, and the extensive fraudulent and laundering conduct engaged

23 in by defendant both predating and post-dating the offense conduct,

24 the government recommends a high-end guidelines sentence of 63

25

26 _____

27      [1] Specifically, defendant was found guilty of conspiracy to
commit money laundering, in violation of 18 U.S.C. § 1956(h) (Count
1); money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i)

28 (Counts 12-15, 17-18); and health care fraud, in violation of 18
U.S.C. § 1347 (Counts 20-24).

months' imprisonment, followed by three years of supervised release, $1,200 in special assessments, and restitution in the amount of $451,599.

Such a sentence is reasonable, and no greater than necessary, to serve the interests of punishment and deterrence, as well as the other sentencing factors laid out in Section 3553(a).

The government reserves the right to respond to defendant's objections to the PSR (Dkt. 594) and sentencing position as well as any amended Presentence Report.

## II.   FACTUAL AND PROCEDURAL BACKGROUND[2]

### A.   Charged Fraudulent Conduct

Because the Court is well familiar with the conduct for which defendant was found guilty, the government will only briefly summarize it here and will address the evidence regarding sophisticated laundering, which the government anticipates will be the primary disputed issue, in the section devoted to its objections to the PSR.  The government also incorporates by reference the facts as set out in Sections II.A.1.-A.2., B.3.a.-B.3.d. of the Government's Opposition to Defendant's Motions for Judgement of Acquittal or, in the Alternative, for New Trial.  (Dkt. 583, "Gov. Opp.")

Between July 2009 and March 2010, defendant managed the Sunset Clinic, which was associated with (and used the Medicare provider number of) Dr. Louis Bascoy, at that time an 81-year-old physician whose primary clinic was located elsewhere in Los Angeles.[3]  (PSR

---

[2] To the extent the facts described below exceed those discussed in the PSR, they are contained in discovery previously produced to defendant or testimony admitted at trial.

[3] Dr. Bascoy passed away in May 2014.  (PSR ¶ 43.)

¶ 31 & n.2.)  Dr. Bascoy, however, only visited the Sunset Clinic on a handful of occasions and does not appear to have seen patients; instead, it was defendant and co-defendant L'Tanya Smith who really controlled the Sunset Clinic, with defendant running the operation and Smith serving as the physician's assistant ("PA") and seeing almost all of the patients.  (PSR ¶ 34.)  Those patients had been recruited to come to the clinic and were brought there by marketers who communicated with and were paid by defendant.  (PSR ¶ 35.)  Smith admitted ordered the same, improbable battery of medically unnecessary services (tests) and items for the patients, services that sometimes were never even performed.  (PSR ¶ 35.)  As the USPO recognized, defendant and unindicted co-schemer Yelena Smolyanskaya set up the clinic with a focus on billing, not treatment of patients, and were looking for "new tests" to bill.  (PSR ¶¶ 76-80; Govt. Ex. 429.)  Defendant found, hired, and paid the Medicare provider (Dr. Bascoy), the PA (Smith), marketers, and the other clinic employees for the Sunset Clinic.  (PSR ¶¶ 146 & n. 13; PSR ¶¶ 76-80; del Carmen Lopez Tr. at 29-33; Tr.[4] at 120-124.)  As laid out in the PSR, defendant played a "central and significant" role including working with Smith to effectuate the scheme and arranging for the submission of claims to Medicare with Smolyanskaya.  (PSR ¶ 96.)  Defendant also directed significant amounts of the Sunset Clinic's Medicare reimbursements ($248,000) to himself through various laundering entities, as compared to the funds that went to his co-schemers Smolyanskaya ($30,000) and Smith ($33,550).  (PSR ¶¶ 44, 48-52, 69 &

---

[4] Unless otherwise noted, all of the government's transcript cites are to the specific page of the complete rough trial transcript in Exhibit 1 to defendant's motion, rather than each particular day of testimony.

1  n.8.)

2      In order to launder those proceeds, defendant listed himself as

3  a signatory on the Sunset Clinic bank account and controlled the

4  checkbook by obtaining blank, pre-signed checks from Dr. Bascoy.

5  (PSR ¶¶ 32-33, 49.)  Defendant made out the checks first to GN Group,

6  defendant's company, and later – after a Medicare investigator

7  visited the clinic to investigate the skyrocketing number of claims —

8  defendant switched to making out the checks to sham corporations IFA

9  Group ("IFA") and UFA Group ("UFA") (which checks appear to be in

10  defendant's handwriting).  (PSR ¶¶ 48-49, 75.)  Defendant falsely

11  indicated the checks were for advertising or consulting, even though

12  IFA and UFA provided no such services.  (Id.)  In just the less-than-

13  three-week period between February 22, 2010, and March 10, 2010,

14  defendant (1) wrote eight checks totaling $72,475 from the Sunset

15  Clinic to IFA and UFA, sometimes splitting up amounts between the two

16  companies on the same day; (2) accompanied co-defendant Aram Aramyan

17  ("Aramyan"), president of IFA and UFA, to the bank to negotiate at

18  least some of those checks; and (3) had more than 30 telephone calls

19  with co-defendant Khachatour Hakobyan ("Hakobyan"), who, with

20  Aramyan, controlled IFA and UFA.  (PSR ¶¶ 48-49 & n.6; Govt. Ex. 968;

21  Tr. at 443:17-446:24.)  In using these sham corporations to launder

22  the Sunset Clinic's health care fraud proceeds, defendant not only

23  conspired with Hakobyan and Aramyan, but also became part of an

24  extensive network of health care entities using IFA and UFA (and

25  their predecessors) to launder the proceeds of health care fraud, a

26  network that included several of the entities receiving referrals

27  from the Sunset Clinic.  (PSR ¶¶ 47 & n.4.)

28

**B.    Additional Fraudulent Conduct**

As recognized by the USPO, defendant's practice of acting as a clinic manager and orchestrating the submission of false claims to Medicare predates his involvement in the Sunset Clinic and continued after the Sunset Clinic was shut down (PSR ¶¶ 83-92, 146 & n.13), as did his money laundering activities (PSR ¶¶ 50, 75, 80-82, 86).

1.    Laundering of Sunset Clinic Health Care Fraud Proceeds through Med-Tech

Following the visit by a Medicare fraud investigator, defendant also arranged to have $88,574.90 in checks written out of the Sunset Clinic bank account and made payable to Med-Tech, a medical equipment company owned by Jerayr Rostamian.  (PSR ¶¶ 50-52 & n.7.)  Defendant provided Rostamian checks from the Sunset Clinic (signed by Dr. Bascoy and containing fictitious memo lines) so that Rostamian could launder the money and return it to defendant in cash, minus a 10-12% commission.  (Id.)  In March 2010, Dr. Bascoy refused to sign any more checks for defendant, and defendant signed checks in his own name from the Sunset Clinic bank account for one week, including two checks to Med-Tech, until Dr. Bascoy blocked the account.  (Id.) When it was blocked, Sarkissian was "upset" and told the office manager of Dr. Bascoy's other clinic that she and Dr. Bascoy "had no business doing that."  (Id.)

2.    Other Laundering of Funds and Structuring

In 2009, the FBI conducted an undercover operation in which it recorded defendant making arrangements with and ultimately cashing checks for a confidential informant for the government.  Defendant conducted four check and cash exchanges (totaling approximately $25,555) with the confidential informant in June and July 2009 at the

Sunset Clinic.  (PSR ¶¶ 81-82.)  Defendant requested that the checks be structured in amounts of less than $10,000 (thus avoiding a transaction reporting requirement), added fictitious payees and dates, arranged for the cashing of these checks with a check-cashing service, and then returned the cash to the confidential informant, minus a fee.  (PSR ¶ 81; Tr. at 681:7-11.)

Defendant was also involved with laundering Medicare proceeds from a bank account fraudulently opened under the name of Dr. R.C. (PSR ¶ 75.)  Dr. R.C. had sought employment at a clinic on 10545 Burbank Blvd. in North Hollywood and filled out a Medicare application for a provider number.  However, that provider number was delayed, and Dr. R.C. never ended up working there, never saw any patients there, and never opened up a Wells Fargo bank account for the clinic.  Nonetheless, checks written on a Wells Fargo bank account under Dr. R.C.'s name and the Burbank Blvd. clinic address, apparently without his authority, were negotiated at G&A Check Cashing ("G&A").  (PSR ¶ 75.)  Materials obtained from G&A connect defendant with those fraudulent Dr. R.C. checks, including checks made out to various companies with generic names purporting to relate to support services for the medical industry, and were made out in handwriting that matches defendant's.  (PSR ¶ 75.)  Defendant's name and phone number were also associated with the cashing of other checks from other medical entities.  (PSR ¶ 75.)  Together, he was associated with the cashing of more than $275,000 worth of checks through G&A in March and April 2009.[5]  (PSR ¶ 75.)

---

[5] G&A and associated individuals were charged with a conspiracy that lasted from 2006 to 2012 in which G&A would conduct transactions, often for medical businesses, while failing to file *(footnote cont'd on next page)*

1
2
    3. <u>Health Care Fraud and Laundering of Health Care Fraud</u>
      <u>Proceeds at Eagle-1 Healthcare (the "North Virgil</u>
      <u>Clinic")</u>

3   Defendant was engaged in health care fraud at another clinic

4 shortly after the charged conduct associated with the Sunset Clinic.

5 Defendant was employed as the manager of a clinic located at 640

6 North Virgil in Los Angeles (the "North Virgil Clinic") between June

7 2010 and February 2011. (PSR ¶ 83-86 & n.11.) The North Virgil

8 Clinic was associated with Dr. Howard Pfupajena. (<u>Id.</u>) Defendant

9 told Dr. Pfupajena that he would handle the business side of the

10 clinic through a company (Med-Tech) that he described as being a

11 management company he operated (although, as discussed above, Med-

12 Tech was actually a company operated by Rostamian). (<u>Id.</u>) Defendant

13 instructed Dr. Pfupajena to write checks to Med-Tech. (<u>Id.</u>)

14   Like the patients at the Sunset Clinic at issue in this case,

15 the patients at the North Virgil Clinic were primarily Medicare

16 beneficiaries for whom Dr. Pfupajena was not the primary care

17 physician. (<u>Id.</u>) At this clinic, defendant continued to work with

18 co-defendant Smith, who routinely prescribed a high volume of

19 medically unnecessary orthotics and forged Dr. Pfupajena's signature

20 on the prescriptions. (<u>Id.</u>) Defendant at times visited the clinic's

21 biller to discuss billing, which was not a part of defendant's

22 agreed-upon managerial role and demonstrates that he was involved in

23 billing for the fraudulent services occurring at the clinic. (<u>Id.</u>)

24 Defendant, not Dr. Pfupajena, paid co-defendant Smith and appeared to

25 Dr. Pfupajena to be working with co-defendant Smith in running the

26

27 necessary currency transaction reports for transactions over $10,000.
<u>See</u> CR 12-00560-JFW. G&A was convicted of conspiracy and failure to
28 maintain an effective anti-money laundering program. (PSR ¶ 75
n.10.)

1   fraudulent clinic.  When Dr. Pfupajena confronted defendant and co-

2   defendant Smith about the excessive DME referrals and prescriptions

3   in November or December 2010, both were nonchalant.  (Id.)

4   Investigative materials indicate that Rostamian laundered about

5   $72,000 for Sarkissian in connection with the North Virgil Clinic.

6   (Id.)

7           4.   Health Care Fraud and Laundering of Health Care Fraud
                 Proceeds at California Medical Care

8

9       Although defendant apparently did not disclose this in his

10  presentence interview (see PSR ¶¶ 138-151), defendant worked at

11  another clinic with co-defendant Smith after the Sunset Clinic:

12  California Medical Care ("CMC").  CMC was associated with Dr. S.S.

13  and did diagnostic testing, much like the testing at issue in this

14  case.  (PSR ¶¶ 87-92.)  Dr. S.S. identified defendant as CMC's

15  manager and stated that defendant handled the Medicare reimbursements

16  and expenses for CMC from September through December 2010.  (Id.)

17  There were a number of crossover beneficiaries between the Sunset

18  Clinic and CMC -- i.e., beneficiaries on whose behalf Medicare was

19  billed by first the Sunset Clinic and shortly thereafter by CMC,

20  suggesting that defendant brought those patients, or at least their

21  Medicare information, from the Sunset Clinic to CMC.  (Id.)

22      A review of the patient files for some of these crossover

23  beneficiaries reveals that, while working with defendant at CMC, co-

24  defendant Smith at times ordered the exact same tests less than a

25  year after she had ordered them at the Sunset Clinic, but with

26  supposedly different clinical indications supporting them.  (Id.)

27      Rostamian also identified CMC as defendant's company and stated

28  that the company did not have any diagnostic testing machines,

                                    8

1    despite the fact that CMC billed Medicare for diagnostic testing.

2    (Id.)  Rostamian had an arrangement with defendant to launder funds

3    for CMC through Med-Tech, much in the same way that he had for

4    defendant at the Sunset Clinic. (Id.)

5              5.    Health Care Fraud at Inglewood Clinic

6         Defendant was also involved in healthcare fraud at another

7    clinic he managed in Inglewood in 2003 and 2004, at which patients

8    would arrive in vans driven by individuals who dealt with defendant,

9    patients' charts reflected similar medical complaints, and

10   beneficiaries interviewed were not even familiar with the clinic.

11   (PSR ¶ 146 & n.13.)  The doctor at that clinic told defendant not to

12   pay patients.  (Id.)  On defendant's suggestion, a PA was hired.

13   (Id.)  In 2003, the clinic came under investigation for diagnostic

14   lab tests ordered and billed to Medicare that beneficiaries said they

15   never received, and those billing irregularities led to a Medicare

16   overpayment assessment.  The investigation into defendant was closed

17   due to inability to locate the PA and the running of the statute of

18   limitations.  (Id.)

19             6.    Health Care Fraud and Laundering at HiChoice While
                     Defendant Was "Employed" There
20

21        From June 2006 to May 2014, defendant claims that he worked at

22   HiChoice Healthcare, a company tied to medical billing fraud and

23   money laundering through shell companies.  (PSR ¶ 144 & n.12.)

24   HiChoice records provided no description of defendant's employment,

25   and during the prior trial, defendant's father, an administrator for

26   one of the HiChoice locations, Ararat, admitted that audits found

27   that Medi-Cal was being billed for services that patients were

28   ineligible for and files were inconsistent with what patients said in

1  interviews.  (Id.)   HiChoice was also a depositor with IFA and UFA

2  and employed Hakobyan at the same time as defendant.  (Id.)

3      **C.  Presentence Report**

4      The United States Probation Office issued its Presentence Report

5  ("PSR") on October 1, 2021.  (Dkt. 590.)  In the PSR, the Probation

6  Officer calculated a total offense level of 24 and a Criminal History

7  Category of I, which corresponds to a Guidelines range of 51-63

8  months.  (PSR ¶ 164.)  In the letter accompanying the PSR, the

9  Probation Officer recommended a sentence of 57 months' imprisonment,

10  in the middle of the Guidelines range (Dkt. 589 at 2), the same

11  sentence received by defendant at his prior sentencing (Dkt. 417).

12  That mid-range recommendation was based upon the fact that the

13  Guidelines range accounts for the loss to Medicare, and defendant's

14  money laundering and health care fraud involvement extended beyond

15  the Sunset Clinic conduct charged.  (Id. at 5.)  The Probation

16  Officer also recommended a three-year term of supervised release and

17  conditions, payment of a $1,200 special assessment, and payment of

18  restitution in the amount of $451,599.  (Id. at 1-2.)

19      The government agrees with the calculation in the PSR of a total

20  offense level of 24 and that, with a Criminal History Category of I,

21  the applicable Guidelines range is 51 to 63 months' imprisonment, but

22  arrives at that offense level and Guidelines range through a

23  different calculation.  The government also agrees with the PSR's

24  restitution calculation.  The government objects to the USPO's

25  recommended sentence, maintaining that a high-end Guidelines sentence

26  of 63 months is appropriate here.

27

28

**III. OBJECTIONS TO PRESENTENCE REPORT**

    **A.  Intended Loss Amount Based on What Medicare Did and Would Have Paid on the Sunset Clinic Claims[6]**

    As argued by the government in connection with the prior sentencing (Dkt. 410 at 3-4), in light of defendant's presentation of evidence regarding defendant's knowledge of Medicare billing (Dkt. 386, Ex. 7) and the Ninth Circuit's opinion in <u>United States v. Popov</u>, 742 F.3d 911, 914 (9th Cir. 2014), the government's position is that defendant's intended losses should be based on the amount that Medicare paid or would have paid on claims submitted, which is less than the total amount billed.  The total amount that Medicare paid on the Sunset Clinic claims, <u>i.e.</u>, total intended loss amount for the Sunset Clinic claims, is $863,603.

    <u>Sunset Clinic</u>:

| | |
|---|---|
| **Paid Amounts on Billed Claims** | $451,499 |
| **Could Have Been Paid on Zero-Pay Claims** | $412,004 |
| **Total Intended Amount:** | $863,603 |

---

[6] The USPO declined to include the additional losses associated with the Sunset Clinic referrals into its loss calculation because it found "insufficient evidence that Smith's conduct in connection with these referrals was part of defendant's jointly undertaken activity with Smith."  (PSR ¶ 42 n.5.)  The USPO has already determined that Smith should be held accountable for those referral losses.  (<u>See</u> Dkt. 337 (Smith PSR) ¶ 38.)  For the reasons set out in its prior sentencing position papers (Dkt. 387 at 14-17), the government maintains that defendant's loss calculation should include losses associated with the Sunset Clinic's referral claims, as should the restitution amount.  (Dkt. 410 at 3-5.)  However, given the Court's finding at the original sentencing hearing that defendant's loss amount should not include referral claims (Dkt. 436 at 5-6, 33-34), the government is not relitigating this issue at resentencing.

1    (See Dkt. 410 at 3-4; Dkt. 410-1 (Declaration of Kristen A. Williams)

2    ¶ 2 & Ex. A.)   This loss amount leads to a base offense level of 20

3    under the fraud Guidelines:   6 levels under U.S.S.G. § 2B1.1(a)(2)

4    with a 14-level increase under U.S.S.G. § 2B1.1(b)(1)(H).[7]

5         A base level of 20 is also incorporated into the money

6    laundering Guidelines, because it is the offense level for the

7    intended losses at the Sunset Clinic, the "offense level for the

8    underlying offense from which the laundered funds were derived,"

9    pursuant to U.S.S.G. § 2S1.1(a)(1).

10        **B.    Intended Loss Amount Based on What Medicare Did and Would**
              **Have Paid on the Sunset Clinic Claims**

11

12        The government agrees with the USPO that a 2-level enhancement

13   is appropriate under the money laundering Guidelines because

14   defendant was convicted under 18 U.S.C. § 1956.   (PSR ¶ 66.)

15        The government maintains, however, that an enhancement for

16   sophisticated laundering is also appropriate here pursuant to

17   U.S.S.G. § 2S1.1(b)(3), based on the evidentiary record, which

18   clearly demonstrates defendant's deliberate and systematic use of

19   multiple shell companies to obfuscate where he was directing the

20   fraudulent proceeds of Sunset Clinic's Medicare fraud.   Specifically,

21   as set out in the government's opposition to defendant's Rule 29

22   motion, the evidence at trial showed that after Medicare investigator

23

24        [7] There is no difference in the outcome under the government's
     proposed loss calculations whether the 2009 Guidelines Manual or the
25   2018 Guidelines Manual is used.  (Either way U.S.S.G. § 2B1.1
     (b)(1)(H) mandates a 14-level increase, for a loss of more than
26   $550,000 under the 2018 Guidelines or for a loss of more than
     $400,000 under the 2009 Guidelines.)  The government agrees with the
27   USPO's recommendation that the 2009 Guidelines should be used to
     avoid any ex post facto issue that would be created by the additional
28   enhancement for losses to a government health care program under the
     2018 Guidelines.  (PSR ¶ 56 & n.9.)  U.S.S.G. § 2B1.1(b)(7).

1   Angelo Cruz's visit on January 26, 2010 to investigate the

2   skyrocketing number of claims (Tr. at 218:19-219:25, 398:18-399:1,

3   Govt. Ex. 936), defendant got concerned and took steps to conceal

4   that he was continuing to withdraw money from the Sunset Clinic

5   account.  At that point, defendant began writing checks, again that

6   were signed by Dr. Bascoy, to IFA, UFA, and Med-Tech.  (Govt. Ex. 968

7   (calls to Hakobyan beginning in February); Tr. at 443:17-446:24;

8   43:11-45:16; 554:1-3; Govt. Exs. 22, 921B.)[8]  These companies, unlike

9   GN Group, were not in defendant's name.

10        The payments to IFA, UFA, and Med-Tech were documented with

11   sham invoices for advertising, consulting, and equipment repair

12   services; however, they were to be converted into cash in exchange

13   for a fee.  (Id.; 516:1-522:9 (IFA and UFA invoices appeared fake in

14   numerous ways); Govt. Exs. 11, 980; 52-53 (IFA and UFA invoices were

15   not "decent" and looked like photocopies); 554:4-10; 558:13-20; Exs.

16   14, 19.)  All of these steps were designed to insulate and distance

17   defendant from the fraud and laundering.  In fact, defendant even

18   went so far as to issue a belated invoice from GN Group to Sunset

19   Clinic for $82,500 in March 2010, after he already paid himself

20   $90,000 months earlier, in an attempt to paper his previous

21   withdrawals with the veneer of legitimacy.  (Tr. at 514:19-515:19;

22   Govt. Ex. 23.)  Moreover, defendant had Dr. Bascoy sign checks (up

23   until Dr. Bascoy refused to do so), even though defendant was a

24   signatory on the Sunset Clinic account and had the ability to sign

25

26   _____

27        [8] The jury was presented with testimony from Margarita Dosal,
     who was familiar with Dr. Bascoy's handwriting, that while Dr.
     Bascoy's signature was on checks to IFA and UFA, the handwriting on
28   payee lines, was not Dr. Bascoy's (43:11-45:16; Govt. Ex. 22 at 36,
     37).

checks himself.  (Govt. Ex. 10, p.5; Govt. Ex. 22; Tr. at 41-43; 496; 509; 528:19-529:14; 387:8-388:2.  See also Tr. at 50:3-51:2.) Defendant did this to hide his role in the scheme and that the money was going to him.

That defendant took successive steps to avoid any paper trail tying defendant to the fraud, including paying a fee to utilize shell corporations to turn the proceeds of the Medicare fraud into cash, after learning he was under investigation, is precisely the type of conduct that warrants a sophisticated laundering enhancement. Sophisticated laundering typically involves the use of any of the following: "(i) fictitious entities; (ii) shell corporations; (iii) two or more levels (i.e., layering) of transactions, transportation, transfers, or transmissions, involving criminally derived funds that were intended to appear legitimate" — all of which were employed by defendant here.  U.S.S.G. § 2S1.2, cmt. n.5.  See United States v. Jennings, 711 F.3d 1144, 1147 (9th Cir. 2013) (upholding a "sophisticated means" enhancement for using a bank account with a deceptive name to conceal income and stating that conduct need not involve "highly complex schemes or exhibit exceptional brilliance" to warrant the enhancement); see also United States v. Juan-Gonzalez, 493 F. App'x 852, 854 (9th Cir. 2012) (sophisticated means enhancement was appropriate in prosecution for mail fraud, money laundering, and false representation of Social Security number, where defendant changed name of his investment group because he was being investigated, and used multiple business and personal bank accounts to conceal investment funds and make tracing difficult).

**IV.   PROPOSED GUIDELINES CALCULATIONS**

The government submits that given the prior ruling of the Court regarding non-inclusion of referral claims in loss amount, the Guidelines calculation for the health care fraud is:

| | | |
|---|---|---|
| Base Offense Level: | 6 | [U.S.S.G. § 2B1.1(a)(2)] |
| Specific Offense Characteristics | | |
| Loss of more than $4,500,000 But not more than $1,000,000: | +14 | [U.S.S.G. § 2B1.1(b)(1)(K)] |
| Total Offense Level | 20 | |

The government also submits that the correct calculation for the money laundering is as follows:

| | | |
|---|---|---|
| Base Offense Level: | 20 | [U.S.S.G. §§ 2S1.1(a)(1), 2B1.1(a)(2), (b)(1)(H)] |
| Convicted under Section 1956: | +2 | [U.S.S.G. § 2S1.1(b)(2)(B)] |
| Sophisticated Laundering: | +2 | [U.S.S.G. § 2S1.1(b)(3)] |
| | 24 | |

Because that fraud offense level of 20 is less than the money laundering offense level of 24, the money laundering offense level should be used.  See U.S.S.G. § 3D1.2(d) and Application Note 6; U.S.S.G. § 3D1.3 and Application Note 3.  Thus, the government agrees with the USPO that a total offense level of 24 should be applied here.  A total offense level of 24, with a criminal history category of I, corresponds to a Guidelines range of 51 to 63 months in custody.

1    **V.     ARGUMENT**

2         **A.    Legal Standard**

3         While not definitive, the Guidelines range provides the starting

4    point for finding a reasonable sentence and must then be considered

5    with the factors set forth in Section 3553(a).  See <u>United States v.</u>

6    <u>Cantrell</u>, 433 F.3d 1296, 1279 (9th Cir. 2006).

7              To comply with the requirements of Booker, the district
             court must have sufficiently considered the Guidelines as
8             well as the other factors listed in § 3553(a).  This
             requirement does not necessitate a specific articulation of
9             each factor separately, but rather a showing that the
             district court considered the statutorily-designated
10            factors in imposing a sentence.

11   <u>United States v. Nichols</u>, 464 F.3d 1117, 1125 (9th Cir. 2006)

12   (quoting <u>United States v. Knows His Gun</u>, 438 F.3d 913, 918 (9th Cir.

13   2006)).

14        The Section 3553(a) factors are as follows:

15        (1)  The nature and circumstances of the offense and the
         history and characteristics of the defendant;
16
         (2)  The need for the sentence imposed:
17
              (A)  To reflect the seriousness of the offense, to
18        promote respect for the law, and to provide just punishment
         for the offense;
19
              (B)  To afford adequate deterrence to criminal
20        conduct;
21            (C)  To protect the public from further crimes of the
         defendant; and
22
              (D)  To provide the defendant with needed educational
23        or vocational training, medical care, or other correctional
         treatment in the most effective manner;
24
         (3)  The kinds of sentences available;
25
         (4)  The kinds of sentence and the sentencing range
26        established [for the offense and the defendant as set forth
         in the Sentencing Guidelines];
27
         (5)  Any pertinent policy statement . . . ;
28

1    (6)  The need to avoid unwarranted sentence disparities
2    among defendants with similar records who have been found
     guilty of similar conduct; and

3    (7)  The need to provide restitution to any victims of the
4    offense.

5    18 U.S.C. § 3553(a).

6    **B.   A 63-Month Sentence Is Reasonable in Light of the Nature
          and Circumstance of the Offense and Defendant's History and
7          Characteristics**

8         As noted above, defendant is a repeat player in the health care

9    fraud arena, having been involved with several fraudulent clinics and

10   money laundering/check-cashing schemes that supported those clinics.

11   With his regular co-schemer Smith, he caused the Sunset Clinic to

12   engage in over $1 million in Medicare fraud and enabled other

13   Medicare providers to engage in another $10.9 million in Medicare

14   fraud.

15        Defendant's crime is a serious one.  His behavior victimized not

16   only Medicare, a particularly vulnerable government program, but also

17   the Medicare beneficiaries whose information was used to support the

18   fraudulent claims and who were taken to fraudulent clinics that

19   appeared to have little to do with legitimate medical practice.  The

20   Medicare beneficiaries defendant used were individuals who, by virtue

21   of their age and lack of familiarity with the English language and

22   Medicare system, were not in a position to understand all the ways in

23   which their information was being used or complain about the

24   fraudulent scheme.  Defendant's own statements show that he and his

25   co-schemer, Smolyanskaya, were setting up the Sunset Clinic with the

26   goal of finding "new tests . . . in order to bill" Medicare — not

27   patient care.  (Tr. at 687:13-688:2; Govt. Ex. 429.)

28

                                    17

Defendant has no criminal history, which is to his credit, but this has been taken into account in the Guidelines calculation.  (PSR ¶¶ 96-97.)

Defendant also has an advanced degree (in engineering) (PSR ¶ 136) and significant professional work experience, although much of that appears to be associated with businesses likely engaged in fraud. (PSR ¶¶ 75-92 & n.10-11, 141-42, 144 & n.12, 146 & n.13.)  He is currently unemployed.  In this respect, defendant is different from many defendants this Court sees (who have few options aside from crime) and had the opportunity to turn that education and experience into legitimate work.  He chose not to.

For all of these reasons, a high-end Guidelines range sentence of 63 months is reasonable.

### C.   A 63-Month Sentence Is Reasonable Because It Reflects the Seriousness of the Offense, Promotes Respect for the Law, and Provides a Just Punishment

As discussed above, there is no question that defendant's offenses and relevant conduct are serious because of the impact they had on Medicare and Medicare beneficiaries.

Moreover, defendant's conduct evidences his lack of respect for the law.  Defendant recruited patients and turned them into a commodity for the Sunset Clinic and the other providers it supplied with referrals.  This is not defendant's first foray into fraud and crime.  This is not the only time he has partnered with co-defendant Smith to commit fraud.  He has cheated Medicare and participated in the money laundering networks that make that fraud possible.  When applying for citizenship to this country, signing that application under penalty of perjury, he lied about his connection to the Sunset

Clinic, attempting to conceal that fraud and gain citizenship through deceit.  (PSR ¶ 45.)

For these reasons, as well, a 63-month sentence is necessary.

**D.    A 63-Month Sentence Is Reasonable Because It Protects the Public from Defendant's Crime and Affords Adequate Deterrence**

As noted above, defendant's conduct exposed Medicare to significant losses.  In a time of skyrocketing health costs, the costs of fraud are an unnecessary strain on an already overworked program, jeopardizing the continued ability of that program to provide health care to those most in need.  Defendant's conduct also exposed Medicare beneficiaries to further unauthorized use of their personal information by similarly inclined fraudsters.  A significant sentence is warranted to protect the public from defendant, particularly given that defendant does not appear inclined to stop engaging in the fraud that has been his bread-and-butter for many years now.  Defendant's current substance abuse (PSR ¶ 132) also suggests he is unstable and could present a further danger to the public; the best place to address these issues is in custody.

Moreover, the need to deter others like defendant strongly justifies a substantial custodial sentence here.  Health care fraud costs Medicare billions of dollars nationwide and hundreds of millions of dollars in Los Angeles alone.  Deterrence is even more significant in cases like this one.  The government regularly sees fraudulent clinics that seem to be in the business of generating medically unnecessary prescriptions and orders; when Medicare flags one for fraud, the individuals simply open up another clinic, leaving Medicare unaware that the same individuals are often working behind the scenes.  Here, defendant and his co-schemer bounced from clinic

to clinic, continuing the scheme at each and racking up the
fraudulent billing.  Defendant's peers and the public, in general,
must not be left with the impression that defendant's conduct is
acceptable, legal, or without serious consequences.

For these reasons, the government believes that a sentence of 63
months' imprisonment is necessary to protect the public and deter
other individuals from taking advantage of Medicare.

### E.   A 63-Month Sentence Is Reasonable Because It Does Not Create Unwarranted Sentencing Disparities

A sentence within the Sentencing Guidelines range may be the
best way to satisfy this factor.  See United States v. Mares, 402
F.3d 511, 518-519 (5th Cir. 2005).  The government's recommendation
is within the Guideline range, and so is commensurate with what
others in defendant's position would receive.

In addition, this sentence is consistent with other sentences of
owners and managers of Medicare providers (clinics and durable
medical equipment ("DME") suppliers) in this District.  For example,
defendant Susanna Artsruni received a 76-month custodial sentence in
the related case, United States v. Artsruni, et al., CR 13-00052-PSG,
based on her convictions for health care fraud and money laundering
in connection with Mid Valley Medical Supply, the DME supplier she
owned and enrolled as a Medicare provider, and with her work as an
office manager at two other fraudulent clinics, the Vermont and
Rampart Clinics referenced in the First Superseding Indictment in
this case.  (Mid Valley and the two fraudulent clinics also deposited
funds with companies owned and operated by co-defendants Hakobyan and
Aramyan.)  While that sentence was based partly on some aggravating
factors not present here – including more than $25,000,000 in losses,

20

1    many of which were related to referrals out of the Vermont and

2    Rampart Clinics she managed, and conduct occurring while she was on

3    pretrial release related to separate health care fraud charges – the

4    government's recommendation here is also lower than that sentence and

5    so takes some of those differences into account.  Additionally,

6    Artsruni's sentence demonstrates the need for a significant custodial

7    sentence for someone who, like defendant, did a considerable amount

8    of damage to Medicare through her work managing a clinic that

9    committed its own fraud and also led to a large volume of fraudulent

10   referrals.

11          The government's 63-month sentencing recommendation for

12   defendant is also consistent with the sentences received by co-

13   defendants Hakobyan (57 months) and Aramyan (51 months) in this case,

14   both of whom pled guilty to money laundering conspiracy and tax

15   charges (and thus qualified for acceptance of responsibility), but

16   were not charged with health care fraud.  It also is consistent with

17   the sentence received by co-defendant Smith (57 months).  Smith pled

18   guilty (and thus qualified for acceptance of responsibility) and is a

19   licensed medical professional (and thus subject to an abuse of

20   position of trust enhancement) but was not charged with money

21   laundering.

22          Nor, as pointed out in the PSR, does Smith appear to be the

23   financial beneficiary of the scheme other than being paid her regular

24   wages — as compared to defendant who directed significant amounts of

25   the Sunset Clinic's Medicare reimbursements ($248,000) to himself

26   through various laundering entities.  (PSR ¶¶ 44, 48-52, 69 & n.8.)

27   Thus, it is appropriate that defendant, the mastermind and chief

28   financial beneficiary of the Sunset Clinic scheme, receive a

21

custodial sentence that is greater than that of his co-schemer,

Smith.

**VI.   CONCLUSION**

For the foregoing reasons, the government agrees with the PSR's calculation of an offense level of 24, arriving at that offense level through a different calculation, but objects to the USPO's recommendation of a 57-month sentence.  The government argues, consistent with the position taken at defendant's initial sentencing

///

///

///

1   hearing, that a 63-month sentence is appropriate and warranted here,

2   followed by a three-year term of supervised release, special

3   assessments of $1,200, and restitution in the amount of $451,499.

4    Dated: October 24, 2021            Respectfully submitted,

                                        TRACY L. WILKISON
                                        Acting United States Attorney

                                        SCOTT M. GARRINGER
                                        Assistant United States Attorney
                                        Chief, Criminal Division


                                              */s/*
                                        _____
                                        RACHEL N. AGRESS
                                        ANDREW M. ROACH
                                        BYRON R. TUYAY
                                        Assistant United States Attorneys

                                        Attorneys for Plaintiff
                                        UNITED STATES OF AMERICA